PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY  10017
Telephone: 212/561-7700
Facsimile:  212/561-7777
Jeffrey N. Pomerantz
Robert J. Feinstein
Bradford J. Sandler

Counsel for HP Inc.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>HANJIN SHIPPING CO. LTD.,<br><br>　　　　　　Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 16-27041 (JKS)<br><br>Hearing Date: September 6, 2016<br>Hearing Time: 2:00 p.m.<br>Courtroom:     3D |

**HP INC.'S RESPONSE TO MOTION OF FOREIGN REPRESENTATIVE FOR ENTRY OF PROVISIONAL AND FINAL ORDERS GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDING AND CERTAIN RELATED RELIEF PURSUANT TO SECTIONS 362, 365, 1517, 1519, 1520, 1521, AND 105(A) OF THE BANKRUPTCY CODE**

TO THE HONORABLE JOHN K. SHERWOOD,
UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY:

HP Inc., formerly known as Hewlett Packard Company ("**HP**") files this response to the

*Motion of Foreign Representative for Entry of Provisional and Final Orders Granting*

*Recognition of Foreign Main Proceeding and Certain Related Relief Pursuant to Sections 362,*

*365, 1517, 1519, 1520, and 105(A) of the Bankruptcy Code* [Docket No. 5] (the "**Motion**") and

in support thereof, respectfully represents as follows:

**Preliminary Statement**

1.　　HP supports the relief requested by the foreign representative set forth in

the Motion as it is clear that a collective forum to deal with the Foreign Debtor's financial

distress is needed. At the same time, however, the Court should condition such relief by addressing immediately the rights of HP, and dozens of other "Beneficial Cargo Owners," *i.e.*, those who are designated as the importer of record taking possession of cargo at destination, whose property is in containers on the Foreign Debtor's ships. Failure to turn over such property to HP and other Beneficial Cargo Owners will cause such parties irreparable harm. As the automatic stay would not apply to HP's products, the Court should direct that such property be turned over and released to HP or its representatives. To facilitate expedited transport of HP's products and mitigate the ongoing harm to HP from the disruption in shipments of its products by the Foreign Debtor occasioned by its bankruptcy filings, HP has outlined below a proposed protocol to address the cost and logistics of expedited retrieval of its products from the Foreign Debtor's container ships, including those waiting to dock in Long Beach, California and Seattle, Washington.

## Background

2. HP hired the Foreign Debtor as its shipping provider. HP pays the Foreign Debtor a point-to-point fee for shipment of HP's products. The Foreign Debtor transports HP's products from factories in China to destinations throughout the world, including numerous ports and other locations in the United States.

3. The Foreign Debtor uses ships, railroads, and trucks to move and transfer HP's products. The ships are either owned or chartered by the Foreign Debtor or the Foreign Debtor procures shipment space for the containers containing HP's products from other shippers.

4. The products in the containers are owned by HP, its factories, and its customers (depending on the point of transit – ownership transfers en route in some cases). HP is responsible for the shipment of the products on behalf of these entities or otherwise has products in the containers for which it has delivery obligations to customers.

5. On a world-wide basis, HP has its products in over 500 containers in the possession or control of the Foreign Debtor. Approximately 314 of these containers are shipping within the Americas and 142 of these containers are destined for or are in transit to the United States.

6. The value of HP's products in the Foreign Debtor's possession or control is in the tens of millions of dollars, and the ongoing disruption to HP's supply chain caused by the Foreign Debtor's bankruptcy filings is material, costly, and worsening on a daily basis. For example, if HP does not meet its delivery obligations, its customers, including local, state and U.S. federal government agencies, can cancel purchase orders or their contract with HP. In some cases, HP may be required to pay up to $100 per day in liquidated damages until delivery is complete, or suffer deductions to its invoices (e.g., 5% per week from the total invoice).

