**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
David A. Van Grouw, Esq.
Philip J. Gross, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400
E-mail: krosen@lowenstein.com
          dvangrouw@lowenstein.com
          pgross@lowenstein.com

*Counsel to Maher Terminals LLC*

**VEDDER PRICE P.C.**
John E. Bradley, Esq.
1633 Broadway
New York, New York 10019
Tel: (212) 407-6940
E-mail: jbradley@vedderprice.com

*Special Maritime Counsel to
Maher Terminals LLC*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>HANJIN SHIPPING CO., LTD.,[1]<br><br>Debtor in a Foreign Proceeding. | Case No. 16-27041 (JKS)<br><br>Chapter 15<br><br>**Hearing Date: September 9, 2016 at 10:00 a.m.** |

**PRELIMINARY OBJECTION OF MAHER TERMINALS LLC TO THE INTERIM
PROVISIONAL ORDER GRANTING RECOGNITION OF FOREIGN MAIN
PROCEEDING AND CERTAIN RELATED RELIEF**

TO: THE HONORABLE JOHN K. SHERWOOD,
    UNITED STATES BANKRUPTCY JUDGE

Maher Terminals LLC ("Maher"), by and through its undersigned counsel, submits this preliminary objection (the "Objection") to certain of the interim relief set forth in the *Interim Provisional Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief Pursuant to Sections 362, 365, 1517, 1519, 1520, 1521, and 105(A) of the Bankruptcy Code* [Docket No. 22] (the "Interim Order") and otherwise sought in the *Motion of*

---

[1] The last four digits of Hanjin Shipping Co., Ltd.'s Business Registration Number are 1835. The Debtor's main corporate and mailing address is Hanjin Shipping Bldg., 25 Gukjegeumyung-Ro 2-Gil, Yeongdeungpo-Gu, Seoul 07327, Korea.

*Foreign Representative for Entry of Provisional and Final Orders Granting Recognition of Foreign Main Proceeding and Certain Related Relief Pursuant to Sections 362, 365, 1517, 1519, 1520, and 105(A) of the Bankruptcy Code* [Docket No. 5] (the "Motion") filed by Hanjin Shipping Co., Ltd. ("Hanjin" or the "Debtor"). In support of this Objection, Maher respectfully states as follows:[2]

## PRELIMINARY STATEMENT AND RELEVANT FACTS

1. Maher recognizes Hanjin's need for an orderly proceeding to (i) deal with the multitude of issues and claims facing the Debtor in the United States and elsewhere; and (ii) preserve the *status quo* while the Court and parties-in-interest, including Maher, try to determine an appropriate path forward consistent with Chapter 15.

2. That path forward, however, cannot come at the expense and to the detriment of innocent third parties like Maher, one of the largest multi-user container terminal operators in North America. Maher operates a marine container terminal facility (the "Terminal") in Port Elizabeth (part of the Port of New York and New Jersey) and serves as a vital link in the container cargo movement chain, helping its customers effectively compete in the global marketplace by handling their cargo as expeditiously and economically as possible.

3. Part of making sure Maher can effectively and expeditiously move cargo containers and keep the stream of commerce moving – particularly in the critical pre-holiday shipping season that already has begun – is the ability for Maher (i) to release import containers to truck drivers or railway carriers; and (ii) to accept export containers and/or return empty containers to outgoing ships. Maher's Terminal only has finite storage space, and chaos ensues if truckers or rail carriers are unable to retrieve containers that they have been contracted for delivery either to a warehouse facility or to the ultimate owner of the goods in the container.

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion or Interim Order.

Maher's inability to timely release containers causes a severe backlog and limits the space available within the Terminal to offload containers from ships arriving into the port.[3]

4. Maher is a stevedore and marine terminal operator which provides vessel loading and unloading services and related cargo receipt, delivery and handling services for and on behalf of containerized cargoes arriving at the Terminal. Prior to Hanjin's worldwide cessation of transportation services, Maher provided such services for and on behalf of containerized cargoes brought to the Terminal under Hanjin bills of lading and transported aboard ships that were owned or time-chartered by Hanjin or owned or chartered by Hanjin's various alliance partners, including Evergreen, COSCO, Yang Ming, and "K" Line. Hanjin currently owes millions of dollars to Maher in respect of such services and, Maher, in turn, possesses an *in personam* claim against Hanjin therefor, as well as a maritime lien enforceable *in rem* against each of the ships to which such services were provided (including ships that are not owned by Hanjin).

