Steven J. Reed, Esq.
Attorney ID: 041141988
**GREGORY & REED LLC**
*Attorneys at Law*
2 Sylvan Way, Suite 303 West
Parsippany, New Jersey 07054
Tel:  (973) 898-1400
Fax: (973) 898-1403

Attorneys for World Fuel Services, Inc.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**HONORABLE JOHN K SHERWOOD**

|  |  |
|---|---|
| In re | **Chapter 15** |
|  | **CASE NO. 16-27041 (JKS)** |
| HANJIN SHIPPING CO., LTD., | |
|  | **DECLARATION OF STEVEN J. REED** |
| Debtor in a Foreign Proceeding | **IN SUPPORT OF LIMITED OBJECTION** |
|  | **OF WORLD FUEL SERVICES, INC.** |

I, Steven J. Reed, hereby declare as follows:

1.     I am an attorney licensed to practice before the courts in the State of New Jersey.
I am a principal member of Gregory & Reed, LLC, attorneys of record for World Fuel Services,
Inc.  I have personal knowledge of the matters stated herein and if called upon would testify
competently thereto.

2.     Attached hereto as Exhibit A is a true and correct copy of the Amended Verified
Complaint which World Fuel Services, Inc. filed on September 1, 2016 in the Central District of
California, with exhibits attached to the Amended Verified Complaint.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Dated:  September 8, 2016
       New York, New York

Respectfully submitted,


/s/ Steven J. Reed                    
Steven J. Reed, Esq.
Attorney I.D. 041141988
**GREGORY & REED, LLC**
*Attorneys at Law*
2 Sylvan Way, Suite 303 West
Parsippany, New Jersey 07054
Tel:  (973) 898-1400
Fax: (973) 898-1403

*Attorneys for World Fuel Services, Inc.*

# Exhibit A

Neil B. Klein, Bar No. 142734
neilk@mckassonklein.com
Maria del Rocio Ashby, Bar No. 206282
mrashby@mckassonklein.com
**McKASSON & KLEIN LLP**
2211 Michelson Drive, Suite 320
Irvine, California 92612
Telephone: (949) 724-0200
Facsimile:   (949) 724-0201

Attorneys for: Plaintiff World Fuel Services, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| WORLD FUEL SERVICES, INC., | ) Case No.:  2:16-cv-06584 |
| Plaintiff, | ) IN ADMIRALTY |
| vs. | ) **AMENDED VERIFIED COMPLAINT FOR ENFORCEMENT OF MARITIME LIEN *IN REM;* RULE C ARREST** |
| M/V HANJIN MONTEVIDEO, its freights, engines, apparel, appurtenances, and tackle, | ) **SUPP. ADMIRALTY RULE C** |
| Defendant *in rem.* | ) |

Plaintiff, WORLD FUEL SERVICES, INC., trading as WORLD FUEL SERVICES ("World Fuel"), hereby files its Amended Verified Complaint against Defendant M/V HANJIN MONTEVIDEO ("Vessel") *in rem*, and pleads as follows.

### Jurisdiction, Venue and Parties

1.  This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. This Complaint and the claims set forth also fall under this Court's Admiralty Jurisdiction pursuant to 28 U.S.C. Section 1333, and is brought under the provisions of Rule C of the Supplemental Rules for Admiralty or

-1-

1  Maritime Claims and Asset Forfeiture, Federal Rules of Civil Procedure and Local

2  Admiralty Rules ("Supplemental Admiralty Rules").

3      2. Venue lies within the Central District of California pursuant to the provisions

4  of 28 U.S.C. Section 1391(b) and Rules C and E of the Supplemental Admiralty

5  Rules, in the Vessel is or soon will be within this District.

6      3. World Fuel is a corporation engaged in the fueling (bunkering) of ocean-

7  going vessels, and provided bunkers and bunker services to the Vessel on or about

8  July 24th 2016 in Seattle, Washington.

9      4. The Vessel is an ocean-going vessel that, through its charterer/operator,

10  ordered bunkers from World Fuel for the Vessel on or about July 24th 2016.

11  **COUNT I**

12  **Maritime Lien Claims in Contract against Vessel**

13      5. Plaintiff realleges and incorporates herein each and every allegation

14  contained in Paragraphs 1 through 4, as though fully set forth herein.

15      6. Pursuant to a maritime contract between World Fuel and the Vessel's owners

16  and/or charterers, World Fuel provided $488,749.43 worth of bunkers and bunker

17  services to the Vessel on or about July 24th 2016 at Seattle, Washington. A copy of

18  the bunker order confirmation and invoice is attached hereto as Exhibit A.

19      7. World Fuel provided bunkers to the Vessel on the order of and to account of

20  the Vessel, Vessel's Owner(s), and the Vessel's charterer(s) and agent(s), pursuant

21  to order by the Vessel's Master and/or charter/operator Hanjin Shipping Co. Ltd.

22  ("Hanjin"), who had presumed authority to bind the Vessel.

23      8. World Fuel emailed confirmation of the order (Exhibit A) to Hanjin. The

24  confirmation specifically stated:

25          All sales are on the credit of the vessel. Buyer is presumed to
        have authority to bind the vessel with a maritime lien.

26          Disclaimer stamps placed by vessel on the bunker receipt will
        have no effect and do not waive the Seller's lien. This

27          confirmation is governed by and incorporates by reference
        Seller's general terms and conditions for marine fuel products

28

-2-

and related services in effect as of the date that this confirmation is issued.

These incorporated terms can be found at www.wsfcorp.com/Marine/index.jsp.

Alternatively, you may inform us is if you require a copy and same will be provided to you.

