LOWENSTEIN SANDLER LLP
Michael S. Etkin
Philip J. Gross
65 Livingston Avenue
Roseland, New Jersey 07068
973-597-2500

- and -

NORTON ROSE FULBRIGHT US LLP
David A. Rosenzweig
1301 Avenue of the Americas
New York, New York  10019
212-318-3000

Counsel for Canadian National Railway Company

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------------x

| | |
|---|---|
| In re: | Case No. 16-27041 (JKS) |
| HANJIN SHIPPING CO., LTD., | Chapter 15 |
| Debtor in a Foreign Proceeding. | Hearing Date:  September 9, 2016 at 10:00 a.m. |

---------------------------------------------------------------x

**CANADIAN NATIONAL RAILWAY COMPANY'S LIMITED OBJECTION AND STATEMENT REGARDING THE MOTION OF THE FOREIGN REPRESENTATIVE FOR ENTRY OF A PROVISIONAL ORDER AND RELATED RELIEF**

Canadian National Railway Company ("CN"), by its undersigned counsel, files this limited objection and statement regarding the Motion filed by the Foreign Representative (Docket No. 5) seeking entry of a provisional order and related relief, and respectfully states as follows:

**Background**

1.    CN is a Canadian public company headquartered in Montreal, Quebec, Canada. CN owns and operates the largest freight railway in Canada and currently is Canada's only

22220182.4

transcontinental railway. CN and its subsidiaries operate approximately 20,000 route miles in Canada and the Midwestern and Southern United States.

2. CN and Hanjin Shipping Co., Ltd. ("Hanjin") are parties to a Transportation Agreement under which CN and its subsidiaries agreed to transport by rail intermodal containers for Hanjin. The containers contain cargo owned by third parties, known as Beneficial Cargo Owners ("BCOs"). With respect to containers transported by CN, the principal point of origin for Hanjin's vessels is the Port of Prince Rupert ("PPR") in British Colombia, Canada. Vessels holding Hanjin's containers enter PPR and discharge those containers. The containers then are loaded by the terminal operator onto CN's railcars. The cargo containers then are transported by CN by rail inland to destinations in Canada and in some circumstances across the border in the United States, where the BCOs or trucking companies take possession of the cargo or containers. CN thereafter transports the empty Hanjin containers back to PPR or another location, where the containers are retrieved by Hanjin.

3. Generally, Hanjin invoices the BCOs for the entirety of the transportation services, including the ocean voyage provided by Hanjin as well as the rail transport provided by CN and other transport that may be provided by trucking companies. Under the Transportation Agreement, CN invoices Hanjin for CN's rail transportation services, which includes the costs for round trip transport of Hanjin's containers. Hanjin granted CN a security interest on Hanjin's assets to secure charges owed under the Transportation Agreement. CN also maintains separate statutory and possessory liens on Hanjin's assets (such as the containers) securing certain transportation and storage charges.

4. Hanjin currently owes CN approximately CDN$20 million. On August 30, 2016, CN provided written notice to Hanjin that, in accordance with credit terms incorporated into the

Transportation Agreement, CN would no longer extend credit to Hanjin and that Hanjin would be required to prepay for CN's services from that point forward. Accordingly, CN suspended credit to Hanjin effective as of August 30, 2016.

### Hanjin's Insolvency Proceedings

5. Upon information and belief, Hanjin's insolvency proceeding (the "Korean Proceeding") was commenced in the South Central District Court (the "Korean Court") on September 1, 2016 (the "Commencement Date"). The Korean Court appointed Tai-Soo Suk as the Foreign Representative of Hanjin.

6. On September 2, 2016, Hanjin filed a petition in this Court for recognition of the Korean Proceeding under chapter 15 of the Bankruptcy Code and the Motion for entry of a provisional order seeking a stay and the application of section 365(e) of the Bankruptcy Code pending the final hearing pursuant to sections 1517 and 1521 of the Bankruptcy Code.[1]

7. On September 6, 2016, this Court held a hearing (the "Initial Hearing") on the provisional relief sought in the Motion. The Court entered an "interim" provisional order (Docket No. 22) (the "Interim Order") that set a continued hearing on September 9, 2016, concerning the provisional relief sought in the Motion.[2]

---

[1] Upon information and belief, Hanjin has not yet filed an insolvency proceeding in Canada. CN has requested notice of the commencement of any such proceedings. To date, Hanjin has not informed CN of the commencement of a Canadian proceeding.

