**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

Steven J. Reed, Esq.
Attorney ID: 041141988
**GREGORY & REED LLC**
*Attorneys at Law*
2 Sylvan Way, Suite 303 West
Parsippany, New Jersey 07054
Tel:  (973) 898-1400
Fax: (973) 898-1403

Attorneys for World Fuel Services, Inc.

| | |
|---|---|
| In re | Case No. 16-27041 (JKS) |
| HANJIN SHIPPING CO., LTD., | Chapter 15 |
| | Judge:  Hon. John K. Sherwood |
| Debtor in a Foreign Proceeding | Hearing Date: September 9, 2016 |

**LIMITED OBJECTION OF WORLD FUEL SERVICES TO**
**RECOGNITION OF FOREIGN PROCEEDING AND RELATED RELIEF**

Debtor Hanjin Shipping Co., Ltd. ordered bunker fuel from World Fuel Services, Inc.

The bunkers were delivered to a vessel chartered by Debtor known as M/V Hanjin Montevideo

(the "Vessel").  Hanjin failed to pay World Fuel for the bunkers and related bunker services.  On

about September 1, 2016, World Fuel filed an Amended Verified Complaint in Central District

Court of California for enforcement of its maritime lien *in rem* seeking a Rule C arrest of the

Vessel.

World Fuel submits this objection (the "Objection") to the Chapter 15 Petition for Recognition of a Foreign Proceeding submitted by Tai-Soo Suk, as the court appointed foreign representative (the "Foreign Representative") of Hanjin Shipping Co., Ltd. (the "Debtor"), in the Debtor's proceeding under the Korean Debtor Rehabilitation And Bankruptcy Act (as amended, the "DRBA") pending before the Seoul Central District Court (the "Korean Bankruptcy Proceeding").

## PRELIMINARY STATEMENT

World Fuel submits this limited objection because the Foreign Representative seeks continuation of the Interim Order entered on September 6, 2016 enjoins World Fuel from executing against or further arresting vessels that the Debtor does not own i.e. Debtor has no property interest in third party vessels that Debtor time charters.  A Rule C *in rem* arrest does not infringe on the Debtor's time charter agreement.  Any effect on the Debtor is incidental and temporary, and does not warrant an expansion of the automatic stay to property not owned by Debtor.  In the Korean Bankruptcy, the Debtor would not be entitled to such broad relief.

World Fuel should not be enjoined from continuing or commencing actions to pursue its maritime rights against vessels not owned by Debtor.  The *in rem* proceeding against the vessel is against the owner of the vessel (not the Debtor) to ensure that the owner pays for the bunker fuel supplied by companies like World Fuel.

If this Court determines that such an order should be entered so as to preclude World Fuel from exercising its Rule C *in rem* arrest rights, then World Fuel should be provided with adequate protection of its liens on such nondebtor vessels under the Bankruptcy Code. [1]

---

[1] World Fuel has raised these objections in briefing in other courts in similar circumstances and has modified this brief to apply to the facts of this case.

## BACKGROUND

**A.      The Debtor's Korean Bankruptcy Proceeding and Chapter 15 Proceeding.**

On September 1, 2016, the Debtor filed a rehabilitation petition with the Seoul Central District Court (the "Seoul Court") under the DRBA.  The Seoul Court issued a commencement order (the "Korean Commencement Order") that formally approved the Debtor's ability to start rehabilitation proceedings under the DRBA.

On September 2, 2016, the Foreign Representative filed a petition under chapter 15 of title 11 of the United States Code (the "Bankruptcy Code") in this Court for recognition of the Debtor's Korean Bankruptcy Proceeding (the "Recognition Petition") in the United States. Pending the consideration by this Court of the Recognition Petition, the Foreign Representative filed an application  (the "Preliminary Injunction Application") seeking provisional relief pursuant to sections 105(a) and 1519(a) of the Bankruptcy Code.  In particular, the Foreign Representative sought an order that enjoined the commencement or continuation of any action or proceeding in the United States against the Debtor or its assets.  As confirmed by a marine terminal operator partially owned by Debtor, Debtor's Korean bankruptcy is a *de facto* liquidation rather than a reorganization because there is no plan of reorganization and there is no refinancing. See Total Terminals International LLC's Objection, page 3.

As mentioned, on about September 1, 2016, World Fuel filed suit in federal court in California to enforce its Maritime Lien in rem seeking a Rule C arrest of the Vessel.

On September 6, 2016, this Court entered an Interim Provisional Order granting temporary provisional relief which, among other things, temporarily enjoined the commencement or continuation of any action or proceeding in the United States against the Debtor or its assets  (the "Temporary Stay Order).  The Temporary Stay Order indicated that the

-3-

parties could submit papers on September 8, 2016 for a continuation hearing on September 9, 2016 at 10 am.