7. Similarly, HP's customers, and their customers, will also suffer substantial losses. Without a prompt resolution to the shipping standstill, national and international commerce, inclusive of local, state, and federal agencies that are customers of HP, will be adversely affected given the sheer quantity of goods and other products on the vessels controlled by the Foreign Debtor. For example, the products in the containers include printing supplies that customers need to continue printing and operating their business, especially when stock on hand

is subject to rapid depletion. The products also include consumer personal computers that are the latest in computing technology. Delays can result in the next release of computers rendering these devices less competitive in the market and causing HP to lose sales. The containers include component parts necessary to complete the assembly or repair of HP products and place them in the supply chain. The components are used for custom PCs, consumer PCs, and retailers who each depend on HP to deliver the merchandise in a timely manner, which is crucial during the current back-to-school season. Also, certain of the products are the subject of current HP promotions. The failure to have sufficient supply on hand in the stores during these promotion will cause significant risk of loss to HP in revenue and reputation.

8. The market for HP's products is extremely competitive. Failure to place these products on shelves in a timely manner will likely result in loss of market share, difficulty meeting supply for current consumer promotional campaigns which have cost HP to implement, and loss of sales which cannot be recouped.

9. Accordingly, HP faces the prospect of loss of customers, business reputation, market share and other irreparable harm. This is especially the case because the potential for any recovery of damages from the Foreign Debtor, who is currently insolvent, may be remote at best.

10. Under its contracts with the Foreign Debtor and in these circumstances, HP has the right to divert or otherwise exercise control over the containers containing its products, in part as mitigation to its damages. Additionally, it is undisputed that either HP or its customers, and not the Foreign Debtor, owns the goods contained in containers aboard the

Foreign Debtor's vessels or otherwise in transit. Prior to and after the commencement of the Foreign Debtor's chapter 15 case, HP, its counsel, and other advisors have been continuously working cooperatively with the Foreign Debtor, its professionals, and other representatives to address how to turnover and release HP's captive products currently located at various ports in the United States and around the world in an attempt to avoid the accumulation of disruptions to the businesses of HP and its many customers affected by the circumstances.

11. Finally, the practicalities of the situation require not only HP's cooperation, but that of port and other service providers, other Beneficial Cargo Owners and customs agents. In order for HP to retrieve its goods, the containers of multiple other parties on the same ship may need to be moved from the ships to the docks and otherwise.

12. HP believes the cooperation from the Foreign Debtor is essential to avoid any further losses to HP, claims against the Foreign Debtor, and to prevent the substantial injuries that will result to the hundreds, if not thousands, of businesses in the national and international stream of commerce expecting to receive timely shipment of the products they have purchased from HP.

13. Further, HP believes that the implementation of a coordinated effort and scheme designed by this Court and the Foreign Debtor is necessary for the timely delivery of goods, considering the multitude of parties involved, both as service providers to deliver the goods and as Foreign Debtor's customers, to whom delivery is required.

**The Proposed Turnover Protocol**

14.     HP respectfully requests that any order granting the requested relief and extending the automatic stay of section 362 of the Bankruptcy Code to the Foreign Debtor's chapter 15 case (i) recognize the right of HP (and other Beneficial Cargo Owners) to the ownership of their goods trapped in containers in the Foreign Debtor's awaiting shipment to their rightful owners and (ii) in furtherance of that right, either immediately provide assurances and proof that it has sufficient funds to pay for necessary services to deliver good to HP and other similarly situated parties, or incorporate the following protocol, which is will stabilize the Foreign Debtor's United States shipping operations, the turnover and release of HP's products in the Foreign Debtor's possession or control, and the payment for the Foreign Debtor's services.

15.     The protocol below would be implemented by the Foreign Debtor and HP upon entry of the Court's order granting the Motion:

- HP will promptly deposit funds into a trust account controlled by the Foreign Debtor's United States bankruptcy counsel in an estimated amount equal to the Foreign Debtor's entitlement for delivery of goods which the Foreign Debtor is able to either deliver to final destination or remit to HP's possession and control so that Foreign Debtor may complete its contractual obligations with HP (*i.e.*, delivery and turnover of HP's products at the final destination or turnover of HP's products to HP).