5. In the ordinary course of business, stevedores and terminal operators such as Maher incur terminal handling charges (collectively, "Terminal Charges") related to containers (such as Hanjin containers) that (i) arrive on Hanjin and/or non-Hanjin ships, (ii) are removed from the ships, placed onto terminals, and then brought to the terminal gate for release to a trucking company or railway; or (iii) are brought back from trains or trucks to the terminal

---

[3] Indeed, many articles over the past few days have indicated the impending crisis caused by stranded goods sitting in Hanjin containers due to Hanjin's failure to pay its obligations to terminal operators and common carriers, among others. *See, e.g..*, Retailers Seek U.S. Help With Shipping Crisis, Wall Street Journal (Sept. 1, 2016), *available at* http://www.wsj.com/articles/hyundai-ships-take-cargo-delayed-by-rival-hanjins-bankruptcy-protection-filing-1472747412 (noting that "terminal operators, ports, cargo handlers, truckers and others have refused to handle its cargo, for fear they won't get paid. That is causing turmoil at U.S. ports and beyond, said shippers, importers and freight forwarders."); *see also* Letter from Members of the Congressional PORTS Caucus to Secretary of the U.S. Department of Commerce (Sept. 6, 2016), *available at*
http://hahn.house.gov/sites/hahn.house.gov/files/Letter%20to%20Secretary%20of%20Commerce%20RE%20Hanjin.pdf (noting concern of making sure ports and other workers/operators dealing with Hanjin have assurance of being paid)*.*

facility for placement onto a ship. Typically, the containers contain cargo and goods owned by third parties known as beneficial cargo owners ("BCOs"; *i.e.* the people for whose benefit the goods in the containers are being shipped). The BCOs pay Hanjin for all shipping (known as "ocean freight rate") and Terminal Charges, and then Hanjin is invoiced and pays back the terminal facility (*i.e.* Maher) for any Terminal Charges serving essentially as a "go between" in that regard.

6.     Prior to the date that Hanjin commenced its chapter 15 proceeding, Maher was owed millions of dollars in unpaid charges incurred by Hanjin for Terminal Charges and other charges related, in part, to services rendered with respect to Hanjin containers. In additional to its maritime liens against the ships for which services were performed, Maher holds automatically perfected liens by operation of state, federal, maritime and/or other applicable law and published tarrifs against cargoes and Hanjin containers sitting in Maher's Terminal facility to the extent of any unpaid Hanjin charges. However, Maher has released certain Hanjin containers to the extent other parties have been willing to pay the Terminal Charges owed to Maher. Nonetheless, Maher is still owed millions of dollars for services it performed for the benefit of its customer, Hanjin, despite the fact that Hanjin presumably received payment from the BCOs for these Terminal Charges.

7.     Terminal operators such as Maher have the right to require third party BCOs, who obviously want to receive their goods inside the Hanjin containers, to cover certain Terminal Charges owed by Hanjin, at which point, in the ordinary course, Maher releases the container after receipt of payment from the BCO.

8.     The Court made clear at the initial hearing on the Motion that the goal of the interim, provisional relief granted in the Interim Order is to preserve the *status quo* and all parties-in-interest's substantive rights.

9.     Notwithstanding these statements by the Court, Maher respectfully submits that the Interim Order is prejudicial to Hanjin's counterparties by:

- failing to protect Maher's pre-existing and future lien rights with respect to Hanjin containers remaining in Maher's facilities (*see* Interim Order, at ¶ 4(c));

- unduly providing Hanjin's Foreign Representative veto power (*see* Interim Order, at ¶ 4(d)) in connection with the release of Hanjin containers where BCOs are willing to pay the Terminal Charges owed by Hanjin to have their cargo released, and thereby impeding ordinary course business transactions and commerce generally to the detriment of Maher, others and Hanjin itself;

- failing to adequately protect the interests of Maher and others to ensure payment for services rendered and to be rendered; and

- ostensibly prohibiting the arrest or attachment of Hanjin vessels outside the territorial jurisdiction of the United States, the arrest of non-Hanjin vessels within or without the United States, and protecting Hanjin vessels from seizure within the United States without providing adequate protection to U.S. suppliers such as Maher that hold valid maritime liens enforceable *in rem* (*see* Interim Order, at ¶¶ 4(c) and 4(g)).