9. World Fuel's General Terms and Conditions (attached hereto as Exhibit B), governing the bunker sales to the Vessel, provide in pertinent part as follows:

7. PAYMENT: ... (b) Any individual bunker transaction not requiring cash in advance shall require credit approval by Seller's Credit Department in Miami, Florida. This approval, which will occur prior to Seller's transmittal to Buyer of a Confirmation, shall be construed as the binding act in a bunker transaction and it is agreed that contract formation has occurred in Florida.

(c) Past due amounts shall accrue interest at a rate equal to the lesser of 2.0 percent per month, or the maximum rate permitted by applicable law. All amounts more than 15 days past due shall incur an additional 5% administrative fee. All payments received from Buyer after an invoice is overdue shall first be applied to interest, legal collection costs and administrative fees incurred before they will be applied to the principal amounts on a subsequent delivery. Buyer may not designate application of funds to a newer invoice so long as there are any unpaid charges, interest, collection costs or administrative fees on a previous one. This shall not be construed, however, as preventing Seller's option to choose application of funds in instances where subsection (h) below shall apply. Any waiver by Seller of interest charges or administrative fees on a particular invoice shall not be construed as a waiver by Seller of its right to impose such charges on subsequent deliveries.
...

8. CREDIT AND SECURITY; ADEQUATE ASSURANCE: (a) Products supplied in each Transaction are sold and effected on the credit of the Receiving Vessel, as well as on the promise of the Buyer to pay, and it is agreed and the Buyer warrants that the Seller will have and may assert a maritime lien against the Receiving Vessel for the amount due for the Products delivered. This maritime lien shall extend to the vessel's freight payments for that particular voyage during which the bunkers were supplied and to freights on all subsequent voyages. Disclaimer of lien

AMENDED VERIFIED COMPLAINT FOR ENFORCEMENT OF MARITIME LIEN *In rem*; RULE C ARREST

stamps placed on a Bunker Delivery Receipt shall have no effect towards the waiver of such lien.

…

(c) If the purchase of Products is contracted for by an agent, then such agent, as well as the principal, shall be bound by and be fully liable for obligations of the Buyer in the Transaction.

(d) All sales made under these terms and conditions are made to the registered owner of the vessel, in addition to any other parties that may be listed as Buyer in the confirmation. Any bunkers ordered by an agent, management company, charterer, broker or any other party are ordered on behalf of the registered owner of the Receiving Vessel and such registered owner is fully liable as a principal for payment of the bunker invoice.

…

18. LAW, VENUE AND JURISDICTION; WAIVER OF JURY TRIAL: The General Terms and each Transaction shall be governed by the General Maritime Law of the United States of America and, in the event that such laws are silent on the disputed issue, the laws of the State of Florida, without reference to any conflict of laws rules which may result in the application of the laws of another jurisdiction. The General Maritime Law and the applicable federal laws of the United States of America shall apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Any disputes concerning quality or quantity shall only be resolved in a court of competent jurisdiction in Miami-Dade County, Florida. Disputes over payment and collection may be resolved, at Seller's option, in Miami-Dade, Florida state or federal courts or in the courts of any jurisdiction where either the Receiving Vessel or an asset of Buyer may be found. Each of the parties hereby irrevocably submits to the jurisdiction of any such court, and irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum or its foreign equivalent to the maintenance of any action in any such court. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any country where it finds the vessel. BUYER AND SELLER WAIVE ANY RIGHT EITHER OF THEM MIGHT HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING FROM OR RELATED TO THE GENERAL TERMS OR ANY TRANSACTION.

AMENDED VERIFIED COMPLAINT FOR ENFORCEMENT OF MARITIME LIEN *IN REM*; RULE C ARREST

10.    The Vessel failed to pay World Fuel for such bunkers and related bunker services, and is therefore in default of its obligations to pay World Fuel.

11.    World Fuel possesses a maritime lien for the supply of necessaries to the Vessel pursuant to the Federal Maritime Lien Act, 46 U.S.C. Section 31342(a) in the amount of the bunkers and bunker services provided, plus all contractual interest and costs, as set out below.

## DEMAND FOR JUDGMENT

WHEREFORE, World Fuel respectfully demands judgment and prays as follows:

A. That this Court issue a warrant of arrest pursuant to Supplemental Admiralty Rule C for arrest of the Vessel;

B. That the Vessel, its engines, tackle, freights, and apparel be arrested pursuant to Supplemental Admiralty Rule C;

C. That this Court enter judgment in favor of World Fuel, and against the Vessel, in the principal sum of $488,749.43, plus contractual interest and costs, fees and costs; and

D. That this Court award World Fuel such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: September 1, 2016

/s/ Neil B. Klein
Neil B. Klein
Maria del Rocio Ashby
**MCKASSON & KLEIN LLP**
Attorneys for World Fuel Services, Inc.

AMENDED VERIFIED COMPLAINT FOR ENFORCEMENT OF MARITIME LIEN *IN REM*; RULE C ARREST

1

## VERIFICATION

2

3        I am a member of the law firm McKasson & Klein LLP, counsel to Plaintiff

4    WORLD FUEL SERVICES, INC., trading as WORLD FUEL SERVICES. The facts

5    alleged in the foregoing Amended Verified Complaint are true and correct to the

6    best of my knowledge and information, based upon the records of Plaintiff made

7    available to me by Plaintiff.  Authorized officers of Plaintiff are not readily available

8
9    in this District to make verification on Plaintiff's behalf. I am authorized to make this

10   verification on Plaintiffs' behalf.

11       Pursuant to 28 U.S.C. § 1746, I solemnly declare under penalty of perjury

12   that the foregoing is true and correct.