[2] Bankruptcy Rule 2002(q)(1) requires twenty-one days' notice to interested parties of the hearing on the petition for recognition under chapter 15. CN reserves all of its rights and objections with respect to the final hearing on recognition and related relief, which has not yet been scheduled.

**Limited Objection**

  A.  Protection to Allow the Parties to Ensure the Flow of Commerce

  8.  Hanjin lacks the financing necessary to fund and sustain its operations.[3] Hanjin's financial difficulties are causing substantial hardships that are cascading through the supply chain. The problems start with the ports and terminals and flow through to the BCOs located in Canada and the United States. In between, railways like CN and other service providers are drastically impacted. The entire supply chain must work in tandem under tight time frames to avoid delay and disruption. Railroads run on a schedule that essentially accounts for every rail car and its use over the system on an hourly basis. Hanjin's financial predicament has caused massive delays in vessel berthing and cargo unloading at numerous ports, including PPR. In turn, CN has been delayed and prevented from moving cargo and containers for BCOs, causing general business disruption and business tension with the BCOs. At the same time, CN's schedule for other customers in both Canada and the United States is negatively impacted as rail movement for Hanjin is delayed and rail cars sit idle awaiting Hanjin containers stranded at terminals or on vessels.

  9.  As a result, CN has attempted to make arrangements with BCOs under which the BCOs would pay CN for rail transport of their cargo in Hanjin's containers. Hanjin has generally been supportive in allowing these efforts, but there is ambiguity in Hanjin's communications and a lack of clarity. Thus, there is a critical need for a protocol and protection so that the BCOs, CN and others may work to ensure the continued flow of commerce and payment for CN's services without fear of violation of stays and litigation if and when CN's rail

---

[3] Media reports indicate that Hanjin may obtain $90 million in financing. That is all that is known at this point. These same media reports indicate that this amount is a fraction of what Hanjin would need simply to unload the cargo currently on vessels anchored outside various ports around the world.

cars cross the border into the United States.  Such a protocol would allow the BCOs to pay CN directly for rail transportation services (without fear of double recovery were Hanjin to seek payment as well) and mitigate damage claims that may be asserted against Hanjin by BCOs and others.  Similarly, CN should be protected such that Hanjin does not seek to claim that the payments CN received from a BCO should somehow be turned over to Hanjin.  Hanjin as well should be required to reasonably cooperate including in connection with the provision of documents such as any needed for customs clearance at various borders.   At the Initial Hearing, the parties proposed such a protocol to Hanjin.   Hanjin, however, although apparently understanding the benefits of such a protocol, was not in a position to agree at the Initial Hearing without confirming such agreement with Hanjin representatives in Korea.  CN has heard nothing since.

10. Hanjin cannot ignore the protections of other parties' interests especially when those protections would inure to its benefit as well and ensure the continued flow of commerce. "Chapter 15, like the Model Law, anticipates the provision of particularized protection, as stated in §1522(a)," when this Court is requested to provide discretionary relief under section 1519. <u>Jaffe v. Samsung Elecs. Co.</u>, 737 F.3d 14, 29 (4th Cir. 2013).  Regardless of whether Hanjin agrees, this Court is required to grant relief to ensure that the interests of creditors and other interested parties are protected.   In that connection, section 1522(a) of the Bankruptcy Code provides that "[t]he court may grant relief under section 1519 or 1521 . . . <u>only if the interests of creditors and other interested entities, including the debtor, are sufficiently protected</u>." 11 U.S.C. § 1522(a) (emphasis added). Put simply, Section 1522 requires creditor protection as a condition to the granting of the provisional relief under section 1519 sought by Hanjin.   That is precisely

the purpose and necessity of a protocol allowing the movement of cargo and payment directly by BCOs to service providers like CN.