**B.     Maritime Claims.**

World Fuel has the right to enforce its maritime claims through an admiralty "attachment" and a Rule C *in rem* arrest.  The Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure provide the procedure for enforcement. (The "Supplemental Rules").  The admiralty attachment procedure (the "Rule B Attachment") is set forth in Supplemental Rule B, and the *in rem* arrest procedure (the "Rule C *In Rem* Arrest") is set forth in Supplemental Rule C.  See Fed. R. Civ. P. Supp. Rule B; Fed. R. Civ. P. Supp. Rule

World Fuel's limited objection is to preserve its right to obtain a Rule C *in rem* arrest of the Vessel that is not owned by Debtor.

**C.     Rule C *In Rem* Arrest.**

The Federal Maritime Lien Act (the "Maritime Lien Act") creates maritime liens for "necessaries" provided to any vessel on the order of an authorized person.  See 46 U.S.C. §31301, *et seq.*

The Maritime Lien Act provides specifically:

> (a)     The following persons are presumed to have the authority to procure necessaries for a vessel:
> > (1) the owner;
> > (2) the master;
> > (3) a person entrusted with the management of the vessel at the port of supply; or
> > (4) an officer or agent appointed by
> > > (A) the owner;
> > > (B) the charterer;
> > > (C) an owner pro hac vice; or
> > > (D) an agreed buyer in possession of the vessel.

46 U.S.C. §31341.

The term necessaries "encompass[es] any item which is 'reasonably needed for the venture in which the ship is engaged.'" Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd., 808 F.2d 697, 699 (9th Cir. 1987).  Bunker fuel is used for a vessel's propulsion.  It is a necessary as contemplated in the Maritime Lien Act.  See, e.g., Galehead, Inc. v. M/V ANGLIA, 183 F.3d 1242 (11th Cir. 1999) (affirming district court's holding that supplier of bunkers had maritime lien for necessaries); Trans-Tec Asia, 518 F.3d at 1127 n.9 ("[f]uel bunkers are 'necessaries' within the meaning of § 31342, as they were 'useful' to the [vessel] and 'enable[d] her to perform her particular function.'") (citations omitted).

The Maritime Lien Act further provides:

> A person providing necessaries to a vessel (except a public vessel) on the order of a person listed in section 31341 of this title or a person authorized by the owner
> > (1) has a maritime lien on the vessel;
> > (2) may bring a civil action in rem to enforce the lien;
> > (3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342.

Through § 31342, a maritime lien arises in favor of bunker fuel suppliers against vessels using the fuel supplied by the suppliers, regardless of whether the bunker fuel may be deemed to have been procured by the owner, the master or the charterer's agent, each of which are capable of causing a maritime lien to attach to a vessel under the Federal Maritime Act.  Under United States law, a maritime lien arises by operation of law.  No notice or recordation is required. See generally Robert Force, Admiralty and Maritime Law, Chapter 9, pp. 163-164 (Federal Judicial Center, 2004).

A maritime lien and Rule C In Rem Arrest are separate and distinct from an *in personam* claim and Rule B Attachment.  United States maritime law has long recognized the distinction

between these two unique types of claims.  The Kongsli, 252 F. 267, 270 (D. Maine 1918) ("Actions in rem are prosecuted to enforce a right to things arrested to perfect a maritime privilege or lien attaching to a vessel …, and in which the thing to be made responsible is proceeded against as the real party; but actions *in personam* are those in which an individual is charged personally in respect to some matter of admiralty and maritime jurisdiction. Both the process and proceedings are different…..").  The *in personam* Rule B Attachment is filed against the defendant personally.  Belcher Co., 724 F.2d at 1163.  An action for a Rule C *In Rem* Arrest, on the other hand, is filed against the vessel itself as the "offending thing," and the vessel can be liable even though the owner has no *in personam* liability.  T. Schoenbaum, Admiralty and Maritime Law, at 995.

The maritime lien has been defined as: "(1) a privileged claim, (2) upon maritime property, (3) for service done to it or injury caused by it, (4) accruing from the moment when the claim attaches, (5) traveling with the property unconditionally, (6) enforced by means of an action in rem." Id.  Consequently, a bunker fuel supplier that possesses a maritime lien on a vessel, like World Fuel, may bring a Rule C *In Rem* Arrest action against the vessel itself. See generally Thomas J. Schoenbaum, Admiralty and Maritime Law, §19-3, 995 (3rd ed. 2001). Indeed, the right to assert *in rem* jurisdiction to enforce a maritime lien on a vessel is an ancient and venerable right.  See, e.g., The Barnstable, 181 U.S. 464 (1901); The Schooner Freeman v. Buckingham, 59 U.S. (18 How.) 182, 188 (1855); 2 Benedict on Admiralty § 21, at 2 (7th ed. 1983); G. Gihnore & C. Black, The Law of Admiralty Chapter IX (2d ed. 1975); The Aurora, 14 U.S. 69 (1816).