- Ports or other points of entry where the Foreign Debtor's shipments are received would have a lien on the amounts deposited into the trust account for any fees and costs associated with the delivery and receipt of HP's products (and not the products of any other customers of the Foreign Debtor) but only to the extent the Foreign Debtor does not otherwise pay for such fees and costs.

- Like the ports and other points of entry, stevedores would have a lien on the trust account for any costs and fees of their services relating solely to shipment of HP's products. HP understands that various parties help facilitate the Foreign Debtor's shipment of HP's products, which include

- tugboat operators, berth/terminal operators, ship pilots, railroad yards and personnel.

- Any remaining common fees or costs allocable to the shipment of HP's products (inclusive of the fees payable to the Foreign Debtor per the terms of the applicable contract to the extent not already paid per one of the items above) would be paid from the funds deposited in the trust account.

- When HP's products reach their final destination or are delivered to HP's possession and control, HP will assume responsibility for any further transportation to their ultimate destination.

- To the extent necessary, a procedure could be established for creditors to obtain payment from the trust account.

- The Foreign Debtor would be required to continue its cooperation with HP to allow deliveries to HP.

- HP would reserve its rights for claims and damages against the Foreign Debtor.

16. HP has already experienced substantial losses as a result of the Foreign Debtor's bankruptcy case and the suspension of the Foreign Debtor's services to HP. While the Foreign Debtor continues to work with HP, it is HP's view that its mounting losses require immediate action by the Foreign Debtor and that the Court should direct the Foreign Debtor to implement the protocol to ensure there is no further delay in the transport and delivery of HP's products if the Foreign Debtor cannot otherwise address this critical situation immediately. Given the international state of affairs of the Foreign Debtor, HP believes will an order from the Court is required to help the Foreign Debtor implement these arrangements and also ensure the cooperation of third-parties who work with the Foreign Debtor in the shipment and transport of the products.

17. While HP recognizes the complexity and enormity of the Foreign Debtor's international bankruptcy, it nevertheless believes that the implementation of a turnover protocol

should be paramount because the automatic stay cannot be used to protect property that is not property of a debtor's estate. *In re D.H. Overmyer Telecasting Co., Inc.*, 35 B.R. 400, 401 (Bankr. N.D. Ohio 1983) (holding that the automatic stay does not protect property that is not property of the estate). Here, there is no dispute that the Foreign Debtor's mere possession or control of HP's products, which in certain cases are owned by HP's customers, does not makes them subject to the automatic stay. As a result, the Foreign Debtor should, in connection with relief from the Court, seek to immediately implement the turnover of property that the automatic stay does not protect nor was it meant to protect. HP submits that any further delay in the turnover of its product will only increase HP's losses and subject the Foreign Debtor's estate to substantial claims that could otherwise be avoided.

18. Entry of a protocol by this Court will advance the Foreign Debtor's prospects for a reorganization, as it will mitigate customer losses and promote timely and efficient movement of goods.

19. Between the filing of this response and the hearing on the Motion, HP will continue to work with the Foreign Debtor, its bankruptcy counsel, and other representatives to explore the bests to stabilize and turnover the HP's property.

**<u>Notice</u>**

20. HP has served this Response on: (i) the Office of the United States Trustee; (ii) counsel to the Foreign Representative, and (iii) those parties that have requested notice in this case.

**Conclusion**

21. HP respectfully requests that the Court grant the Motion but subject to or incorporating the protocol discussed herein, and such other and further relief as may be just and proper.

Dated: September 5, 2016
      New York, New York

                PACHULSKI STANG ZIEHL & JONES LLP

                /s/ *Bradford J. Sandler*
                Jeffrey N. Pomerantz
                Robert J. Feinstein
                Bradford J. Sandler
                780 Third Avenue, 34th Floor
                New York, NY 10017
                Tel: (212) 561-7700
                Fax: (212) 561-7777
                Email: jpomerantz@pszjlaw.com
                          rfeinstein@pszjlaw.com
                          bsandler@pszjlaw.com

                *Counsel for HP Inc.*