10. These serious concerns are not theoretical. Maher currently has approximately 500 Hanjin import containers in its terminal facility that have been discharged from ships and for which Hanjin has not paid any of the Terminal Charges. Further, there are an additional approximately 600 Hanjin containers expected to arrive in port imminently (these containers are arriving on other non-Hanjin vessels).

11. Each of these containers (whether delivered pre-petition or post-petition) will require post-petition services to deliver such containers to railways or trucking companies that will deliver the container containing the goods to their final destination. Yet, based on the language in the Interim Order, if the Foreign Representative refuses or fails to respond to a request for the release of the Hanjin containers, such containers cannot be transferred for the benefit of the BCOs – even if the Terminal Charges are paid by agreement between the BCOs and terminal operators such as Maher.

12. Maher also understands that it has no assurance that Hanjin will pay for the post-petition Terminal Charges based upon services that will be rendered in order to move inbound

and outbound Hanjin containers, and Hanjin has no apparent financing source to guarantee recoveries to creditors that may be forced to provide services for Hanjin's benefit.

13. In addition, and although Maher understands the need for relief requested by the Foreign Representative, such relief materially interferes with valuable and unique maritime lien rights that Maher now possesses against Hanjin vessels and non-Hanjin vessels to which stevedoring and marine terminal services were performed.

14. In sum, the Interim Order does not adequately protect the interests of creditors such as Maher, and therefore does not satisfy section 1522(a) of the Bankruptcy Code. The Interim Order should therefore at the very least be modified in accordance with this Objection.

## **OBJECTION**

15. Judge Henry Friendly declared approximately 50 years ago that the conduct of bankruptcy proceedings not only should be right, but must seem right. *Knapp v. Seligson (In re Ira Haupt & Co.)*, 361 F.2d 164, 168 (2d Cir.1966). It strains credulity that an international shipping company with thousands of creditors and contract counterparties can expect broad relief from this Court, yet have no plan for how it will fund its ongoing costs of administration or provide for any assurance of payment for post-petition services. Maher is not required to extend free credit to Hanjin, and should not be forced to do so.

16. While the Court was understandably reluctant to deny the interim provisional relief at the initial hearing on the Motion, the Interim Order should be modified or clarified to fully protect the interests of creditors and parties-in-interest, including Maher, so as to truly maintain the *status quo*.

17. Section 1519 of the Bankruptcy Code permits the Court, from the time of the filing of the Chapter 15 petition until the final hearing on the petition, to grant provisional relief, including pursuant to sections 1521(a)(3) or 1521(a)(7) of the Bankruptcy Code. However, any such relief (and, indeed, any final relief granted pursuant to section 1521 of the Bankruptcy Code) must be consistent with section 1522(a) of the Bankruptcy Code, which allows the Court to grant relief under sections 1519 or 1521 of the Bankruptcy Code "<u>only if the interests of the</u>

<u>creditors</u> and other interested entities, including the debtor, <u>are sufficiently protected</u>." 11 U.S.C. § 1522(a) (emphasis added).

18.  Thus, simply because Chapter 15 theoretically authorizes relief does not mean that relief may be granted without sufficient protection to creditors. *Cf. Jaffe v. Samsung Elec. Co. Ltd.* (*In re Qimonda AG)*, 737 F.3d 14, 27-29 (4th Cir. 2013) (after describing the balancing test pursuant to 11 U.S.C. § 1522 as mandatory, the Fourth Circuit upheld conditioning the recognition relief on declining to permit a foreign representative to use German law that would have eviscerated certain protections granted to United States intellectual property holders).

19.  For the reasons set forth above and below, the interest of creditors such as Maher are not sufficiently protected based on the current language in the Interim Order.

A.  **Maher's Lien Rights Are Improperly Impaired Pursuant to Paragraph 4(c) of the Interim Order**

20.  First, as noted above, Maher is the beneficiary of liens that arise automatically by operation of state, federal, maritime and/or other applicable law.  Maher has pre-existing liens on Hanjin containers that arrived in Maher's terminal facility pre-petition, and potential future liens for future Hanjin containers that Maher expects to offload in the immediate short term at Maher's terminal facility.

21.  Despite statements on the record at the initial hearing that nothing in the Interim Order was meant to impair or impact such lien rights, paragraph 4(c) of the Interim Order, which provides that all entities are enjoined from "taking or continuing any act to create, perfect, or enforce a lien or other security interest . . . against the Foreign Representative . . . Hanjin or any of the Hanjin's assets[]", does just that to the extent that it improperly enjoins the enforcement or the maintenance of validly held liens against Hanjin arising under state and/or federal law.