13       Executed on September 1, 2016.

14
                                McKASSON & KLEIN LLP
15
16                              /s/ Neil B. Klein
                                Neil B. Klein
17

18

19

20

21

22

23

24

25

26

27

28

AMENDED VERIFIED COMPLAINT FOR ENFORCEMENT OF MARITIME LIEN *IN REM*; RULE C ARREST

# Exhibit A

**Ginny Lee**

| | |
|---|---|
| **From:** | glee@wfscorp.com |
| **Sent:** | Tuesday, July 26, 2016 11:41 PM |
| **To:** | suyoon.bae@hanjin.com |
| **Cc:** | Joe Gowen |
| **Subject:** | {CONFIRMATION: HANJIN MONTEVIDEO / SEATTLE / 2868992} |
| **Attachments:** | Worldfuelservices_logo.gif |



26-JUL-2016

```
TO              : HANJIN SHIPPING CO LTD
ATTENTION       : MS. SU YOON BAE
FROM            : WORLD FUEL SERVICES

WORLD FUEL SERVICES CONFIRMS you have placed following firm order:

VESSEL          : HANJIN MONTEVIDEO
PORT            : SEATTLE
DATE            : 23-JUL-2016
AGENT           : HANJIN SEATTLE

SELLER          : WORLD FUEL SERVICES
                  A TRADE NAME/DIVISION OF WORLD FUEL SERVICES, INC.
PAYMENT TERMS   : 30 DDD BY TT
BUYER           : MV HANJIN MONTEVIDEO AND HER OWNERS/OPERATORS AND
                  HANJIN SHIPPING CO LTD

PHYSICAL        : PHILLIPS 66 COMPANY
FUEL GRADE/SPEC : 500CST/ISO 8217:2010:RMK500 MAX 3.5%S
QUANTITY        : 1,800.00 MTONS
PRICE           : USD 254.50 / MTONS DELIVERED


PHYSICAL        : MAXUM PETROLEUM
FUEL GRADE/SPEC : LS  MGO/ISO 8217:2010:DMA MAX 0.1%S
QUANTITY        : 115.00 MTONS
PRICE           : USD 637.00 / MTONS DELIVERED

EXPENSES        : BOOM OIL FENCE USD 2,400.00 FLAT

For changes please contact: Lee, Ginny at glee@wfscorp.com

 + HOLIDAY CHARGES (IF/AS INCURRED)
 + BOOM FEE
 ** NOTE: It is very important to instruct your agent to contact
          supplier IMMEDIATELY to ensure a timely delivery! **



* Overtime/demurrage/cancellation fees/other charges (if any) at cost for Buyer's
account
* Please ensure close coordination between agent/local supplier at all times
* Please inform us by return of any errors, omissions or changes in the above

All sales are on the credit of the vessel. Buyer is presumed to have authority to bind
```

1

the vessel with a maritime lien. Disclaimer stamps placed by vessel on the bunker
receipt will have no effect and do not waive the Seller's lien. This confirmation is
governed by and incorporates by reference Seller's general terms and conditions for
marine fuel products and related services in effect as of the date that this
confirmation is issued.
These incorporated and referenced terms can be found at
https://www.wfscorp.com/Marine/index.jsp.
Alternatively, you may inform us if you require a copy and same will be provided to
you.

When applicable by law in the country of supply, the delivery will comply with
regulations 14 and 18 of MARPOL ANNEX VI.

In accordance with Seller's trade sanctions policies and procedures, Seller (i) may not
be able to supply vessels that have visited Cuba/Iran/North Korea/Syria/Sudan/Crimea
Region of Ukraine in the 30 days preceding the supply date, (ii) cannot supply vessels
that are scheduled to visit Cuba/Iran/North Korea/Syria/Sudan/Crimea Region of Ukraine
in the 45 days following the supply date, and (iii) cannot supply vessels that are
transporting goods/crude/cargo of predominantly (50% or more) Cuba/Iran/North Korea/
Syria/Sudan/Crimea Region of Ukraine origin.
Buyer acknowledges and agrees that Seller is required to comply with applicable trade
sanctions regulations and hereby represents and warrants that, to the best of Buyer's
knowledge, none of the above conditions apply.
Upon discovery or reasonable belief by Seller that any of these 3 conditions apply,
the delivery may be cancelled at no cost to either party.

Please contact your usual World Fuel Services representative if you have any questions
or want any changes.

Authorized signatory for the World Fuel Services entity outlined in the order details
above,

RGDS,
JOE GOWEN

MSG#: 2868992

2

# WORLD FUEL SERVICES

A TRADE NAME/DIVISION OF WORLD FUEL SERVICES, INC.
9800 N.W. 41st STREET SUITE 400
MIAMI, FL 33178
Tax ID 76-0291977

MV HANJIN MONTEVIDEO AND/OR HER OWNERS/OPERATORS AND
HANJIN SHIPPING CO LTD
ATTN: MR. J.H. KIM
PURCHASE AND PROCUREMENT TEAM, 25-11, YOIDO-DONG,
YOUNGDEUNGPO-GU
SEOUL 150-010
KOREA, REPUBLIC OF

## INVOICE

| CUSTOMER NO. | INVOICE NO. | INVOICE DATE | PAGE NO. |
|---|---|---|---|
| 15295 | 164984-31101 | 31-JUL-16 | 1 - 1 |

Tel: (305) 428-8001 Fax: (305) 392-5605
Internet: www.wfscorp.com

**WIRE TRANSFER FUNDS TO:**
Bank of America N.A. New York, NY
SWIFT: BOFAUS3N
FedWire ABA: 026009593
ACCT: World Fuel Services, Inc
ACCT# 5800239169
ALL BANK CHARGES ARE FOR SENDERS ACCOUNT

| LIFT DATE | BDR NO. | ORDER NO. | CONTRACT NO. | POI NO. | TERMS |
|---|---|---|---|---|---|
| 24-JUL-16 | MULTIPLE | N/A | N/A | 2868962 | 30 DDO BY TT |
| VESSEL | PORT | STATE | DESTINATION | ITEM NO. | DUE DATE |
| HANJIN MONTEVIDEO | SEATTLE | WASHINGTON | VANCOUVER, B.C. | N/A | 23-AUG-16 |

| DESCRIPTION | QUANTITY | UNIT PRICE | EXTENDED AMOUNT | TAX AMOUNT | INVOICE AMOUNT |
|---|---|---|---|---|---|
| | | | USD | USD | USD |
| 500CST / RMK500 MAX 3.5%S(10) | 1,800.1700 MTN | 229.50000 USD/MTN | 413,139.02 | 0.00 | 413,139.02 |
| MGO / DMA MAX 0.1%S(10) | 114.9300 MTN | 637.00000 USD/MTN | 73,210.41 | 0.00 | 73,210.41 |
| BOOM OIL FENCE | 1.00000 FLT | 2,400.00000 USD/FLT | 2,400.00 | 0.00 | 2,400.00 |
| | | | 488,749.43 | 0.00 | 488,749.43 |