    B.    <u>Allowing Ordinary Course Transactions to Occur</u>

11.    Section 4(d) of the Interim Order could be read to prevent ordinary course transactions since it could be read to stay the transfer or relinquishment of any Hanjin assets to any party other than the "Foreign Representative, except with the Foreign Representative's consent;. . . ." This will severely impact the operation of Hanjin's business and puts numerous parties at risk of violating the stay simply through the ordinary course movement of cargo in Hanjin's containers into the United States. A protocol as described above could present a solution to this issue. Nonetheless, there also must be an exception in section 4(d) for the ordinary course movement of cargo and containers by CN for BCOs, without the need for the Foreign Representative's consent. Even if consent is to be required, the Foreign Representative is but a single individual who cannot as a practical matter consent to the movement of all cargo and containers.[4] If there is to be a consent requirement, it must be that of Hanjin or its affiliates. Finally, at the Initial Hearing, Hanjin indicated that such consent would not be unreasonably withheld. That qualification was not included in the order submitted by Hanjin following the Initial Hearing. Such language should be included.[5]

    C.    <u>Counterparties Should Not Be Compelled to Provide Credit</u>

12.    Section 1522 also requires that the Court condition provisional relief in this case by making it clear that CN and other service providers are not compelled to provide post-

---

[4]    Through counsel, CN requested contact information for the Foreign Representative, but has not yet received this information.

[5]    Section 4(d) of the Interim Order also inadvertently lacks the qualifier "within the territorial jurisdiction of the United States" as contained in the other subsections of section 4 of the Interim Order. This should be remedied in order to avoid any ambiguity as to the scope of section 4(d).

bankruptcy credit to Hanjin.[6]  Hanjin states in the Motion that seeks to have section 365(e) of the Bankruptcy Code apply so as to prevent terminations and modifications of executory contracts – <u>and also to ensure that counterparties will continue performing thereunder</u>.  Motion at ¶ 20 – 21.  Hanjin, however, is teetering on liquidation without solid or sufficient financing.  Moreover, CN placed Hanjin on prepay on August 30, 2016, before Hanjin entered insolvency proceedings in Korea or filed this chapter 15 case.  CN is willing and able to perform as long as it is prepaid by Hanjin and/or can otherwise make arrangements for payment from the BCOs directly.  CN cannot be compelled to extend post-bankruptcy credit to Hanjin absent adequate assurances and adequate protection.   The provisional order or any further interim order therefore should make clear that it does not in any way compel counterparties to extend such credit to Hanjin.

          D.      <u>Possessory Liens Should Not Be Impacted by Provisional Relief</u>

       13.      Section 4(c) of the Interim Order may prevent lienholders from maintaining possessory liens arising by law or contract.  In that connection, section 4(c) may stay perfection and enforcement of  possessory liens.  By definition,  possessory liens are perfected and enforced by the lienholder maintaining possession of the property.  Hanjin could not compel the loss of such liens through the turnover of the property absent the provision of adequate protection were this a chapter 11 case.  <u>See</u> 11 U.S.C. § 363(e).   At the Initial Hearing, Hanjin agreed to protective language, but it did not include such language in the proposed order submitted to the Court.   Regardless of Hanjin's agreement, this Court should grant relief under section 1522 to protect creditors and prevent the loss of their possessory liens.  Nothing in the provisional order

---

[6]    As set forth above, CN, prior to Hanjin's bankruptcy filing in Korea, exercised its rights under the Transportation Agreement to stop extending credit to Hanjin.

or any further interim order should be deemed to require possessory lienholders to relinquish the collateral absent the provision of adequate protection that preserves the possessory lien.

## Conclusion

14. For the reasons set forth above, CN respectfully requests that the Court condition any provisional relief granted to Hanjin as provided herein and grant CN such other and further relief as is just and proper.

Dated: September 8, 2016

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

By: */s/ Michael S. Etkin*
    Michael S. Etkin
    Philip J. Gross

65 Livingston Avenue
Roseland, New Jersey 07068
973-597-2500

-and-

**NORTON ROSE FULBRIGHT US LLP**
David A. Rosenzweig
1301 Avenue of the Americas
New York, New York  10019-6022
212-318-3000

Counsel for Canadian National Railway Co.