Most notably for purposes of this Objection, a Rule C *In Rem* Arrest is filed against the vessel itself because the vessel is considered a distinct legal entity independently responsible for

its own debts to the supplier of the necessaries and wholly independent of any contractual

obligation of any entity that engaged the supplier.  See Chugach Forest Prods., Inc. v. N.

Stevedoring & Handling Corp. (In re Chugach Forest Prods., Inc.), 23 F.3d 241, 244-45 (9th Cir.

1994) (service provider "automatically acquired its maritime lien by supplying" necessaries and

"therefore had the right to proceed *in rem* directly against the vessel."); Petroleos Mexicanos

Refinacion v. M/T KING A, 554 F.3d 99 (3rd Cir. 2009) ("Supplemental Rule C permits an

action in rem to enforce any maritime lien.").

**D.     World Fuel's Relationship To The Debtor.**

Debtor transports bulk goods through the use of vessels, including third-party owned

vessels that it time charters.  World Fuel supplies bunker fuel to vessels around the world,

including vessels that are time chartered by the Debtor. World Fuel's General Terms and

Conditions, which govern all bunker supply contracts it enters, including contracts with vessels

that the Debtor time charters, provide that any dispute is governed by the maritime law of the

United States.  It also provides that World Fuel will have rights of lien or attachment and may

assert a maritime lien, which automatically arises pursuant to United States maritime law, against

the vessel being supplied with bunker fuel for the amount of the bunker fuel delivered.  See

World Fuel General Terms and Conditions, Exhibit A to Reed Declaration (Exh. A to Amended

Complaint).

World Fuel has a legal right to bring a Rule C *In Rem* Arrest action against the Vessel

under the Maritime Lien Act, the Supplemental Rules and World Fuel's General Terms and

Conditions.

## OBJECTION

**A.     Rule C Arrests of Nondebtor Vessels Do Not Violate The Automatic Stay.**

The order should not state that the automatic stay provisions of section 362 of the Bankruptcy Code apply to the "property" of the Debtor, including vessels that the Debtor time charters but does not own and that entities are enjoined from executing against or further arresting vessels that the Debtor time charters but does not own.  The automatic stay under sections 362 and 1520 of the Bankruptcy Code, however, does not provide such expansive and unwarranted protection to non-debtor property.  Indeed, such relief cannot be granted because: (i) the Debtor does not have a property interest in the third party-owned vessels; (ii) a Rule C *In Rem* Arrest is not an attack on the time charter agreement; and (iii) any affect on the Debtor is incidental and temporary. Further, Debtor's Korean bankruptcy appears to be a *de facto* liquidation rather than a reorganization because there is no plan of reorganization and there is no refinancing.

**1.     The Debtor Does Not Have A Property Interest In The Vessels It Time Charters.**

In a time charter arrangement, the time charterer contracts for a specific service of the vessel, such as the transport of goods, and "the ship owner mans, equips and supplies the vessel (except that usually the charterer is required to furnish bunker fuel oil and pay for port charges and certain sundry items), and retains possession and control of the vessel through the master and crew who remain in the owner's employ."  Benedict on Admiralty, Vol. 8, § 18.02[B] (Matthew Bender); Asprogerakas v. MOL Tankship Mgmt., Ltd., No. Civ.A.CV-97-3053, 1998 WL 760291, at *3 (E.D.N.Y. Aug. 31, 1998) (indicating that a "time charterer contracts not for the vessel but for a specific service of the vessel, such as the transport of goods, which is rendered by the owners' ship, captain and crew").

The Debtor has no property interest in the vessels it time charters because a time charter agreement conveys no property interest to the charterer in the chartered vessel. See Bergan v. Int'l Freighting Corp, 254 F.2d 231, 232 (2d Cir. 1958) ("Under a time charter the ship-owner agrees to carry goods in a ship in which the charterer has no property interest."); see also Mondella v. S.S. Elie V, 223 F. Supp. 390, 392 (S.D.N.Y. 1963) (noting that a time charterer "merely rents cargo space . . . and has no property interest in the vessel"); Fed. Commerce & Navigation Co. v. M/V Marathonian, 392 F. Supp. 908, 910 (S.D.N.Y. 1975) (a time charterer is without any property right in the vessel); G & G Steel, Inc. v. Sea Wolf Marine Transportation, LLC, No. 06-01840 (S.D.N.Y. Jan. 23, 2008) ("time-charterer does not have a proprietary interest in a vessel."); Hayes v. Wilh Wilhelmsen Enters., Ltd., 818 F.2d 1557, 1562 (11th Cir. 1987) ("The rule regarding control of the vessel in a time charter-party is as old as time charters themselves.  Of course, the vessel is not demised in a time charter.  The time charterer has no property interest in the vessel."); Riffe Petroleum Co. v. Cibro Sales Corp. (In re Riffe Petroleum Co.), 601 F.2d 1385, 1389 (10th Cir. 1979) ("Under a time charter, the ship owner agrees to carry goods in a ship in which the charterer has no property interest."); Nautilus Marine, Inc. v. Niemela, 989 F. Supp. 1229, 1235 n.4 (D. Alaska 1996) ("Under a time charter the owner retains the management and control of the vessel.") (internal citations omitted).