22.  Given the significant risk Maher continues to face due to the lack of any source, let alone guarantee, of future payment and/or future contractual performance by Hanjin, other than moving for adequate assurance from this Court and/or seeking the granting of a security or a bond (*see* 11 U.S.C. § 1522(b)), Maher must be able to (i) maintain and assert liens that arise

automatically by operation of state, federal, maritime and/or other applicable law; and (ii) and continue to exercise its lien rights on a go-forward basis. Paragraph 4(c) of the Interim Order unfairly (and with potential significant harm to Maher) alters those lien rights.

23. Instead, a broad carve out provision should be added to the Interim Order to make clear that the Interim Order does not impair or impact lien rights that arise automatically by operation of state, federal, maritime and/or other applicable law (whether such lien rights exist as of the petition date or by virtue of services rendered by Maher or others on a post-petition basis), and to the extent such lien rights are impaired, adequate protection must be provided.

**B.     Paragraph 4(d) of the Interim Order Gives Hanjin's Foreign Representative Unfair Veto Power Over the Release of Containers**

24. As discussed extensively at the initial hearing on the Motion, prior to the petition date, Hanjin approved of requests to release certain of its containers to the extent BCOs were willing to pay the Terminal Charges owed to Maher. This allowed the flow of goods in the stream of commerce without interruption. While the parties worked during the course of the initial hearing to arrive at a protocol to allow what had become ordinary course of business pre-petition to continue post-petition, Hanjin ultimately indicated it lacked authority from a Hanjin decision maker to authorize such a protocol. We are now several days later, and yet no such protocol has been put in place to allow the necessary movements of containers once Maher has been paid for its services.

25. It makes no sense for the Foreign Representative (or Hanjin for that matter) to be able to hold veto power over the stream of commerce resulting from the containers being released, particularly where the Terminal Charges with respect to containers have been paid or will be paid by BCOs or other third parties. Yet, paragraph 4(d) effectively freezes all property of Hanjin and prevents any movement of Hanjin containers – even though the contents of such containers are loaded with third party goods – unless the Foreign Representative consents to the property being transferred.

26. A qualifier to paragraph 4(d) allowing for ordinary course release of containers of Hanjin to the extent the BCOs agree to cover the Terminal Charges is therefore necessary to sufficiently protect creditors. Moreover, this provision would <u>not</u> harm Hanjin at all and will, in fact, help Hanjin avoid spiraling claims for damages. The continued imposition of the restriction on the transit of containers without the approval of the Foreign Representative (and without any reasonableness qualifier) would cause discrete and definitive harm to Maher and the BCOs (and others in the chain of commerce).

27. Maher is currently being victimized by having hundreds of Hanjin containers clogging up its facility and impeding the ability of Maher to properly service its other customers. Hanjin is not Maher's sole customer. The backflow and disruptions caused by the current situation involving Maher's ability to move and process Hanjin containers will have a disastrous effect on Maher's business given the impending holiday season and the expected influx of inbound containers in the near term. The trickle-down effect is obvious, as the bottlenecks at the ports will adversely affect retailers and other companies who are dependent on the timely receipt of goods in the containers. The language in paragraph 4(d) should be modified or struck entirely.

**C.    The Interim Order Fails to Adequately Protect Maher's Interests**

28. This Court is aware that in a typical Chapter 11 bankruptcy scenario, debtor-in-possession financing and/or use of cash collateral utilize is made available to ensure funding of post-petition expenses of administering the Debtor's estate. Such financing is tied to a budget that provides for payment to counterparties that render services during the Chapter 11 case.

29. Yet, with approximately 600 Hanjin containers expected to arrive on ships in a matter of days at Maher's terminal facility in the Port of Elizabeth, and with more to follow, Hanjin apparently expects Maher and other contract counterparties to provide services without any committed financing in place, and with no adequate security or assurance of payment.

30. The Interim Order and any final order in connection with the Motion should make explicit that while contracts cannot be terminated solely due to the Debtor's insolvency, nothing

in the Interim Order should be deemed to compel parties like Maher to continue to provide services without receiving payment or adequate assurance of such payment. Of course, the ability of BCOs to fund such payment would go a long way to resolve this problem.