This transaction is subject to the terms and conditions of sale set forth at www.wfscorp.com/Marine/index.jsp
WE WILL ASSUME THIS INVOICE TO BE CORRECT UNLESS WE RECEIVE WRITTEN NOTICE FROM YOU WITHIN 14 DAYS FROM THE INVOICE DATE.
A CHARGE OF 2% PER MONTH PRO-RATA WILL BE APPLIED ON AMOUNTS PAST DUE.
This invoice may be assigned, transferred, or sold to another affiliate of World Fuel Services.

| MAIL INSTRUCTIONS | CUSTOMER PO NO. | PLEASE REMIT THIS AMOUNT |
|---|---|---|
| REGULAR MAIL | N/A | USD   488,749.43 |

# Exhibit B

## THE WORLD FUEL SERVICES MARINE GROUP OF COMPANIES
## GENERAL TERMS AND CONDITIONS

Effective May 1, 2016, the following terms of sale and supply shall constitute the General Terms and Conditions ("General Terms") of the World Fuel Services Marine Group of companies (collectively, "World Fuel Services"), 9800 N.W. 41st Street, Suite 400, Miami, Florida 33178, which includes, but is not limited to, World Fuel Services, Inc.; World Fuel Services Europe, Ltd.; World Fuel Services (Singapore) Pte. Ltd.; World Fuel Services Canada, ULC, World Fuel Services (Denmark) ApS; Tramp Oil Germany GmbH; Tramp Oil (Brasil) Ltda.; Tramp Oil and Marine (Chile) Limitada.; Henty Oil Limited; Falmouth Petroleum Limited; Trans-Tec International S.R.L.; Casa Petro S.R.L.; World Fuel Services Trading, DMCC; World Fuel Services (Australia) Pty Ltd; World Fuel Services Mexico, S. de R.L. C.V. and their respective trade names, subsidiaries, affiliates and branch offices.  Unless otherwise agreed in writing, the General Terms shall apply to every sale of marine petroleum products ("Products") entered into between any World Fuel Services entity as seller ("Seller") and any buyer ("Buyer") of such Products.

1.    **INCORPORATION AND MERGER:** Each sale of Products shall be confirmed by e-mail, fax or other writing from Seller to Buyer ("Confirmation").  The Confirmation shall incorporate the General Terms by reference so that the General Terms thereby supplement and are made part of the particular terms set forth in the Confirmation.  The Confirmation and the General Terms shall together constitute the complete and exclusive agreement governing the transaction in question (the "Transaction").  No other prior agreements or understandings, whether verbal or written, shall apply unless specifically referenced in the Confirmation.  In the event of an inconsistency or conflict between the particular terms of the Confirmation and the General Terms, the Confirmation shall control for the purpose of that particular Transaction with the exception of Clauses 8 and 18 below, which can only be modified by a mutually signed writing between Buyer and Seller.

2.    **PRICES:** The price to be paid for Products sold in each Transaction shall be as agreed between Buyer and Seller in the Confirmation.  Unless otherwise specified, the quoted price shall be ex-wharf and shall represent only the purchase price of the Products.  If the price is quoted as "delivered," then, in addition to the purchase price of the Products, the price shall include the cost of transportation.  Buyer shall pay any additional expenses or costs such as barging, demurrage, wharfage, port dues, duties, taxes, fees and any other costs, including, without limitation, those imposed by governmental authorities.  Seller reserves the right, upon notification to Buyer, to adjust the price after the date of the Confirmation to reflect any unanticipated increase in costs to Seller incurred after issuance of the Confirmation.  If Buyer does not accept such adjustment, the delivery of the affected quantity of the Products shall be cancelled without liability to either party.

3.    **QUALITY:** Unless otherwise specified in the Confirmation, the Products shall be of the quality generally offered by Seller at the time and place of delivery, for the particular grade or grades ordered by Buyer.  Should the Confirmation refer to a particular specification, the analysis of any test results shall make allowances for generally recognized industry standards of repeatability and reproducibility.  All grades of Products may contain bio-derived components generally acceptable in the petroleum industry.  Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Confirmation.  Conversely, where minimum values are

provided in a specification, no maximum values are guaranteed unless expressly stated in the Confirmation. Buyer shall have the sole responsibility for the selection of proper Products for use in the vessel being supplied ("Receiving Vessel") or other receiving facility. The product is, according to industry norm, the quality AT DELIVERY and prior to appropriate treatment by Receiving Vessel for use. **ANY OTHER CONDITIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY, USE AND FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY EXCLUDED AND DISCLAIMED.**

4. **QUANTITY:** The quantity of Products sold in each Transaction shall be as agreed between Buyer and Seller in a Confirmation. Notwithstanding acceptance of Buyer's order, Seller's obligation to supply such quantities shall be subject to availability of Products from Seller's source of supply at the time and place delivery is requested. Actual quantity delivered may vary in accordance with normal operational tolerances of delivery equipment.