A vessel that a debtor has time chartered, which by definition is the performance of a service for such debtor, is not that debtor's property.   United States v. West Indies Transport Co., 57 F. Supp. 2d 198, 204 n.7 (D.V.I. 1999) ("a time or voyage charterer who "contracts not for the vessel itself but for a specific service of the vessel, such as carriage of goods, which is rendered by the owner's master and crew. ") (citing McAleer v. Smith, 57 F.3d 109, 112-13 (1st Cir. 1995)).

Because the Debtor has no property interest in the vessels that it time charters, the

automatic stay that will arise pursuant to section 1520(a)(1) of the Bankruptcy Code (should this

Court continue the interim order) does not prohibit World Fuel from exercising its Rule C *In*

*Rem* Arrest rights against nondebtor vessels that the Debtor time charters such as the M/V Hanjin

Montevideo.

> 2.    **Rule C *In Rem*  Arrests Are Not An Attack On The Charter Agreement.**

Under maritime law, a vessel is a distinct entity wholly responsible for its own

debts. Riffe Petroleum Co. v. Cibro Sale Corp., 601 F.2d 1385, 1389 (10th Cir. 1979); Chugach

Forest Prods., Inc. v. N. Stevedoring & Handling Corp. (In re Chugach Forest Prods., Inc.), 23

F.3d 241, 244-45 (9th Cir. 1994). The Maritime Lien Act provides a vessel's supplier of

necessaries, such as World Fuel, with a lien on a vessel for the cost of supplies. 46 U.S.C. §

31342. Such a maritime lien constitutes "a unique security device which serves the dual purpose

of keeping ships moving in commerce while not allowing them to escape their debts by sailing

away. See Riffe Petroleum Co., 601 F.2d at 1389.

The existence of a maritime lien works to allow a supplier of necessaries to furnish its

services on the credit of a vessel. Crimson Yachts v. Betty Lyn II Motor Yacht, 603 F.3d 864,

869-70 (11th Cir. 2010); Equilease Corp. v. M/V SAMPSON, 793 F.2d 598, 602 (5th Cir. 1986).

The lien arises regardless of who shall actually pay for the necessaries and the lien is considered

a proprietary right in the vessel itself distinct from any personal liability of the time charterer. 46

U.S.C. § 31342; see also Riffe Petroleum Corp., 601 F.2d at 1390; Thomas J. Schoenbaum,

Admiralty and Maritime Law, §19-3, 995 (3rd ed. 2001) (explaining that an action for a Rule C

*In Rem* Arrest is filed against the vessel itself as the "offending thing," and the vessel can be

liable even though the owner has no in personal liability).

When World Fuel delivers bunker fuel to a vessel, it is well aware of its substantive rights under maritime law.  In its General Terms and Conditions, which govern all bunker supply contracts it enters, World Fuel expressly states that it will have rights of lien and may assert a maritime lien, which automatically arises pursuant to United States maritime law, against the vessel being supplied with bunker fuel for the amount of the bunker fuel delivered.  <u>See</u> Exhibit A to Reed Declaration, World Fuel General Terms and Conditions (Exh B to the Amended Verified Complaint).

As further evidenced by the General Terms and Conditions, World Fuel possesses no obligation to look solely to the time charterer for payment of the bunker fuel it supplies.  <u>See</u> World Fuel General Terms and Conditions, at § 8 ("All sales made under these terms and conditions are made to the registered owner of the Receiving Vessel, in addition to any other parties that may be listed as Buyer in the confirmation. Any Products ordered by an agent, management company, charterer, broker or any other party are ordered on behalf of the registered owner of the Receiving Vessel and such registered owner is fully liable as a principal for payment of the bunker invoice.").

In practice World Fuel cares little who actually pays for the bunker fuel it supplies to vessels as long as it is paid for the bunker fuel it supplied.  Armed with the powers of the Maritime Lien Act, World Fuel understands that it will receive payment for any necessaries that World Fuel supplies to a vessel or, absent payment, World Fuel may arrest such vessel and sell it in satisfaction of the vessel's debt to World Fuel.  Congress enacted the Maritime Lien Act to grant suppliers of necessaries with maritime liens that automatically provides such suppliers with maximum financial security.  <u>Island Tanker S.A. v. BP N. Am. Trading, Inc. (In re Energy Coop., Inc.)</u>, No. 81-0581, 1986 Bankr. LEXIS 4865, at *18-19 (Bankr. N.D. Ill. Dec. 4, 1986).