**D.      The Interim Order Fails to Protect Maher's Maritime Lien Rights**

31.     Maher possesses a maritime lien enforceable *in rem* in respect of "necessaries" that it furnished to each of the vessels (whether owned by Hanjin or not) for which services were performed.

32.     The term "necessary" was defined at common law to include those items which a prudent ship owner or master would deem to be reasonably required to facilitate the use of a ship. *See Walker-Skageth Food Stores, Inc. v. The Bavonis*, 43 F. Supp. 109, 110 (S.D.N.Y. 1942); *Payne v. S.S. TROPIC BREEZE*, 423 F.2d 236, 240-1 (1st Cir.), *cert. denied*, 400 U.S. 964 (1970). The term has an expansive meaning which includes, among other things, stevedoring and related marine terminal services. *See Universal Shipping Inc. v. Panamerican Flag Barge*, 563 F.2d 483, 484 (1st Cir. 1976); *Pacorini USA, Inc. v. Rosina Topic MV*, 2005 U.S. App. LEXIS 4821 (5th Cir. 2005); *Bollinger Quick Repair, Inc. v. M/V GOLIATH*, 965 F.Supp. 1448 (D. Ore. 1996). Under the Commercial Instruments Act, the term "necessaries" is defined to include "repairs, supplies, towage, and use of a dry dock or marine railway." 46 U.S.C. § 31301(4).

33.     A person providing necessaries to a vessel on the order of the owner or other authorized person "(1) has a maritime lien on the vessel; (2) may bring a civil action *in rem* to enforce the lien; and (3) is not required to allege or prove in the action that credit was given to the vessel." 46 U.S.C § 31342(a). The maritime lien for necessaries perfects automatically upon the furnishing of goods or services. *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 12 (1920). The lien attaches to the vessel and, in addition, to any freights and sub-freights earned by the vessel during the voyage in which such supplies were furnished or

-10-

services performed. *Schirmer Stevedoring Co. Ltd. v. Seaboard Stevedoring Corp.,* 306 F.2d 188, 192 (9th Cir. 1962).

34. The Commercial Instruments Act imposes no requirement that the supplier of necessaries record or file notice of its maritime lien in order to perfect the lien against the vessel. Nor does the Commercial Instruments Act or the general maritime law require possession as a means of perfecting a maritime lien for necessaries. *The Nestor*, 18 Fed. Cas. 9, 13 (D. Me. 1831). Indeed, possession would be "utterly inconsistent" with the object of the supplies, which is to keep a vessel moving in commerce. *Id.*

35. The Interim Order is inconsistent with the territorial limitations of chapter 15 relief insofar as the injunction contained in paragraph 4(g), unlike the one contained in paragraph 4(c), is not confined to the "territorial jurisdiction of the United States." In addition, the injunction set forth in paragraph 4(g) would seemingly improperly extend the protections of the Bankruptcy Code to non-debtor entities and thereby protect vessels that are not owned by Hanjin from arrest or seizure – despite the active presence of maritime liens by U.S. suppliers such as Maher. Moreover, without some form of adequate protection offered by the Foreign Representative in Maher's favor, Maher may forever lose its unique and high priority maritime lien rights against any Hanjin vessel that is allowed to freely enter and leave U.S. territorial waters under cover of the automatic stay.

36. Accordingly, the language in paragraph 4(g) should be modified to ensure the protection of Maher's maritime liens, both with respect to Hanjin and non-Hanjin ships.

## **RESERVATION OF RIGHTS**

37. Maher reserves all of its rights to supplement this Objection and join in any and all other arguments raised in connection with the continued interim hearing on the Motion.

38. To the extent further interim relief is granted, Maher reserves the right to file additional objections and/or present evidence prior to or at any final hearing on the Motion.

**WHEREFORE**, Maher respectfully requests that the Court deny the Motion or condition any further interim provisional relief or final relief as set forth herein, and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  September 8, 2016

**LOWENSTEIN SANDLER LLP**

By: ___*/s/ Kenneth A. Rosen*___
Kenneth A. Rosen, Esq.
David A. Van Grouw, Esq.
Philip J. Gross, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400
E-mail: krosen@lowenstein.com
        dvangrouw@lowenstein.com
        pgross@lowenstein.com

*Counsel to Maher Terminals LLC*

-and-

**VEDDER PRICE P.C.**
John E. Bradley, Esq.
1633 Broadway
New York, New York 10019
Tel:  (212) 407-6940
E-mail:  jbradley@vedderprice.com

*Special Maritime Counsel to Maher Terminals LLC*