5. **TITLE AND RISK OF LOSS:** Delivery of the Products shall be completed and title to and risk of loss of the Products shall pass to Buyer from Seller when the Products pass the flange connection at the end of the physical supplier delivery hose or pipe connected to the Receiving Vessel or its receiving facilities, including the barge or coastal tanker nominated by Buyer. Buyer shall be responsible for such flange connection, and pumping shall be performed under the direction and responsibility of Buyer.

6. **MEASUREMENT, TESTING AND CLAIMS:**

   (a)   The quantity of the Products delivered shall be conclusively determined from the official gauge or meter of the bunkering barge or tank truck effecting delivery. However, in those ports where legal or operational requirements or industry practice dictate that quantities are measured by referencing either shore tank figures or barge loading figures, such measurements shall instead be conclusive. In cases of delivery ex-wharf, shore tank figures shall be conclusive. Quantities calculated from the Receiving Vessel's soundings shall not be considered. Quantity claims are waived by Buyer unless expressly noted in writing on the Bunker Delivery Receipt ("BDR") at the time of delivery or, in ports where such notation on the BDR is not permitted, presented at the time of delivery to the physical supplier's personnel in a separate letter of protest.

   With respect to the quality of the Products supplied, samples shall be drawn at the time of delivery. The method of sampling will be governed by local regulation, if such exists, otherwise as per the method used by the local physical supplier. Buyer or its representatives may witness the sampling but the absence of Buyer or its representatives at the time of sampling shall not prejudice the validity of the samples taken.

   (b)   These samples shall conclusively represent the quality of the Products supplied to the Receiving Vessel. In the event of a claim by Buyer, the sample(s) in Seller's

treatment, blending and/or special handling. In the event that the Product is off-specification and cannot be consumed by the Receiving Vessel, Buyer's remedies shall be limited exclusively and solely to the replacement of the nonconforming Product. If Buyer removes the Product without the express written consent of Seller, then all such removal and related costs shall be solely for Buyer's account. **IN ANY EVENT, SELLER'S LIABILITY FOR ANY CLAIMS, WHETHER ARISING FROM QUALITY, QUANTITY, ACCIDENT, DELAY, SPILL OR ANY OTHER CAUSE, SHALL NOT EXCEED THE PRICE OF THAT PORTION OF THE PRODUCT SOLD ON WHICH LIABILITY IS ASSERTED. FURTHERMORE, NO LIABILITY WILL BE BORNE BY SELLER FOR (1) ANY DEMURRAGE OR OTHER VESSEL DELAY OR FOR INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, DAMAGES ARISING FROM THE EXERCISE OF SELLER'S RIGHT TO SUSPEND AND/OR TERMINATE DELIVERY OF PRODUCT.**

7.    **PAYMENT:**

(a)    Unless otherwise provided in the Confirmation, all sales shall be on a cash in advance, irrevocable letter of credit basis, or other form of credit support acceptable to Seller. All letters of credit procured by Buyer in favor of Seller shall be in a form and substance acceptable to Seller and issued only by a bank acceptable to Seller.

(b)    Any individual bunker transaction not requiring payment of cash in advance shall require credit approval by Seller's Credit Department in Miami, Florida. This approval, which will occur prior to Seller's transmittal to Buyer of a Confirmation, shall be construed as the binding act in a bunker transaction and it is agreed that contract formation has occurred in Florida. If payment of cash in advance is not required, Buyer shall make payment in full on or before the due date set forth in the invoice, in immediately available U.S. dollars and in such manner as Seller may designate in the invoice, without discount, set-off, counterclaim or deduction. Invoices may be sent via fax, e-mail or any other means permitted by law. In the event that delivery documents are not available, Seller may invoice based on email or facsimile advice of delivery details in lieu of delivery documents. Notwithstanding any disputes regarding quality, quantity or other matter, Buyer must initially pay the full amount due, and any disputes shall be resolved between Buyer and Seller after such payment has been made. Failure by Buyer to pay the full amount when due shall constitute a waiver of any claims by Buyer.

(c)    Past due amounts shall accrue interest at a rate equal to the lesser of 2% per month, or the maximum rate permitted by applicable law. All amounts more than fifteen (15) days past due shall incur an additional 5% administrative fee. All payments received from Buyer after an invoice is overdue shall first be applied to interest, legal collection costs and administrative fees incurred before they will be applied to the principal amounts on a subsequent delivery. Buyer may not designate application of funds to a newer invoice so long as there are any unpaid

charges, interest, collection costs or administrative fees on a previous one. This shall not be construed, however, as preventing Seller's option to choose application of funds in instances where sub-clause (h) below shall apply. Any waiver by Seller of interest charges or administrative fees on a particular invoice shall not be construed as a waiver by Seller of its right to impose such charges on subsequent deliveries.

(d)     If the payment due date falls on a weekend or any bank holiday in the country where payment is to be remitted (other than a Monday), payment must be made on the first prior available banking day. If the payment due date falls on a Monday bank holiday, payment may be made on the next available banking day.

(e)     Buyer and Seller are responsible for each of their respective banking charges.

(f)     Buyer agrees to pay, in addition to other charges contained herein, internal and external attorneys fees on a full indemnity basis for Seller's collection of any non-payment or underpayment, as well as any other charges incurred by or on behalf of Seller in such collection, including, but not limited to, the cost of bonds, fees, internal and external attorneys fees associated with enforcing a maritime lien, attachment or other available right, whether in law, equity or otherwise.

(g)     All unpaid invoices from Seller to Buyer shall immediately be considered overdue, upon the occurrence of any of the following events: (i) any invoice of Seller to Buyer is seven (7) days overdue; (ii) any vessel owned or operated by Buyer is arrested or attached by Seller or a third party for unpaid debts; or (iii) there is a change in the financial circumstances or structural organization of Buyer sufficient to cause Seller to reasonably believe that its likelihood of receiving payment from the Buyer is jeopardized or that its security interest in any of Buyer's owned, managed, chartered, operated or otherwise controlled vessels is jeopardized.