-11-

World Fuel, like any other supplier of necessaries to time chartered vessels, provides its services directly to the vessel itself.  The nature of the maritime lien permits the supplier of necessaries to rely on the vessel's credit without regard to any other party's financial condition. Maritime law contemplates that a supplier furnishes the vessel with the necessaries and the vessel, being a distinct maritime entity is responsible for payment. It is due to that ancient and venerable right, that a bunker fuel supplier that possesses a maritime lien on a vessel, like World Fuel, may bring a Rule C *In Rem* Arrest action against the vessel.

As such, it is clear that (i) a time charter agreement does not provide a time charterer, such as the Debtor, with a property interest in the vessel, (ii) a maritime lien is a unique security device that arises in favor of bunker fuel suppliers against vessels in which it supplied bunker fuel, and (iii) a Rule C *In Rem* Arrest is filed against the vessel itself because the vessel is considered a distinct legal entity independently responsible for its own debts to the supplier of the necessaries and wholly independent of any contractual obligation of any entity that engaged the supplier.  When viewed in that light, this Court must reach the same conclusion reached by the Ninth and Tenth Circuits in Riffe Petroleum Corp. and Cugach:  A Rule C *In Rem* Arrest is directed neither at the time charter (*i.e.* the Debtor) nor the time charter agreement and, therefore, does not violate the stay provisions provided under the Bankruptcy Code.  See Riffe Petroleum Corp., 601 F.2d at 1390 ("The admiralty proceeding was not directed at the time charter contract."); Chugach, 23 F.3d at 246 ("we think Riffe applies to this case.").

**3.      Any Affect On The Debtor Resulting From a Rule C *In Rem* Arrest of a Nondebtor Owned Vessel Is Incidental And Temporary.**

As noted above, upon recognition of a foreign main proceeding, "sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States."  11 U.S.C. § 1520(a)(1).  It is "well-established that

bankruptcy stays pursuant to §362(a) are limited to debtors and do not encompass non-bankrupt

co-defendants . . . [there is] no provision to protect non-debtors who are jointly liable on a debt

with the debtor." <u>Teachers Ins. And Annuity Assoc. of Am. v. Butler</u>, 803 F.2d 61, 65 (2nd Cir.

1986) (citations omitted).  That limitation is explicit with respect to a stay triggered pursuant to

sections 1520 and 1521.  <u>See</u> 11 U.S.C. § 1520 (extending relief under section 362 only to "the

debtor and the property of the debtor . . . ."); 11 U.S.C. § 1521 ("where necessary to protect the

assets of the debtor or the interests of creditors, the court may… grant any appropriate

relief…").  Accordingly, the stay provided by section 1520 (and any additional relief provided

under section 1521) should not, as suggested by the Foreign Representative, bar actions against

vessels time chartered by the Debtor, but that are not the Debtor's property.

       Only under extraordinary and unusual circumstances should a court expand the automatic

stay to include nondebtor property.  <u>See</u>, <u>e.g.</u>, <u>Queenie</u>, 321 F.3d at 287-88.  Any expansion of

the automatic stay to cover nondebtor property (such as third-party owned vessels) would cause

vast interference with creditors' maritime rights with respect to nondebtors.  And  as noted by

<u>Queenie</u>, 321 F.3d 282, 287-88 (2d Cir. 2003), any expansion of a stay would be inappropriate

where, as here, "there would be vast and unwarranted interference with creditors' enforcement of

their rights against non-debtor[s]."  <u>Id.</u> at  287-88.  Moreover, World Fuel believes there exists

no legal basis in the Bankruptcy Code or otherwise that would warrant the extension of the

automatic stay to include the prohibition of a Rule C *In Rem* Arrest action against a vessel that is

time chartered by the Debtor and owned by a third party. Moreover, the bankruptcy appears to be

a *de facto* liquidation rather than a reorganization. There is no plan of reorganization and there is

no refinancing.

Case law, under facts substantially similar to those in this case, confirms that a Rule C *In Rem* Arrest on a nondebtor vessel does not arise to special circumstances that warrant the extension of the automatic stay to vessels owned by nondebtors.  Both the Ninth and Tenth Circuits have concluded that the incidental and temporary affect of a Rule C *In Rem* Arrest on a debtor is not sufficient enough to expand the automatic stay to include a vessel that is not owned by the Debtor.  See Chugach Forest Prods., Inc., 23 F.3d at 245; Riffe Petroleum, 601 F.2d at 1390.