(h)     In the event that more than one invoice is past due, Seller shall be entitled, at its sole discretion, to specify the particular invoice to which any subsequent payments shall be applied.

(i)     Seller reserves the right, in addition to all other rights and remedies available to it under applicable law, in equity, or otherwise, to suspend further deliveries of Product, and demand payment of all outstanding balances, if the outstanding balances due from Buyer (including estimates of unbilled sales) exceed Buyer's applicable credit limit, or if Buyer fails to make any payment as herein provided or otherwise defaults under the General Terms.

8.      **CREDIT AND SECURITY; ADEQUATE ASSURANCE:**

(a)      Products supplied in each Transaction are sold and effected on the credit of the Receiving Vessel, as well as on the promise of Buyer to pay, and it is agreed and Buyer warrants that Seller will have and may assert a maritime lien against the Receiving Vessel for the amount due for the Products delivered. This maritime lien shall extend to the vessel's freight payments for that particular voyage during which the Products were supplied and to freights on all subsequent voyages. Disclaimer of lien stamps placed on a Bunker Delivery Receipt shall have no effect towards the waiver of such lien.

(b)      If Buyer fails to pay Seller any amounts owed when due, or if Seller, in its sole discretion at any time and for any reason, deems the credit or financial condition of Buyer to be impaired, unsatisfactory or unacceptable or otherwise has reasonable grounds for insecurity with respect to Buyer's performance hereunder, Seller, at its sole option, may require Buyer to pay cash (in an amount reasonably determined by Seller in its commercially reasonable judgment) to reflect the value of any future deliveries of product or may require Buyer to post an irrevocable standby letter of credit or other security reasonably required by Seller, and may suspend all further deliveries of product until such security is received. If such requested security is not received within the time specified by Seller, then such failure shall be an event of default hereunder with respect to Buyer, allowing Seller to terminate or suspend its obligations with respect to the applicable Transaction(s) or any other agreement between Buyer and Seller, as well as impose cancellation fees set forth in Clause 10 below, or exercise any other remedies allowed by applicable law, equity or otherwise.

(c)      If the purchase of Products is contracted for by Buyer's agent, then such agent, as well as Buyer as principal, shall each be bound by and be fully liable for obligations of Buyer in the Transaction.

(d)      All sales made under these terms and conditions are made to the registered owner of the Receiving Vessel, in addition to any other parties that may be listed as Buyer in the confirmation. Any Products ordered by an agent, management company, charterer, broker or any other party are ordered on behalf of the registered owner of the Receiving Vessel and such registered owner is fully liable as a principal for payment of the bunker invoice.

9.    **DELIVERIES:**

(a)    Buyer shall give Seller's local representative at the port of supply at least 48 hours prior written notice of the scheduled time of delivery, excluding Sundays and holidays.

(b)    In the event that delivery is desired outside normal working hours and is permitted by port regulations, Buyer shall pay any overtime and additional expenses incurred in connection therewith.

(c)    Buyer shall provide, free of charge, a clear safe berth, position or anchorage alongside the Receiving Vessel's receiving lines.   Seller shall be under no obligation to make deliveries when, in Seller's sole opinion, a clear and safe berth, position or anchorage is not available.   Buyer shall make all connections and disconnections of the delivery hose to the Receiving Vessel or barge or coastal tanker nominated on behalf of Buyer and shall render all other necessary assistance and equipment to promptly receive the Products.

(d)    Seller shall use due diligence in the timely delivery of Product to Buyer's Receiving Vessel.  However, Seller shall not be liable for any delays due to congestion at the loading terminal, prior commitments of available barges/trucks, or discretionary decisions of the local transportation provider as to the vessel's order of placement. In the case of actual delays not caused by the above circumstances, and which can be attributed solely to the gross negligence of Seller, Seller will reimburse Buyer for reasonable port costs such as shifting, pilotage and berthing. However, under no circumstances will Seller be liable for costs of ship's demurrage, off-charterhire or for indirect, special, incidental, exemplary, punitive or other consequential damages. If the actual delivery date is later than the contracted date stated in the Confirmation, the price may be subject to fluctuations up to the time of actual delivery, at Seller's discretion.  If the Receiving Vessel does not arrive within five (5) days after the expected date of arrival, Seller shall have the right, at its sole discretion, to cancel the Transaction without prejudice to any other rights Seller may have.

(e)    Seller shall be at liberty to make arrangements with other companies ("Suppliers") to supply the whole or any part of the Products sold in each Transaction.

(f)    Buyer shall be responsible for all demurrage or additional expenses incurred by Seller if Buyer, its vessel or its port agent causes delay to the barge, truck or delivery facilities.  Buyer shall also pay any charges for mooring, unmooring and port dues, if incurred.  In addition, Buyer shall be liable for any expenses incurred by Seller resulting from Buyer's failure to accept the full quantity of Products ordered by Buyer.

10.    **CANCELLATION:** Buyer agrees and acknowledges that in order for Seller to offer the product to Buyer over the applicable delivery period, Seller has entered into or may enter

into one or more transactions with third parties, including derivative and/or hedging transactions using financially settled instruments with third parties or physical products purchase and sale transactions with Seller's physical supplier. In the event that Buyer does not purchase the entire quantity of product from Seller as contracted, Seller may suffer losses as a result of exposure under the foregoing transactions. As such, Buyer agrees to purchase and accept delivery of the full quantities contracted, and to do so within the designated delivery period. In the event that Buyer purchases less than the full contracted quantity for any reason, or purchases such quantities outside the designated delivery period(s), regardless of fault or causation and without regard to Force Majeure, then, without prejudice to Seller's other rights and remedies it may have against Buyer, Buyer shall be liable to Seller for all damages incurred, including those incurred by Seller as a result of having entered into the foregoing transactions or having to enter into any replacement transactions, and any and all costs of maintaining, terminating and/or reestablishing any hedge or related trading positions or transactions (and discounted to present value or bearing interest, as appropriate), in each case as determined by Seller in a commercially reasonable manner, as well as the costs of storing, transporting or disposing of the Product quantities not purchased by Buyer and any related administrative and legal fees. Buyer further acknowledges that Seller shall not be obligated to perform any or Seller's obligations hereunder if there is an event of default or another breach by Seller's physical supplier with respect to Seller's purchase and sale agreement with such physical supplier.