In Chugach, the debtors hired a stevedorer to load logs and lumber onto a vessel and then filed a Chapter 11 case before paying the stevedorer for these services.  Chugach Forest Prods. Inc., 23 F.3d at 242.  The debtors' failure to pay the stevedore gave rise to a maritime lien against the vessel.  The debtors later hired the stevedore to load another shipment of logs and lumber onto the same vessel, and the stevedore executed a Rule C *In Rem* Arrest against the vessel after loading it with the debtors' logs and lumber.  Id.  When the vessel was arrested with the cargo only half-loaded, the debtor argued that the arrest violated the automatic stay because it was either (i) a seizure of the debtor's property or (ii) an impermissible interference with the debtor's right to realize a profit on such property.  Id.  The Ninth Circuit squarely rejected these arguments and found that no stay violation occurred.  Id. at 245.  In reaching that conclusion, the court determined that, notwithstanding the arrest of the vessel and concomitant detention of the debtor's cargo on the vessel, the supplier "did not 'exercise control' over [the debtor's] property," and any "incidental effect [on the debtor or its property] is insufficient to trigger the stay."  Id. at 245-46.  The Court continued by quoting from the In re Continental Airlines decision:

> Although ... the scope of subsection 362(a)(3) is [not] precisely limited to instances where a creditor is taking direct action against a res in the hands of the debtor, there is no reason to adopt a strained interpretation which ignores legislative purpose.... Thus, while seemingly broad in scope, the

automatic stay provisions should be construed no more expansively than is
necessary to effectuate legislative purpose.

Id. at 245 (citing Continental Air Lines, Inc. v. Hillblom (In re Continental Air Lines, Inc.), 61

B.R. 758, 779 (S.D. Tex. 1986).  To conclude the point, the Chugach court noted that "Congress

did not give the bankruptcy court exclusive jurisdiction over all controversies that in some way

affect the debtor's estate."  Id. at 245 (quoting Riffe Petroleum, 601 F.2d at 1390).

A similar result was reached by the Tenth Circuit in Riffe Petroleum Co. v. Cibro Sales

Corp., 601 F.2d 1385.  In Riffe, under facts practically identical to the instant case, the Tenth

Circuit considered the issue of whether a supplier's post-petition arrest of a vessel time chartered

to a debtor, but owned by a third party nondebtor, violated a stay order issued in a Chapter XI

proceeding under the former Bankruptcy Act.  601 F.2d at 1390.  In Riffe, as in this case, the

supplier filed a Rule C *In Rem* Arrest action against a vessel owned by a nondebtor in order to

enforce a maritime lien for necessaries (*i.e.* bunker oil).  The bankruptcy court had previously

entered a stay order in respect of the debtor's property, from which the supplier had not sought

relief prior to arresting the vessel.  The debtor argued that the arrest of the ship violated the

bankruptcy court's stay order and that the supplier should be held in contempt.  The Riffe court

found that the debtor's time charter did not convey to the debtor any incidents of ownership in

the vessel sufficient to merit protection of the vessel from arrest by a third party.  Id. at 1390.

Riffe clearly acknowledged that the Rule C *In Rem* Arrest of the nondebtor chartered

vessel had some affect on the debtor – specifically, that the arrest "temporarily affected" the

debtor's use of the vessel.  Id.  The court stated, "[t]he seizure of the ship temporarily affected

[the debtor's] right to use it.  Id.  "'Affect' is not enough to sustain summary jurisdiction of a

bankruptcy court or to justify its use of contempt power."  Id.  The court further explained that

"[t]he fact that a debtor's property may be affected by proceedings under admiralty law does not

constitute a 'claim' against that property" that should be subject to a stay order or otherwise subject to contempt proceedings.  Id.

The lesson to be learned from Chugach and Riffe is that actions against nondebtor owned vessels do not violate the automatic stay, even where there is a temporary and incidental affect on the debtor.[2]  That is precisely the situation before this Court.  When a supplier (such as World Fuel) supplies bunker fuel to a vessel, a maritime lien automatically arises in favor of the supplier against the vessel for the amount of the bunker fuel provided.  When the bunker fuel is not paid for, the supplier, pursuant to applicable maritime law, is provided the opportunity to initiate a Rule C In Rem Arrest action against the vessel itself and independent of any contractual relationship with the time charterer of the vessel.  In many instances, the owner of the vessel will come forward quickly and provide the supplier with a cash payment, bond or other security in order to release the vessel.  Consistent with the conclusions of both the Ninth and Tenth Circuits in Chugach and Riffe, respectively, such incidental and temporary affect is insufficient to trigger the stay.