11.    **INDEMNITY:** Buyer shall defend, indemnify and hold Seller and any of Seller's agents or representatives harmless with respect to any and all liability, loss, claims, expenses, or damage suffered or incurred by reason of, or in any way connected with, the acts, omissions, fault or default of Buyer or its agents or representatives in the purchase, receipt, use, storage, handling or transportation of the Products in connection with each Transaction.

12.    **FORCE MAJEURE CONTINGENCIES:**

(a)    Seller shall not be in breach of its obligations under any Transaction in the event that performance is prevented, delayed, or made substantially more expensive as a result of any one or more of the following contingencies, whether or not such contingency may have been foreseen or foreseeable at the time of contracting and regardless of whether such contingency is direct or indirect:

(i)    labor disturbance, whether involving the employees of Seller, Supplier or otherwise, and regardless of whether the disturbance could be settled by acceding to the demands of the labor group;

(ii)    compliance with applicable law or a change, request or order of any governmental authority or agent;

(iii)    shortage in raw material, transportation, manufacturing, or fuels from Seller's contemplated source of supply;

     (iv)    any other cause beyond the reasonable control of Seller, whether or not foreseeable; or

     (v)    any determination, at Seller's sole discretion, that proceeding with a delivery would be a violation of the sanctions laws or regulations of the United States or any other jurisdiction to which Seller may be subject.

(b)    In the event that performance is prevented or delayed by such a contingency, Seller may reduce deliveries in any manner as it may determine in its sole discretion.

(c)    If performance is made substantially more expensive by such a contingency, Seller shall have the option either to reduce or stop deliveries or to continue deliveries and increase prices in fair proportion to the increased cost of operation under such a contingency.

(d)    Seller shall not be liable for demurrage or delay resulting from any of the foregoing contingencies.

(e)    Quantities not sold or purchased due to the occurrence of such a contingency may be reduced or eliminated from the contractual amount at the discretion of Seller.

(f)    Nothing in this provision shall be deemed to excuse Buyer from its obligation to make payments for Products received.

13.   **TAXES AND ASSESSMENTS:**

(a)    Buyer will pay Seller the amount of all excise, gross receipts, import, motor fuel, superfund and spill taxes, and all other federal, state and local taxes (collectively, "Taxes and Assessments") or the foreign equivalent as determined in the sole, absolute and unfettered discretion of Seller (other than taxes on income), and paid or incurred by Seller directly or indirectly with respect to the Products and/or on the value thereof insofar as the same are not expressly included in the price quoted. Any additional Taxes and Assessments incurred by Seller arising from a Transaction and imposed by any governmental and/or any regulatory authority after delivery as a result of an audit, whether domestic and/or international, shall be borne solely by Buyer.

(b)    Buyer will present Seller with any required documentation, including, but not limited to, registrations, exemptions, certifications, claims, refunds, declarations or otherwise, in a form and format, and on or before whatever due date Seller shall require, to satisfy Seller's concerns in connection with any of the above taxes or assessments. Further, Buyer shall indemnify and hold Seller harmless for any damages, claims, liability or expense Seller might incur due to Buyer's failure to comply with this requirement.

14.    **SAFETY AND ENVIRONMENTAL PROTECTION:**

(a)    It shall be the sole responsibility of Buyer to comply and advise its personnel, agents and/or customers to comply, both during and after delivery, with all the health and safety requirements applicable to the Products and to ensure so far as possible that any user of such Products avoids, without limitation, any frequent or prolonged contact with the Products. Seller accepts no responsibility for any consequences arising from failure to comply with such health and safety requirements or arising from such contact. Buyer shall protect, indemnify and hold Seller harmless against any damages, expense, claims or liability incurred as a result of Buyer, or any user of the Products, or its customers failing to comply with the relevant health and safety requirements.

(b)    In the event of a spill or discharge occurring before, during or after bunkering, Buyer shall immediately notify the appropriate governmental authorities and take whatever action is necessary, and pay all costs to effect the clean-up. Failing prompt action, Buyer authorizes Seller and Supplier, if any, to conduct such clean-up on behalf of Buyer at Buyer's risk and expense, and Buyer shall indemnify and hold Seller and Supplier, if any, harmless against any damages, expense, claims or liability arising out of any such spill or clean-up unless such spill or clean-up shall be proven to be wholly and solely caused by Seller's gross negligence.

(c)    Buyer warrants that the Receiving Vessel is in compliance with all governmental, port/terminal and pollution rules and regulations. The Receiving Vessel will not be moored at a wharf or alongside other marine loading facilities of Seller or Supplier unless free of all conditions, deficiencies or defects which might impose hazards in connection with the mooring, unmooring or bunkering of the Receiving Vessel.

15.    **ADDITIONAL PROVISIONS:**

(a)    Claims, notices and other communications hereunder shall be in writing and shall be mailed via certified or registered mail or by overnight courier to the attention of the particular Seller in each Transaction at the following address: 9800 N.W. 41st Street, Suite 400, Miami, Florida 33178, USA. Unless otherwise indicated by Buyer, notices hereunder shall be mailed, faxed and/or e-mailed to Buyer at the address designated by Buyer for invoicing. Either Buyer or Seller may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it by giving fifteen (15) days prior written notice of its new address to the other party.

(b)    No waiver of any of the provisions hereof shall be effective unless it is in writing and signed by the party against whom it is asserted, and any such waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver of any breach.