Indeed, simply because some action on nondebtor property might have an "affect" on the Debtor, does not mean the automatic stay immediately expands to include nondebtor property.  See, e.g., Feldman v. Trustees of Beck Industries, Inc. (In re Beck Industries, Inc.), 479 F.2d 410 (2d Cir. 1973) (denying efforts to stay actions against non-debtor subsidiaries on the theory that such actions might adversely affect property of the debtor's bankruptcy estate by depressing the value of stock held by the debtor). This is precisely why section 362(a) of the Bankruptcy Code does not stay actions against guarantors, sureties, corporate affiliates, or other non-debtor parties

---

[2] The court in In re Energy Coop., Inc., 1986 Bankr. LEXIS 4865, reviewed the Riffe decision, among others, when a dispute arose as to whether the debtor time charterer, the ship owner or the supplier owned the bunker fuel upon the vessel.  In following the Riffe reasoning, the Energy Coop court determined that the time charterer did not own the bunker fuel because it never paid for the bunker fuel.

liable on the debts of the debtor.  CAE Industries Ltd. v. Aerospace Holdings Co., 116 B.R. 31,

32 (S.D.N.Y. 1990); see also Ingersoll-Rand Fin. Corp. v. Miller Mining Co., 817 F.2d 1424,

1427 (9th Cir. 1987) (creditor may sue nonbankrupt guarantor); Advanced Ribbons & Office

Prods. v. U.S. Interstate Distrib. (In re Advanced Ribbons & Office Prods.), 125 B.R. 259, 263

(Bankr. 9th Cir. 1991) (citations omitted) (foreclosure on stock pledged as security for debtor's

liability does not violate the stay); O'Malley Lumber Co. v. Lockard (In re Lockard), 884 F.2d

1171,1176-79 (9th Cir. 1989) (creditor may sue nonbankrupt surety).

Moreover, as noted in Chugach, the Rule C *In Rem* Arrest might actually facilitate the

Debtor's reorganization by allowing World Fuel to satisfy its claim against the Debtor with the

assets of a nondebtor third party (*i.e.*, the vessel or an owner) thereby preserving funds for other

creditors.  Chugach Forest Prods., Inc., 23 F.3d at 247.

### 4.    Relief Granted Should Not Be Broader Than The Relief Granted By The Seoul Court.

The Debtor's chapter 15 proceeding is an ancillary proceeding to the Korean Bankruptcy

Proceeding.  Chapter 15 specifically contemplates that principles of comity and cooperation with

the foreign court must inform the domestic court with respect to the extent to which a domestic

court makes relief available to a foreign representative.  See In re Daewoo Logistics Corp., 461

B.R. 175, 178 (Bankr. S.D.N.Y. 2011).  Accordingly, a foreign debtor seeking to impose a stay

pursuant to chapter 15 must first demonstrate that an equivalent stay is applicable in the foreign

main proceeding.  See id. ("In light of the ancillary nature of Chapter 15, . . . absent exigent

circumstances, a stay imposed pursuant to chapter 15 is normally coterminous with the stay in

the corresponding foreign proceeding . . . ."); see also In re Int'l Banking Corp. B.S.C., 439 B.R.

614, 626-27 (Bankr. S.D.N.Y. 2010) (denying foreign debtor's motion to vacate an order of

attachment in United States where foreign debtor failed to demonstrate that similarly situated

creditors were similarly restrained in jurisdiction of foreign main proceeding); <u>Vitro, S.A.B. de C.V. v. ACP Master, Ltd. (In re Vitro, S.A.B. de C.V.)</u>, 455 B.R. 571, 582 (Bankr. N.D. Tex. 2011) (noting that "comity is not furthered by granting an injunction when such an injunction may not . . . be recognized under [foreign] law.").

 In the Debtor's Korean Bankruptcy Proceeding, upon the commencement of the rehabilitation proceeding, the Debtor obtained the stay of new attachments by creditors over the Debtor's property and the suspension of all current attachments by creditors on the Debtor's property.  <u>See</u> DRBA Art. 58, paras. 1-2.  Indeed, paragraph 6 of Debtor's motion acknowledges that the stay in the Korean Bankruptcy Proceeding was "against Hanjin and its assets wherever located pursuant to Article 59 of the DRBA." because such relief is not available to the Debtor in its Korean Bankruptcy Proceeding, such extraordinary relief must not be available to the Debtor in its ancillary Chapter 15 case.

**B.** <u>**World Fuel Is Entitled To Adequate Protection And Sufficient Protection Of Its Interests As A Maritime Claimholder Including Its Maritime Lien Rights**</u>**.**

 If this Court determines that the Interim Order should be continued so as to preclude World Fuel from exercising its Rule C *In Rem* Arrest rights against vessels that are not owned by the Debtor, then World Fuel should be granted adequate protection and/or sufficient protection of its liens on such nondebtor vessels pursuant to sections 362, 363 and 1522 of the Bankruptcy Code.

 Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased… the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Further, section 362(d)(1) of the Bankruptcy Code provides that lack of adequate protection is a basis to lift the automatic stay.