(c)    A failure or delay in exercising any right, power or privilege in respect of these General Terms or any Transaction will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(d)    Buyer shall not assign or transfer any right or delegate any obligation, in whole or in part, arising under a Transaction without the prior written consent of Seller.

(e)    If any part of the General Terms is deemed invalid, all other conditions and provisions hereof shall remain in full force as if the invalid portion had never been part of the original agreement.

(f)    The headings used herein are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting these General Terms.

(g)    Neither these General Terms, nor any Confirmation, shall be altered or amended except by an instrument in writing signed by or on behalf of Seller.  Seller may amend these General Terms from time to time without advance notice to Buyer. Any such amendment shall be effective and apply with respect to all Transactions for which a Confirmation is sent after the effective date of the amended General Terms.

(h)    No ambiguity in any provision of these General Terms or any Confirmation shall be construed against a party by reason of the fact it was drafted by such party or its counsel.  Acceptance of, or acquiescence in, a course of performance rendered under these General Terms or any Confirmation shall not be relevant or admissible to determine the meaning of the General Terms or any Confirmation, even though the accepting or acquiescing party has knowledge of the nature of the performance and an opportunity to make objection. The General Terms shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, legal representatives, and successors.

16.    **WAIVER OF IMMUNITIES:** Buyer expressly and irrevocably waives and agrees not to assert such a defense in any action or proceeding, which may be commenced or asserted against Buyer or Buyer's revenues and/or assets in connection with a Transaction to the fullest extent permitted by applicable law, with respect to Buyer and Buyer's revenues and/or assets (irrespective of their use or intended use), all immunity on the grounds of sovereign immunity or other similar grounds, where Buyer is a state or government owned or controlled entity, whether in whole or in part or otherwise, which status would otherwise entitle Buyer to assert or allege the defense of sovereign immunity in any claim against it from:

(a)    suit;

(b)    jurisdiction of any court;

(c)    relief by way of injunction, order for specific performance or for recovery of property;

(d)    attachment of Buyer's assets (whether before or after judgment); or

(e)    execution or enforcement of any judgment to which Buyer or Buyer's revenues and/or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings.

17.    **COMPLIANCE WITH APPLICABLE LAWS**

Each party represents and warrants to the other that at all times during the term of this Agreement it will comply with all laws and shall obtain all appropriate government approvals applicable to the performance of its obligations under this Agreement.

Notwithstanding the generality of the foregoing:

(a)    Each party represents and warrants to the other that at all times during the term of this Agreement: (1) it is knowledgeable about Anti-Bribery Laws applicable to the performance of its obligations under this Agreement and will comply with all such Anti-Bribery Laws; (2) neither it nor, to its knowledge, any director, officer, agent, employee or other person acting on its behalf, has made, offered or authorized, or will make, offer or authorize, either directly or indirectly, any unlawful payment, gift, promise or other advantage related to this Agreement; and (3) it has instituted and maintains policies and procedures designed to ensure continued compliance with Anti-Bribery Laws applicable to its performance under this Agreement, including, but not limited to, the maintenance of accurate books and records. "Anti-Bribery Laws" means the United States Foreign Corrupt Practices Act of 1977 and the United Kingdom Bribery Act 2010 (each as amended from time to time) and all other applicable national, regional, provincial, state, municipal or local laws and regulations that prohibit the bribery of, or the providing of unlawful gratuities or other benefits to, any government official or any other person.

(b)    Each party represents and warrants to the other that at all times during the term of this Agreement: (1) it is knowledgeable about Trade Laws applicable to the performance of its obligations under this Agreement and will comply with all such Trade Laws; (2) except as authorized or otherwise not prohibited under the terms of any applicable Trade Laws, neither it, nor any of its subsidiaries or, to its knowledge, any director, officer, employee, agent, or affiliate, is an individual or entity ("Person") that is or is owned or controlled by Persons that are (i) the subject of Trade Laws, or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Trade Laws; (3) it obtains and maintains all certifications, credentials, authorizations, licenses and permits necessary to perform under this Agreement in compliance with all applicable Trade Laws; and (4) it has instituted and maintains policies and procedures designed to ensure

continued compliance with all Trade Laws applicable to its performance under this Agreement, including, but not limited to, the maintenance of accurate books and records. "Trade Laws" includes all sanctions, embargoes, or other trade restrictions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC", including the OFAC Specially Designated Nationals List ("SDN List")), the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or any other applicable authority or regulatory body.

(c)    Notwithstanding any other clause of this Agreement, either party may terminate this Agreement immediately upon written notice to the other party at any time, if, in its reasonable judgment, the other party is in breach of any of the representations and warranties in sub-clauses (a) or (b) of this clause.

18.    **LAW, VENUE AND JURISDICTION; WAIVER OF JURY TRIAL: These General Terms and each Transaction shall be governed by the general maritime law of the United States of America, the applicable federal laws of the United States of America, and, in the event that such laws are silent on the disputed issue, the laws of the State of Florida, without reference to any conflict of laws rules which may result in the application of the laws of another jurisdiction. The General Maritime Law and the applicable federal laws of the United States of America shall apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Any disputes concerning quality or quantity shall only be resolved in a court of competent jurisdiction in Miami-Dade County, Florida. Disputes over payment and collection may be resolved, at Seller's option, in the Miami-Dade, Florida state or federal courts or in the courts of any jurisdiction where either the Receiving Vessel or an asset of Buyer may be found. Each of the parties hereby irrevocably submits to the jurisdiction of any such court, and irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum or its foreign equivalent to the maintenance of any action in any such court. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any country where it finds the vessel. BUYER AND SELLER WAIVE ANY RIGHT EITHER OF THEM MIGHT HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING FROM OR RELATED TO THESE GENERAL TERMS OR ANY TRANSACTION.**