-18-

The purpose behind the "adequate protection" requirement is to ensure that the value of a secured interest in property does not diminish throughout the course of a reorganization proceeding.  In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984) (citations omitted).  Indeed, "security interests have been recognized as property rights protected by [the United States] Constitution's prohibition against takings without just compensation."  Bank of New York & JCPL Leasing Corp. v. Treco (In re Treco), 240 F.3d 148 (2d Cir. 2001); U.S. Const. Amendment V.  The Bankruptcy Code incorporates the concept of adequate protection to address the impact that the automatic stay has on the property rights of lienholders.  In re WorldCom, Inc., 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004).

Section 1522(a) of the Bankruptcy Code mandates that secured creditors be protected in a chapter 15 case by requiring that creditors and other parties' interests are "sufficiently protected".  See 11 U.S.C. 1522(a); see also In re Tri-Cont'l Exch. Ltd., 349 B.R. 627, 636-37 (Bankr. E.D. Cal. 2006) (noting that section 1522 of the Bankruptcy Code "authorizes the court to assure that interests of creditors and interested parties are 'sufficiently protected,' to impose conditions on any discretionary relief").  In re The Int'l Banking Corp., 439 B.R. 614, 626 ("The idea underlying [§ 1522] is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief.") (citation omitted).

Section 1522(b) of the Bankruptcy Code provides courts with the mechanism to provide parties with the protection required under section 1522(a), stating:

> The court may subject relief granted under section 1519 or 1521, or the operation of the debtor's business under section 1520(a)(3), to conditions it considers appropriate, including the giving of security or the filing of a bond.

11 U.S.C. § 1522(b); In re Tri-Cont'l Exch. Ltd., 349 B.R. at 636 (noting that 1522(b) "permits the court to impose conditions on any discretionary relief that it grants, which permits it to achieve an appropriate balance" between the relief granted to the foreign representative and the interests of creditors).

As mandated under sections 361, 362, 363 and 1522 of the Bankruptcy Code, the Debtor must provide protections to World Fuel.  With respect to World Fuel's liens on vessels that the Debtor time charters, as such vessels depreciate in value through continued use and the passage of time, the value of World Fuel's liens also decreases.  In addition, there are other significant risks that may reduce or entirely eliminate the value of World Fuel's lien on any given vessel if World Fuel is unable to execute Rule C *In Rem* Arrests.  For example, after leaving United States waters, a vessel could be:  (i) subsequently arrested in foreign jurisdictions and made the subject of a judicial sale (even perhaps a "friendly sale" agreed to between the ship owner and the lender) by a foreign court whereby the lien rights of World Fuel would be diminished or even extinguished by other claimants; or (ii) involved in a collision or loss that greatly decreases or completely eliminates the vessel's value and the corresponding value of World Fuel's lien.

Thus, to protect the valuable maritime lien rights World Fuel received when it provided bunker fuel to the vessels that the Debtor time charters, World Fuel respectfully submits that it is appropriate to require the Debtor to provide a cash payment or post a bond in an amount equal to the amount that the Debtor owes to World Fuel for unpaid bunker fuel, including all amounts recoverable under maritime law for attorneys' fees and other expenses.

Moreover, pursuant to section 1522(a) of the Bankruptcy Code, with respect to the bunker fuel that is subject to the existing Rule B Attachments, the only mechanism sufficient to protect World Fuel's maritime attachment rights is to require the Debtor to make cash payments

or post a bond in an amount equal to the bunker fuel's value.  The bunker fuel's value and, correspondingly, the value of World Fuel's attachment rights, automatically decreases as vessels operate and burn off their bunker fuel.  As such, cash payments or a bond in the full amount of the bunker fuel's value is the only way to protect World Fuel's interests while allowing the further use of the bunker fuel.

WHEREFORE, for all of the foregoing reasons, World Fuel respectfully requests that this Court (i) refrain from issuing any order that would stay, enjoin or in any way interfere with World Fuel's right and ability to enforce liens as a supplier of fuel to vessels that are not owned by the Debtor but merely time chartered to the Debtor, including, without limitation, by way of proceedings to arrest such vessels in the United States pursuant to Rule C *In Rem* Arrests, (ii) provide World Fuel with adequate protection and/or sufficient protection for its maritime rights in the form and manner set forth above, and (iii) grant to World Fuel such other and further relief as the Court deems just and proper.

Dated:  September 8, 2016                    Respectfully submitted,

/s/ Steven J. Reed
Steven J. Reed, Esq.
Attorney ID: 041141988
**GREGORY & REED, LLC**
*Attorneys at Law*
2 Sylvan Way, Suite 303 West
Parsippany, New Jersey 07054

*Attorneys for World Fuel Services, Inc.*