# Time Charter

1/2 Original

## GOVERNMENT FORM

### Approved by the New York Produce Exchange

November 6th, 1913-Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1   This Charter Party, made and concluded in *Hamburg*          25th  day of *April*                    ~~19~~ *2003*

2   Between *Conti 31, Container Schiffahrts-GmbH & Co. KG Nr. 1, Putzbrunn Germany*

3   Owners of the good *TBN*              ~~Steamship~~/Motorship *NB from Hyundai Heavy Industries Co., Ltd. - Ulsan / South Korea* of  *Hull No. HHI*
    *1580*

4   of *see Clause 29* tons gross register, and _____ tons net register, having engines of _____ indicated horse power

5   and with hull, machinery and equipment in a thoroughly efficient state, and classed _____

6   at _____ of about_____ cubic feet bale capacity, and about _____ tons of 2240 lbs.

7   deadweight capacity (cargo and bunkers, including fresh water and stores ~~not exceeding one and one-half percent of ship's deadweight capacity,~~

8   ~~allowing a minimum of fifty tons)~~ on a draft of _____ feet _____ inches on _____ Summer freeboard, inclusive of permanent bunkers,

9   which are of the capacity of about _____ tons of fuel, and capable of steaming, fully laden, under good weather

10  conditions about _____ knots on a consumption of about _____ tons of best ~~Welsh coal-best grade fuel oil-best grade Diesel oil.~~

11  now *see Clause 29*

12  _____ and *Hanjin Shipping Co., Ltd.*    Charterers of the City of  *Seoul*

13      Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about *see Clause 38 - worldwide trading always via safe port(s), safe berth(s), safe anchorage(s), always afloat and always within Institute of Warranty*
    *Limits*

15  _____ within below mentioned trading limits.

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfillment of this Charter Party *subject to Owners agreement, which however, not unreasonably withheld.*

18  Vessel to be placed at the disposal of the Charterers, ~~at~~ *on dropping outbound dock-pilot ex building yard at any time day night shinc.*

19

20  ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

21  ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery to be

22  ready to receive cargo with clean-swept holds *free from rust, flakes, scales, residues to an independent Surveyors satisfaction* and tight, staunch, strong and

23  in every way fitted for *ordinary cargo* ~~the~~ service, having water ballast, ~~winches and~~

24  ~~donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same~~
    ~~time~~ (and with full complement of officers, seamen, engineers ~~and firemen~~ for a vessel of her tonnage), to be employed, in carrying *Containers with* lawful
    merchan-

25  dise, including petroleum or its products, in proper containers, excluding *see Clause 66*

26  ~~(vessel is not to be employed in the carriage of Live Stock,~~ but Charterers are to have the privilege of shipping ~~a small number~~ on deck ~~at their risk,~~

27  ~~all necessary fittings and other requirements to be for account of Charterers),~~ in such lawful trades, between safe port and/or ports ~~in British North~~

28  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29  ~~Mexico, and/or South America~~                                                                                           ~~and/or Europe~~

30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31  ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also-excluding, where out of season, White Sea, Black Sea and the Baltic,~~

32  *worldwide, always between safe port(s)/berth(s)/anchorage(s), always afloat and within I.W.L., with lawful merchandise in ISO containers, excluding*

33  *Cambodia, North Korea, Australia, New Zealand, Tasmania, Iraq, Iran, Eritrea, Somalia, Yemen, Lebanon, Israel, Syria, Zaire, Turkey and Turkish*

34  *occupied Cyprus, Georgia, including Abkhazia, former Yugoslav countries, Libya, Denmark, Scandinavia, Finland, Cuba, Haiti, trading in ice, all*
    *warlike-war risks  areas as declared by Lloyds of London. Charterers should advice 4 weeks in advance if intended trade changes and vessel call U.S. port(s*
    *or where the U.S. law applies as far as possible*

35  as the Charterers or their Agents shall direct, on the following conditions:

36      1. That the Owners shall provide and pay for all provisions, wages, *oil sludge disposal* and consular shipping and discharging fees of the Crew;shall pay
        for the

37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38  the vessel in a thoroughly efficient state in hull, machinery and equipment *with all certificates necessary to comply with requirements at ports of call and*
    *canals for and during the service.*

39      2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies *for clearance*

*and cargo purpose only Boatage on Charterers business,* Commissions,

40 Consular Charges (except those pertaining to the Crew *and flag*), and all other usual expenses except those before stated, but when the vessel puts into

41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43 charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44 of six months or more.

45     Charterers are to provide necessary dunnage, *lashing materials* and shifting boards, also any extra fittings requisite for a special trade or unusual cargo,
but

46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47 for dunnage, they making good any damage thereto.

48     2. That the Charterers, at the port of delivery, *see Clause 78* and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining
on

49 board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than _____ tons and not more than

50 _____ tons and to be re-delivered with not less than _____ tons and not more than _____ tons. *See Clause 33*

51     4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *see Clause 63*

52 _____ United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and

53 stores, on _____ summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at

54 and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) at *on dropping last oatbound seapilot station 1 safe port Singapore / Japan range including Korea,*

56 *P.R.C. or Hamburg / Le Havre range in Charterers option always at any time day/night shiac* unless otherwise mutually agreed. Charterers are to give
Owners not less than *9 Months, 90/60/45/30/20/10 days approximate and 3/2/1 days definite*

57 notice of vessels expected date of re-delivery, and probable port.

58     5. Payment of said hire to be made in New York in cash in United States Currency, semi-monthly in advance, and for the last half month or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day

63 following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they

64 to have the privilege of using vessel at once, such time used to count as hire.

65     Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68     6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely

70 lie aground.

71     7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers

74 paying Owners _____ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are

75 incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.

76     8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance *including reefer plugging and
unplugging for which Charterers to pay* ▮▮▮ *per each Container plugged and also to pay* ▮▮▮ *per each Container unplugged by crew provided
local regulations permits. It is clearly understood that crew is working as Charterers servants for such work.* with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, *lash, secure, unlash, discharge, tally* and trim the cargo at their expense under the supervision *and responsibility* of
the Captain. who is to sign Bills of Lading for

79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *See Clause 67*

80      9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82      10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free *and suitable* accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of ▓▓▓▓▓▓▓▓ Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85  Clerks, Stevedore's Foreman, etc., *Charterers paying at the current rate per meal, for all such victualling. See Clause 98*

86      11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in *English* writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88  terers, their Agents or Supercargo, when required, with a true copy of daily *Deck and Engine* Logs, showing the course of the vessel and distance run and the con-

89  sumption of fuel.

90      12. That the Captain shall use diligence in caring for the ventilation of the cargo *holds*

91      *13. That the Charterers shall have the option of continuing this charter for a further period of* see Clause 38 _____

92  _____

93  *on giving written notice thereof to the Owners or their Agents* _____ *days previous to the expiration of the first-named term, or any declared option.*

94      14. That if required by Charterers, time not to commence before *see Clause 97* _____ and *should vessel*

95  *not have given written notice of readiness on or before* _____ *but not later than 4 p.m. Charterers or*

96  *their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.*

97      15. That in the event of the loss of time from deficiency *and/or default of men and/or strike or sabotage by officers, crew or deficiency* of men or

98  stores, fire, breakdown or damages to hull, machinery or equipment,

    grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause *whatsoever*

99  preventing the full working of the vessel, the payment of hire *and overtime* shall cease for the time thereby lost *until the vessel has returned to the same equivalent position*; and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101  thereof, and all extra expenses shall be deducted from the hire. *See also Clause 56*

102      16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105      The vessel shall have the liberty to sail with or without pilots *if local regulations permit*, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property.

107      *17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,*

108  *one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for*

109  *the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. See Clause 76*

110      18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113  might have priority over the title and interest of the owners in the vessel.

114      19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115  Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of

116  York-Antwerp Rules *1974 as amended in 1990 and as amended in December 1994* 1924, at such port or place in *London*, the United States as may be selected by the carrier, and as to matters not provided for by these

117  Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into

118  United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at

This is a computer generated NYPE 46 form. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original approved document shall apply. Dataworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods.~~ Such cash deposit as the carrier
121 or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122 required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. ~~Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~

126     In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever
127 whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the
128 goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129 losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130 goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131 ships belonged to strangers.

132     Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *Hire and freight not to*
*contribute to General Average.*

133     20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~
134 ~~cost of replacing same, to be allowed by Owners~~ *to be for Owners* account.

135     ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 *for periodical survey see Clause 55*
139

140     ~~22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *sufficient lights as on board for*
*night works, free of expenses to Charterers.* ~~lanterns and oil for~~
143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
144 Charterers to have the use of any gear on board the vessel.

145     23. Vessel to work night and day, if required by Charterers. ~~, and all winches to be at Charterers' disposal during loading and discharging;~~
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~

151     ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder.~~
155     ~~U. S. A. Clause Paramount~~
156     ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities, or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160     ~~Both-to-Blame Collision Clause~~
161     ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

163  ~~hereunder will indemnify the Carrier against all loss or liability to the other or non- carrying ship or her owners in so far as such loss~~
164  ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165  ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non- carrying ship or her~~
166  ~~owners as part of their claim against the carrying ship or carrier.~~ *See Clause 68*

167  25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging.

170  26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, *acts of pilot and tugboats, etc.,* insurance, crew, and all other matters, same as when trading for their own account

172  ~~27. A commission of 2 1/2 per cent is payable by the Vessel and Owners to~~
173

174  ~~on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.~~
175  ~~28. An address commission of 2 1/2 per cent payable to~~ _____ ~~on the hire earned and paid under this Charter.~~

*Clause 29 to 100 as attached hereto are deemed to be fully incorporated in this Charter Party*

**FOR THE CHARTERERS**

HANJIN SHIPPING COMPANY, LTD
Europe Regional Headquarter
Postfach 11 12 22    · 20412 Hamburg
Admiralitätstrasse 56 · 20459 Hamburg
Germany

**FOR THE OWNERS**

This is a computer generated NYPE 46 form   Any insertion or deletion to the form must be clearly visible.   In event of any modification being made to the preprinted text of this document, which is not
clearly visible, the original approved document shall apply.   Dataworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

## - Clause 29 - T/C description -

Description still has to be drawn up by Owners and attached to the Charter Party in an Addendum.

## - Clause 30 - Superficial Inspection -

Charterers to have the option of holding a superficial inspection prior to delivery and also at anytime of this Charter, Owners and Master giving every facility and assistance to carry this out.

## - Clause 31 - Charterers' Flag and Funnel Mark -

Charterers to have the privilege of flying their own house flag and painting following Charterers chosen vessels name at the time of delivery free of charge (also including documentation) to Charterers.

    fore part ship's name
    stern ship's name and registry
    bow emblem
    funnel mark/colour
    ships side logo
    life saving equipments marking
    ships name board

The Charterers to rename the vessel and repaint everything to Owners chosen name and colours prior redelivery and at Charterers expenses.

## - Clause 32 - Delivery Notice -

Owners to give 90/60/45/30/20/10 days approximately and 3/2/1 days definite notice of the date of delivery under this Charter Party to Charterers.

## - Clause 33 - Bunker Price, Quantity and Quality -

Bunker prices to be at the Korean mean price on Platts Bunker wire for FO/DO. Charterers on delivery and Owners on redelivery shall take over and pay for all IFO and MDO remaininng on board. Vessel to be delivered with bunkers as on board and redelivered with approximately same quantities as on delivery. Bunker prices as per average of last Platt's Oilgram Bunker Wire, issued at the time of delivery/redelivery for vessel's last major bunker port. Charterers are unable to pursue claims in respect to quality of their bunker supplies more than thirty (30) days after delivery of bunker wherefore Charterers will not accept claims from Owners for bunkers of inferior quality received later than thirty (30) days after date of delivery of the bunker.

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

- Clause 34 – Crew -

In case the crew is to be changed in circumstances where they fail to, in some way perform
their duties, the expenses thereof is to be Owners' account.

- Clause 35 - On-Off-Hire Survey -

Joint on/off-hire survey to ascertain the vessel's condition and quantity of bunkers r.o.b. shall
be carried out on delivery and redelivery. Joint on-hire survey to be carried out on delivery in
Owners' time and joint off-hire survey on redelivery in Charterers' time, but expenses to be
equally shared between Owners and Charterers. Charterers to appoint after consulting with
Owners on/off-hire surveyors representing both Owners and Charterers.

- Clause 36 - Stevedore Damages -

In the case of stevedore damage, for which Charterers may be liable under the terms of this
Charter Party, all such damage must be reported by the Master with written acknowledgment
or receipt by the party causing loss or damage within 48 hours after occurrence unless it is
made good in writing to Charterers' agents giving details of party causing same at the port
when and where such damage occurs or, in case of hidden damage, as soon as discovered
during currency of this Charter.

All damage for which Charterers are liable not being normal wear and tear and not affecting
vessel's seaworthiness or working capacity shall be made good by occasional repairs when
vessel is to dock for Owners' account, Charterers paying actual cost of repairs but not for
time used provided such time does not exceed time necessary for Owners to carry out their
own work or repairs.

- Clause 37 – Equipment -

Vessel's equipment including container lashing materials to comply with the regulations
and/or requirements in effect at ports of call and canals and vessel is at all time in possession
of valid up-to-date certificate on board necessary to comply with such regulations and/or re-
quirements. A particular reference is made to the United States Department of Labor safety
and Health Regulations set forth in part III Code of the Federal Regulations. Although other
provisions of this Time Charter make it the responsibility of Owners, it is agreed that, should
vessel not meet the regulations and/or requirements, Owners to make immediate corrective
measures and that time thereby lost, and Stevedores' standby time and expenses involved to
be for Owners' account.

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

- Clause 38 - Charter Period -

10 years firm time charter plus in Charterers' option 1 year plus in Charterers' option 1 year
+/- 90 days on final firm period. Declaration of the Options has to be 12 months prior termi-
nation of firm Charter Period, once the options have been declared, it will be counted as firm
Charter Period.
Vessel's ownership shall not be changed during Charter period unless the Charterers agree
which agreement shall not be unreasonably withheld.

- Clause 39 – Boycott –

Should the vessel be boycotted, picketed, blacklisted or similar incident at any port or place at
the shore and/or pilot labor and/or the tug boats and/or pilots, or at the Government and/or
any Authority, by reason of vessel's flag or the terms and conditions on which members of
the officers/crew were employed, or by reason of trading of this Charter of this vessel or other
vessel under the same ownership, or by reason of vessel's construction and/or her fittings
and/or her other equipment, all consequences and any direct expenses incurred thereof, to be
Owners account and Charterers are entitled to put the vessel Off-Hire for any time lost by
such reason.

- Clause 40- Hamburg Rules -

Neither the Charterers nor their agents shall permit the issue of any Bill of Lading, Waybill or
other documentation evidencing a contract of carriage (whether or not signed on behalf of any
Sub-Charterers) incorporating, unless compulsorily applicable the Hamburg-Rules or any
legislations, giving effect to the Hamburg-Rules or any legislations imposing liabilities in
excess of Hague-Visby rules. Charterers shall indemnify the Owners against all liability, loss
or damage which may result from any breach of the foregoing provision of this clauses.

- Clause 41 – Eligibility for Bunkering -

Owners warrant the vessel is eligible for bunkers in the United States of America, its territo-
ries and possessions in accordance with governing Export Control Regulations. Also Owners
warrant that vessel is eligible for bunkers in any other countries, if required.

- Clause 42 - Replenishment of Bunkers -

Replenishment of Bunkers is arranged and paid by Charterers, but always under the supervi-
sion and responsibility of Master. However, Master not to be responsible for any conse-
quences due to lack of due diligence and/or actions and/or negligence and/or default of bun-
kering barge or bunkers supplier or Charterers.

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

Master to pay due diligence for replenishment of bunkers so as not to cause oil spillage while bunkering.

### - Clause 43 - Oil Pollution - Financial Responsibility -

1. Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

a) Certificates issued pursuant to Section311(p) of the US Federal Water Pollution Control Act, as amended (Title 33 US Code, Section 1321(p).

b) Certificates issued pursuant to Section 1010(a) of the Oil Pollution Act 1990 and Section 180(a) of the comprehensive Environmental Response. Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulation 33 CFR:

c) Certificates of Pollution Prevention Obligation issued pursuant to Article 49.2 of the Korean Sea Pollution Prevention Act effective as of 30th December, 1997, subject to BIMCO'S view whose account it is.

2. Notwithstanding anything whether printed or typed herein to the contrary:

a) Save as required for compliance with paragraph 1 hereof Owners shall not be required to establish or maintain financial security of responsibility in respect of all or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expenses (including but not limited to the cost of any delay incurred by the vessel as a result of any failure by Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of vessel's inability to perform as aforesaid.

c) Owners shall not be liable for any loss, damage, liability of expenses whatsoever and howsoever arising which Charterers and/or the holders of any Bill of Lading issued pursuant to this Charter Party may sustain by the vessel's inability to perform aforesaid.

### - Clause 44 - Suez Canal Transit -

Vessel is fully fitted for Suez Canal transit and in possession of necessary certificate on board in conformity with current Canals Regulations/requirements.

### - Clause 45 - Cuba/Israel Blacklist -

Owners guarantee that under present ownership neither this vessel nor any other vessel under same ownership has ever called at a Cuban port or an Israeli port, and will not call at any such

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25ᵗʰ April 2003

port prior to or during the currency of this Charter. Owners also guarantee that neither this
vessel nor any other vessel under same ownership is blacklisted by any  Arab countries.


- Clause 46 - Deratting Certificate -

Vessel to be delivered with valid deratting exemption certificate on board and if this does not
cover the whole period of this Charter and renewal of certificate or fumigation is necessary,
cost of same and delay of vessel and any expenses incurred therefrom to be Owners' account.


- Clause 47 - Quarantine -

Normal quarantine time and expense to enter the port to be for Charterers' account, but any
time of detention and expenses for quarantine due to pestilence, illness, etc. of Master, offi-
cers and crew to be for Owners' account.
The vessel not to be ordered to nor bound to enter any place where fever or epidemics are
prevalent or to which the Master, officers and crew are prohibited to enter by law and/or rec-
ommendation of the international competent authorities or organizations. Any detentions in
this connection to be for Charterers' account.


- Clause 48 - Vaccination -

Owners to arrange at their expense that Master, officers and crew of the vessel hold valid
vaccination certificates against yellow fever, cholera or other necessary health certificates
during the Charter.


- Clause 49 - Stowage, Collection of Dunnage etc. -

Owners and Masters to undertake best efforts to cooperate with Charterers for best stowage of
cargo; and Master to make best efforts to collect, restow and provide any useful dunnage,
lashings etc., not broken for next use after completion of the voyage, during the currency of
this Charter.

- Clause 50 -

Deleted.


- Clause 51 - Smuggling -

It is strictly forbidden for the crew, officers and Master to have any merchandise, goods or
possessions on board which, by their nature or amount, are unlawful under the law of the flag
of the ship or any law or regulation of any port or country which the ship may visit. Any such
merchandise found on board is to be confiscated by the Master. Any fine imposed on the ves-

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

sel, Owners, Master, officers or members of the crew or on Charterers originating from Master's and/or members of the crew contravening local port and/or customs regulations, as regards smuggling will be for Owners' account. In the event of the vessel being detained by any authority whatsoever and/or time lost due to the presence on board or carriage of an illegal merchandise, other than cargo, or actual or attempted smuggling by the master, officers or members of the crew payment of hire shall cease for the time thereby lost.

Any fines levied on Charterers on account of events as described in paragraph above of this clause shall be deducted from next hire payment. Prior paying any fines on Owners behalf, Owners have to be advised accordingly.

Owners warrant that bonded stores will only be purchased with the permission of the Master. Owners are not responsible for any offence in this respect involving or caused by Charterers servants.

Any expenses and fines incurred by desertion of crew members to be for Owners account and shall be deducted from next hire payment.

Charterers are fully responsible for all consequences and penalties for any smuggling including smuggling of drugs created by Charterers or their servant and/or drugs in vessels cargo unless caused by negligence of Owners and/or their servants.

- Clause 52 - Watchmen -

Watchmen for vessel ordered by master and where compulsory or customary to be for Owners account and watchmen for cargo where compulsory or customary to be for Charterers account.

- Clause 53 - Owners Agent -

Charterers agree that their officers and/or agents will deliver crew mail free of charge and assist to the Master over minor ships husbandry matters, debiting Owners  with the actual costs including man hours involved. For major part of crew etc. Owners will appoint their own agents.

- Clause 54 - Owners Disbursements -

If during the currency of this Charter Party any husbandry expenditure upto ▓▓▓▓▓ per port is properly incurred by the Charterers on behalf of the Owners, the Charterers shall have the right to recoup themselves in respect of such expenditure and it's interest rate 2,5 % per annum by the way of deduction from hire, such deduction to be justifiable and fully supported by documentation, which may become due and payable under this Charter Party, and in case of expenditure incurred other than in the currency of the payment of hire stated in line 51 of the main body, conversion into such currency will be effected, for the purpose of deduction at



Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

the rate of exchange valid at the time of payment of which the foreign currency was originally purchased.

The Charterers have the further liberty to deduct from last and/or penultimate hire payment the estimated remaining amount of vessels disbursements but maximum ▮▮▮▮▮▮▮▮ also the estimated cost of bunkers on redelivery. Owners will remit funds to agents in case of repatriation expenses or if they make any other large expenditure.

- Clause 55 - Periodical Survey -

Owners have the right of withdrawing vessel, subject to mutual agreement between Owners and Charterers for time and place, from the Charterers service for the reasonable period to drydock vessel or to execute annual or maintenance repairs and/or survey.

However, Owner's to notify Charterers of their intention of such periodical survey not less than three months in advance, except in case of emergency, and obtain Charterers consent for time and place, Charterers consent shall not be unreasonably withheld. Payment of hire shall be suspended on the deviation from Charterers service until vessel is again placed at Charterers disposal at a point not less favorable to Charterers than the point when the hire was suspended.

In case of emergency drydocking, Owners will inform the Charterers as early as possible before making a decision.

Charterers to deliver the vessel for drydocking free of cargo, however, Owners to endeavour to drydock the vessel with cargo in holds, which, however, subject to vessels draft, trim and subject to yards approval. If vessel is drydocking with cargo onboard, extra insurance for the cargo to be for Charterers account.

- Clause 56 - Deviation Put Back -

In the event of loss of time either in port or at sea, deviation from the course of the voyage, caused by sickness of or an accident to or misconduct by Master/Officers/Crew, Stowaway unless board/in Charterers containers, refugee or any person on board vessel other than persons travelling by request of Charterers or by reason of the refusal of Master or Officers or Crew to perform their duties or of an accident or breakdown of vessel or drydocking or periodical survey, the hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back until vessel is again efficient in the same or equivalent position or again in the line of voyage whichever shorter distance for a port where vessel originally destined for any voyage resumed therefrom and any time thereby lost and all extra expenses to be for Owners account.

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

## - Clause 57 - BIMCO Stowaways Clause For Time Charterers -

A.

I. The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

II. If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of Charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever and howsoever which may arise and be made against them furthermore, all time lost and all expenses whatsoever incurred, including fines, shall be for the Charterers account and the vessel shall remain on hire.

III. Should the vessel be arrested as a result of the Charterers breach of Charter according to sub-clause (a) (II) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

B.

I. If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners account and the vessel shall be off-hire.

II. Should the vessel be arrested as a result of stowaways having gained access to the vessel by means of other than secreting away, in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

## - Clause 58 - Seizure, Detention, Arrest -

Should the vessel be arrested or sized or detained or delayed during the currency of this Charter Party at the suit of any person having or purporting to have a claim against or an interest in the vessel, hire under this Charter Party shall not be payable in respect of any time lost as the result of such arrest or seizure or detention or delay and the Owners shall reimburse the Charterers any expenditure which they incur under this Charter Party in respect of any period during payable, unless such arrest or seizure or detention or delay was caused by Charterers and/or their servants.

## - Clause 59 - Requisition -

Should the vessel be requisitioned by any Government or Governmental Authority during the period of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any Government or Governmental Authority in respect of such

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

requisition shall be for Owners account. However, Charterers' have the option of cancelling the balance period of this Charter.

### - Clause 60 - BIMCO Standard War Risks Clause for Time Charters, 1993
### Code Name : "Conwartime 1993"

(1) For the purpose of this Clause, the words :
  - (a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the vessel, and the master, and
  - (b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

(2) The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever, against vessels of certain flags or ownership, or against certain cargoes or crew or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4)
  - (a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls thereof shall be for their account.
  - (b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time the next payment of hire is due.

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25ᵗʰ April 2003

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty:

  (a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppage, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

  (b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

  (c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.

  (d) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

  (e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers.
No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners  may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall be deemed a deviation, but shall be considered as due fulfilment of this Charterparty.


- Clause 61 - Adding Off-hire Period -

Should Vessel be off-hire during the currency of this Charter for any reason whatsoever, Charterers have the option of adding such off-hire period to the Charter period stipulated in line 14 of this Charter. Charterers to declare latest within 14 days after Vessel had come on hire again whether they add the off-hire period to the actual period.

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

- Clause 62 - Consecutive Days Off-hire -

If Vessel is placed off-hire more than 180 consecutive days, Charterers have the right to cancel this Charter.

- Clause 63 - Hire/Hire Payment -

With reference to lines 51 - 52 of the main body hire payable by Charterers is agreed as follows:

  per day/pro rata incl. overtime for the firm period and
  per day/pro rata incl. overtime for the two optional periods

The hire payment is to be remitted to a bank account in Germany independently of vessel's flag. Bank account to be advised prior delivery.

- Clause 64 – Brokerage -

Deleted.

- Clause 65 - War Risk Insurance -

Basic war risk insurance for worldwide trading to be for Owners' account and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also crew war bonus, if any, to be for Charterers' account. The orders of Owners war risk underwriters always to be followed.

- Clause 66 - Cargo Exclusion / Dangerous Cargo -

Charterers are allowed to carry containerised dangerous goods of classes 1-9 of IMDG code as amended, provided these goods are loaded in accordance with Solas regulations of vessel's port of registry and vessel's document of compliance for the carriage of dangerous goods. All dangerous goods have to be in accordance with IMDG code as amended and prevailing national regulations of vessel's port of load and port of discharge as well as intermediate states and ports whose waters the vessel has to pass. Prescribed documents related to the carriage of dangerous goods to be delivered on board the vessel prior loading.

Goods of IMDG code class 1, other than 1,4S and goods of class 7, chemical wastes of any kind and calcium hypochlorite arm and ammunitions, explosives as per IMDG classes 1.1, 1.2, 1.5, cacao butter or talk on tank top or heated areas, any IMDG classes 4.1, 5.2 dangerous goods for which temperature controlled is legally required are always excluded. For such goods Owners' prior approval to be obtained which not to be unreasonably withheld.

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

With regard to the dangerous goods allowed to be carried is agreed that any possible extra insurance as well as any possible extra safety equipment required by local authorities/regulations in ports of call or intermediate states whose waters vessel(s) has/have to pass, to be provided and paid for by Charterers. Any time lost for complying with said regulations to be entirely for Charterers' account.

Vessel not to load any kind of bulk cargoes, unless in containers suitable for bulk cargoes, and/or livestock. Charterers have the option to load up to 8000 tons of dangerous goods in containers.

Charterers to keep Owners harmless against all costs, consequences which might result out of shipping non containerised cargo on deck.

- Clause 67 - Signing of Bill of Lading -

Master to authorize Charterers or their Agents to sign Bills of Lading in Charterers' own form on his behalf without prejudice to this Charter Party.

Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter and any Bills of Lading or Waybills signed by the Charterers or their Agents or by the Master at their request.

- Clause 68 - Clause Paramounts etc. -

New Jason Clause, New Both to Blame Collision Clause, General Clause Paramount, USA Clause Paramount or Canadian Clause Paramount or any other similar enactment in the country of shipment giving effect to the Hague Rule 1924, including Visby Amendment, BIMCO Conwartime 1993, wherever applicable shall be deemed to be incorporated in this Charter Party and Bill of Lading hereunder.

- Clause 69 - NYPE Interclub Agreement -

Liabilities for cargo claim should be borne by Owners/Time Charterers in accordance with the latest terms of the Interclub New York Exchange Agreement of 1996 or subsequent amendments or revisions thereof which may come into force whilst this Charter Party is in existence.

- Clause 70 – Owners' P and I Club -

Owners guarantee vessel is fully covered by P and I Club, Charterers have the benefit of Owners granted by the P and I Club so far as the Club rules permit.



Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

### - Clause 71 - Return Insurance -

Charterers to have the benefit of any return insurance premium receivable by Owners from their underwriters, by reason of vessel being in port for minimum period of 30 days, provided vessel is on hire during the same period.

### - Clause 72 - Lay-up -

Charterers shall have the right to order the laying-up of vessel at any time and for period of time at a safe port or place, and in the event of such laying-up, Owners shall promptly take steps to effect the economies in operating costs including insurance which may be possible and give prompt credit to Charterers in respect of all such economies.

At the request of Charterers, Owners shall at any time provide an estimate of the economies which would be possible in the event of the laying-up of the vessel. The laying-up ports or places shall be at Charterers option but shall always be safe. Should Charterers decide that for reasons of economy, officers and crew should be paid off, then the cost of repatriation and reactivation cost and any expenses related thereto, are to be for Charterers' account. Charterers to give sufficient notice of their intention in this respect to enable Owners to make necessary arrangements for decommissioning or recommissioning. In case the vessel will not put into drydock after the lay up period, the Charterers will accept discrepancies in vessel's speed and consumption being related to the lay up time until next drydocking.

### - Clause 73 - Double Banking -

Charterers have the right to let vessel lie alongside another vessel/coasters/lighters at a safe dock or wharf or place (including anchorage) for transhipment and/or discharge of the cargo and/or for bunkering. Necessary equipment, fenders upto Master's satisfaction to be supplied by Charterers at their time/expense. Such operation always to be subject to Master's approval regarding general safety. Charterers to indemnify Owners against all cargo claims subsequent to such cargo being transferred. Possible extra insurance to be Charterers' account, however, the level of insurance to be discussed in advance.

### - Clause 74 - Anti-technical Clause -

Reference to lines 59, 60 and 61, it is understood and agreed that if there is a failure to make punctual and regular payment due to oversight or negligence, error or omission of Charterers' employees, bankers, agents, or otherwise for any reason, Charterers shall be allowed four (4) banking working days to make payment after receipt of notice from Owners. Provided the payment is made within the said four days, the payment shall be considered as punctual and regular.

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

### - Clause 75 - Reefer Container -

A. The Owners shall be responsible for the supply of electrical power to integral refrigerated unit container(s) shipped on the vessel and the Owners to monitor and record the performance of all such units whilst on board in accordance with Charterers' written instructions.
B. The Master shall immediately take any temporary measure in the event of malfunction of refrigerated containers on board if possible using the source on board the vessel if available. Owners cannot be held responsible for malfunctioning of reefer containers and power pack. If repair works are performed, all expenses incurred by the Owners including spare parts, shall be for the account of the Charterers and the vessel's crew shall always be considered Charterers' servants.

### - Clause 76 – Arbitration -

Any dispute arising under the Charter to be referred to arbitration in London, one arbitrator to be nominated by the Owners and the other by the Charterers, and the arbitrators shall not agree then to the decision of an umpire to be appointed by them, the award of the arbitrators or the umpire to be final and binding upon both parties.

If either of the appointed arbitrators refuses to act, or incapable of acting, or die, the party who appointed him may appoint a new arbitrator in his place.
If one party fails to appoint, either originally, or by way of substitution as aforesaid, for seven clear working days after the other party, having appointed his arbitrator, has served the party making default with notice to make the appointment, the party who has appointed any arbitrator may appoint that arbitrator to act as sole arbitrator in the reference and his award shall be binding both parties as if he had been appointed by consent.
The arbitrators shall be conversant with shipping matters.

### - Clause 77 - Bilge Pipe Soundings -

Master and/or crew to perform sounding of the vessel's bilge tanks everyday during the navigation. The result of the soundings to be reported to the Charterers or their agents in writing upon completion of voyage.

### - Clause 78 - Container Lashing Materials -

Owners on delivery to supply the vessel with all necessary fittings/lashing material requested for the carriage of containers upto her maximum capacity including on deck and to maintain same throughout the currency of this Charter Party. Charterers to pay Owners a lumpsum compensation of ████████ per month for compensation of lost and damaged lashing material. After mutual checking the record of loss/damages to lashing material for intial 2 roundvoyages the agreed lumpsum amount per month applicable from the first roundvoyage (both parties are still entitled to discuss further after 2 roundvoyages).



Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25ᵗʰ April 2003

- Clause 79 - P and C Clause -

Negotiations to be kept strictly P+C by all parties involved.

- Clause 80 - Securing of Cargo inside Containers -

Securing of cargo inside containers and/or flats or other units loads/flats to be entirely Charterers' concern and responsibility. Any damage to the ship, her tackle, apparel, furniture and all else resulting from insufficient lashing/securing of cargo in or on such loads to be repaired at Charterers' expenses any time. However, crew shall always render their best efforts without extra charges in such cleaning/reconditioning as customary assistance as long as circumstances and crew hands permit. Such damage/occurrence to be notified to Charterers/their agents in writing by the Master at the time of occurrence at latest within 24 hours or upon arrival at next port to enable Charterers/owners to conduct joint survey and establish cause and extent of such damage/occurrence.

- Clause 81 – Charterers' Costs -

Charterers to reimburse Owners at costs for telexes/cables/phone/fax calls, made for Charterers' account behalf but in accordance with Charterers' instructions and requirements. Thereafter monthly fixed lumpsum amount to be applied for the easy settlement between both parties after mutual agreement.

- Clause 82 -

Charterers warrant that each transport document accompanying a shipment of cargo designed to a port or place in the United States of America shall have been endorsed with a unique Bill of Lading identifier, as required by the U.S. Customs Regulations (19 CRF part 4, section 4, 7a) including subsequent changes, amendments or modifications thereto, no later than the first port of call. Non-compliance with the provisions of this clause shall amount to breach of warranty for the consequences of which Charterers shall be liable and shall hold Owners harmless and shall keep them indemnified against all claims whatsoever, which may arise and be made against them. Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this clause shall be for Charterers' account.

- Clause 83 - Flag Change -
Owners have the right to change vessel's flag and classification society subject to Charterers' approval which not to be unreasonably withheld. Charterers approval is given for the German Flag and the Flag of the Marshall Islands. Any delay (loss of time) or any additional expenses incurred while changing flag to be Owners' account.



Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

- Clause 84 – Charterers' Gear -

The Master to keep a record of all Charterers' equipment supplied to the vessel and to main-
tain same in good condition such equipment to be redelivered to Charterers prior to redeliv-
ery of vessel to Owners or, if requested by Charterers at any time during the period of the
Charter in like good order and condition, as supplied (ordinary wear and tear excepted).

- Clause 85 - Non-containerised Cargoes -

Charterers have the option to load non-containerised cargo such as yachts, trucks, machin-
ery, etc., on deck provided this is consistent with vessel's strength and stability at Master's
discretion, in such case all deck cargo to be stowed/lashed/secured and unlashed etc. to Mas-
ter's satisfaction. Any extra fittings required are to be supplied and paid by Charterers and
are to be installed/removed in Charterers' time. Such non-containerised cargoes to be loaded
on deck to be carried at Charterers' risk, expense and responsibility without liability on part
of the vessel, her Owners for any loss, damage or expense and Bill(s) of Lading to be
marked accordingly.

- Clause 86 - Taxes etc. -

Any taxes levied by any Government other than that of the vessel's ownership in respect of
freight earnings under this Charter Party to be for Charterers' account. All dues, duties,
charges, and/or taxes on crew and/or stores or advance under clause 5 to be Owners' ac-
count. All taxes and due on the vessel and/or cargo and/or freight arising out of cargoes car-
ried or ports visited under this Charter Party shall be for Charterers' account.

- Clause 87 U.S. Anti-drug Abuse Act 1986 -

In pursuance of the provisions of the U.S. Anti-drug Abuse 1986, or any re-enactment
thereof, the Charterers and Owners warrant to exercise the highest degree of care and dili-
gence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on
board the vessel. Non-compliance with the provisions of this clause shall amount to breach
of warranty for the consequences of which Charterers' shall be liable and shall hold the
Owners, the Master and the crew of the vessel harmless and shall keep them indemnified
against all claims whatsoever, which may arise and be made against them. Furthermore, all
time lost and all expenses incurred, including fines, as a direct and sole result of the Char-
terers' breach of the provisions of this clause shall be for the Charterers' account and the
vessel shall remain on hire. Should the vessel be arrested solely as a result, of the Charter-
ers' non-compliance with the provisions of this, the Charterers shall at their expense take all
reasonable steps to secure that within a reasonable time the vessel is released and at their
expense put up bail to secure release of the vessel. The Owners shall remain responsible for
all time lost and all expenses incurred, including fines, in the event that manifested narcotic

Additional Clauses No. 29 - 100
to the Charter Party
**Hull No. HHI 1580**
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

drugs and marijuana are found in the possession  of effects of the vessel's personnel or
Owners and/or hold otherwise to be in reach of their obligations under the U.S. Anti-drug
Abuse Act 1986 or any re-enactment thereof.

### - Clause 88 - Colombia Anti-drug Legislation -

Charterers confirm that they will strictly comply with the anti-drug legislations-degree 1146
dated 31.05.1990. Furthermore, Charterers to inform vessel's Master if carrying restricted
goods loaded under their instructions and to give proper instruction, which notices master
has to give when calling/transiting Colombia territorial waters (12 miles) and/or calling Co-
lombian ports with restricted goods on board. All time lost and all expenses incurred, in-
cluding fines, as a result of the Charterers' breach of the provisions of this clause shall be
for the Charterers' account and the vessel shall remain on hire.

### - Clause 89 -

Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-511 (also
referred to as the U.S. Tax Reform Act of 1996), including later changes or amendments,
levied on income attributable to freight earnings in respect to cargoes carried under this
Charter Party which begins or ends in the United States, and which income under the law of
the United States is treated as U.S. Source Transportation Gross Income, shall be reim-
bursed by the Charterers.

### - Clause 90 -

The Owners of the vessel warrant that they have signed the United States Seacarrier Initia-
tive Agreement and that they will comply with such agreement. The Charterers of the vessel
warrant that they have signed the United States Seacarrier Initiative Agreement, and that
they will comply with such agreement.

### - Clause 91 -

The Charterers expect that the Owners/Disponent Owners have guidelines on drugs and al-
cohol abuse applicable to the vessel with the object that no seafarer will navigate a ship or
operate its onboard equipment while impaired by drugs or alcohol and that no seafarer will
have the use of, or possession of, or the opportunity to sell or distribute or transport illicit or
non-prescribed drugs aboard the vessel. Further, Charterers expect that the Own-
ers/Disponent Owners will exercise due diligence throughout the period of the Charter Party
to ensure that such guidelines are complied with.

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

- Clause 92 -

Owners warrant their officers, crew and flag shall not be affected by ITF rules or standards
throughout duration of this Charter. Loss of time as a result of non-compliance shall be con-
sidered as off-hire.

- Clause 93 -

Charterers have option to breach I.W.L. by paying additional insurance premium to Owners,
however, Charterers shall have privilege to trade vessel via Bering Sea Route (Unmik Pass -
Aleutian Is.) without paying such additional premiums to Owners.

- Clause 94 -

Deleted.

- Clause 95 - Additional Clauses -

A. Export and/or import permits for cargo to be at Charterers' risk and expense. Charterers
to obtain and responsible for all necessary permits to enter and/or trade in and out of all
ports during the currency of this Charter at their own risk and expenses, taxation or levies
on cargo whatsoever for these purposes to be for Charterers' account and to be paid by
Charterers. Charterers to remain responsible to arrange for Standard Carrier Alpha Code
(SCAC) provided same is required by trade and compulsory whilst trading with USA.
B. Charterers confirm that they have filed a registration statement with R.S.P.A. (Research
and Special Programmes Administration) of U.S. Department of Transportation for cer-
tain persons engaged in the offering of certain hazardous and IMO cargoes necessary to
enter and/or trade in/out of all U.S. and/or European ports during the currency of this
Charter and shall indemnify Owners and hold them harmless in respect of any loss, dam-
age, liability or expense (including fines), but not limited to, imposed on Owners and/or
vessel due to non-fulfilment of the registration/permit requirements of R.S.P.A. and rele-
vant European authorities.

- Clause 96 - Small General Average Clause -

Shipowner shall not declare General Average when the amount of General Average is esti-
mated not exceed ▮▮▮▮▮▮▮▮



Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## I. BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the law of the United States of America, the following clause shall apply:-

## II. BOTH TO BLAME COLLISION CLAUSE

If the ship comes into collision with another ship as a result of the negligence of the other ship and act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contract, and the Charterers shall procure that all Bills of Lading issued this Charter Party shall contain the same clause.

## U.S.A. CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16th 1936, which shall be deemed to be incor-

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

porated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of it's rights or immunities or an increase of any of it's responsibilities or liabilities under said Act. If any terms of this Bill of Lading to be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

## CANADIAN CLAUSE PARAMOUNT

All the terms, provision and conditions of the Canadian Water Carriage of Goods Act 1936, and of the rules comprising the schedule thereto are, so far as applicable, to govern this contract contained in the Bill of Lading issued under this Charter Party and the shipowners are entitled to the benefit of all privileges, rights and immunities contained in such act and in the schedule thereto as if the same were herein specifically set out. If anything herein contained by inconsistent with the said provisions, it shall be to the extent of such inconsistency and so further be null and void.

## GENERAL CLAUSE PARAMOUNT

The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25th August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 ("the Hague Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipment.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this contract. The Protocol signed at Brussels on 21st December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals.

### - Clause 97 -

Owners/Charterers have to closely coordinate vessel's delivery schedule in consultation with shipbuilders and Charterers to declare the final delivery date with a spread of three (3) calendar days within two (2) months after receiving Owners six (6) months prior delivery notice.

Additional Clauses No. 29 - 100
to the Charter Party
Hull No. HHI 1580
NB from Hyundai Heavy Industries Co., Ltd.,
dated 25th April 2003

In case it becomes evident that the vessel will miss the delivery date, Charterers shall nomi-
nate one (1) window date (which is not later than 14 days after the day for which the Owners
have given the new delivery notice), and the vessel shall be delivered on the same date.
Charterers shall nominate such one window date within five (5) working days after receiv-
ing Owners notice of missing the previously agreed date.
Once nominated by Charterers such one (1) window shall become the new delivery date in
the Charter party and which shall bind both Parties. For this purpose Owners shall not claim
Charterers to take delivery of the vessel before the above one (1) window date in any event.

If the vessel should be further delayed this procedure shall remain applicable however if the
vessel should be delayed in that way that the yard has to pay to the Owners a daily penalty
for delayed delivery, the Charterers to be compensated as from the day the Owners are enti-
tled to receive the penalty until the vessel has been actually delivered to Charterers, however
with only one third of the penalty Owners receive but minimum ▮▮▮▮▮▮▮ per day.

The Charterers do have the option of cancelling this contract only if the vessel is delayed for
more than 271 days from the first agreed delivery date, however only after midnight of the
271st day - local time always to apply.

- Clause 98 -

Charterers to pay lumpsum for victualling/representation/communication on a monthly ba-
sis. After two round voyages, a lumpsum amount to be mutually agreed.

- Clause 99 - Container Weight -

Charterers or their agents endeavour to furnish Master with shippers declared weights for
containers. Charterers to be responsible for any consequences, delays and expenses as may
arise in port or at sea from lack of container weights and/or discrepancies between manifests
and actual container weights.

- Clause 100 - BIMCO Standard Year 2000 Clause -

Year 2000 conformity shall mean that neither performance nor functionality of computer
system, electronic and electro-mechanical or similar equipment will be affected by dates
prior to or during the year 2000.
Without prejudice to their other rights, obligations and defences under this Charter Party,
including where applicable, those of the Hague or Hague-Visby Rules, the Owners and the
Charterers, and in particular the Owners in respect of the vessel, shall exercise due diligence
in ensuring Year 2000 conformity in so far as this has a bearing on the performance of this
Charter Party.

≈ A 23

Hamburg, 17th June 2003

### ADDENDUM NO. 1
TO CHARTER PARTY HULL NO. 1580,
DATED 25th APRIL 2003

BETWEEN

Messrs. Conti 31. Container Schiffahrts-GmbH & Co. KG Nr. 1,
Putzbrunn, Germany

- as Owners -

AND

Messrs. Hanjin Shipping Co., Ltd. Seoul, Korea

- as Charterers -

It has been mutually agreed that the following Line/Clauses shall be amended or added as
follows:

- **Line 34:** **to read '3 weeks' instead of '4 weeks'**

- **Clause 67: 1st Line add 'and Sub-Charterers' after 'Charterers'**

- **Clause 92: delete last sentence and add 'Charterers that' after 'warrant'**

All other terms, conditions and exceptions of the Charter Party dated 25th April, 2003 to
remain unaltered and in full force.

**CHARTERERS**
============

**OWNERS**
=======

Signatory:

Signatory:

$\tau$ 23

**Original**

Hamburg, 2nd September 2003

## ADDENDUM NO. 2
### TO CHARTER PARTY HULL NO. 1580,
### DATED 25th APRIL 2003

#### BETWEEN

Messrs. Conti 31. Container Schiffahrts-GmbH & Co. KG Nr. 1,
Putzbrunn, Germany

- as Owners -

AND

Messrs. Hanjin Shipping Co., Ltd. Seoul, Korea

- as Charterers -

It has been mutually agreed that the following Clause shall be amended as follows:

**Clause 92:**

**Owners warrant Charterers that their officers, crew and flag shall not be affected by ITF rules or standards throughout the duration of this Charter. Loss of time as a result of non-compliance shall be considered as off-hire.**

All other terms, conditions and exceptions of the Charter Party dated 25th April, 2003 and Addenda thereto to remain unaltered and in full force.

**CHARTERERS**
============

Signatory:

**OWNERS**
=======

Signatory:



Original
2/2

Hamburg, 4th May 2004

## A D D E N D U M   NO. 3
### TO CHARTER PARTY HULL NO. 1580,
### DATED 25th APRIL 2003

### BETWEEN

Messrs. Conti 31. Container Schiffahrts-GmbH & Co. KG Nr. 1,
Putzbrunn, Germany

- as Owners -

AND

Messrs. Hanjin Shipping Co., Ltd. Seoul, Korea

- as Charterers -

Today it has been mutually agreed that the following BIMCO ISPS Clause is included into the current Charter Party:

### BIMCO ISPS Clause for Time Charter Parties

(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

---

HANJIN SHIPPING CO., LTD.

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

All other terms, conditions and exceptions of the Charter Party dated 25th April, 2003 and Addenda thereto to remain unaltered and in full force.

**CHARTERERS**
============

**OWNERS**
=======

HANJ1N SHIPPING CO., LTD.

Signatory:

Signatory:

GERD NAUSCH
PRESIDENT

Original

Hamburg, 22nd June 2005

**ADDENDUM NO. 4**
TO CHARTER PARTY HULL NO. 1580,
DATED 25th APRIL 2003

BETWEEN

Messrs. Conti 31. Container Schiffahrts-GmbH & Co. KG MS "CONTI BOSTON",
Putzbrunn, Germany

– as Owners –

AND

Messrs. Hanjin Shipping Co., Ltd. Seoul, Korea

– as Charterers –

In reference to Clause 63, Owners' bank account has been nominated as follows:

Bank:
USD Acct. No.:
Swift Code:
IBAN:
In favour of:

Reference:

All other terms, conditions and exceptions of the Charter Party dated 25th April, 2003 and
Addenda thereto to remain unaltered and in full force.

CHARTERERS
============

OWNERS
=======

Signatory:

Signatory:

Original

Hamburg, 20th July 2006

## A D D E N D U M   NO. 5
### TO CHARTER PARTY MV HANJIN BOSTON
### DATED 25th APRIL 2003

#### BETWEEN

Messrs. Conti 31. Container Schiffahrts-GmbH & Co. KG MS "CONTI BOSTON",
Putzbrunn, Germany

- as Owners -

AND

Messrs. Hanjin Shipping Co., Ltd. Seoul, Korea

- as Charterers -

In reference to Clause 29, vessel's description is as follows:

## Time Charter Description

| | |
|---|---|
| Name: | HANJIN BOSTON |
| Owner: | Conti 31. Container Schiffahrts-GmbH & Co. KG, MS "CONTI BOSTON", Putzbrunn, Germany |
| Flag: | Marshall Island, Owners option to change flag |
| Port of Registry: | Majuro |
| Call Sign: | V7IG2 |
| Vessel's class: | GL + 100 A5, "Container Ship", "SOLAS II-2, Reg. 19", + MC, AUT, IW |
| Type: | Full Container Carrier 7,471 TEU |
| Container Intake: | approx. 7,471 TEU  20' x 8' x 8' 6"  including positions used for storage flat racks for semiautomatic twist locks 6,850 based on 10 mtons TEU 5,650 based on 14 mtons TEU, subject to trim and stability |

Container distribution:

| | 20' | 40' | TEU |
|---|---|---|---|
| Deck | 3,737 | 117 | 3,971 |

---

| | | |
|---|---|---|
| Deck alternatively | - | 1,977 | 3,954 |
| Hold | 2,942 | 279 | 3,500 |
| Hold alternatively | 60 | 1,720 | 3,500 |
| Total | 6,679 | 396 | 7,471 |
| Total alternatively | 60 | 3,697 | 7,454 |

Container intake is always subject to vessels stability, trim, lashing plan, permissible stress and subject to vessel's visibility, strength of deck and hatches and damage control regulations.

| | | |
|---|---|---|
| Stack load: | | |
| Tank top: | 24 Metric Tons per 20' | (max. 150 metric tons) |
| | 30.5 Metric Tons per 40' | |
| Hatch covers: | 90 Metric Tons for 20' stack | |
| | 120 Metric Tons for 40' stack | |

Fittings:

Cellguides in holds for 40' units, 20' units can be loaded up to 7 tiers but have to be topped by at least one 40' unit when loaded up over 7 tiers.

Lashing bridges on all bays except bay # 02 fwd.

Vessel is fitted acc. to OSHA rules with semi automatic twist locks

| | |
|---|---|
| Semi automatic twist locks | 11,000 |
| conventional twist locks | 2,250 |
| Turnbuckles | 4,258 |
| short lashing bars | 2,900 |
| long lashing bars | 188 |
| stackers hold | 5,000 |

Reefer sockets: 500 FEU on deck , power supply 440V, 60 Hz, 3 Ph.

High cube container: Two tiers 9' 6" high container can be stowed within the total 9 tiers in cargo holds.
On deck acc. to vessel's visibility line, lash gear arrangement and all other regulations.

45' units: 45' units can be accommodated from 3rd tier on deck on top of 40' container but always subject to lash forces.

Deadweight: 
93,541.7 mt  scantling draft
77,509.7 mt  design draft

Tonnage: 
Intern. GT   82,794
Intern. NT   48,047

Service speed: At design draft 13 m, clean hull, even keel, Bft. 3, Douglas sea state 2, about 25.8 kn  at 90% MCR of main engine not exceeding 32°C seawater temperature and 45°C engine room temperature.

Cruising range: About 19,000 nm on design draft at 90% MCR incl. auxiliaries, no reefer connected.

Consumption main engine: About 268 metric tons per day at 90% MCR  basis ISO conditions and LCV of 10,200 Kcal/Kg

| | |
|---|---|
| Consumption auxiliary engines: | Sea: About 10 metric tons HFO per day no reefer connected<br>Port: About 12 metric tons HFO per day no reefer connected |
| Diesel oil: | about 5 metric tons per month |
| Fuel quality: | Main and auxiliary engines ISO 8217-1996-RMG 35<br>Marine Diesel oil ISO 8217-1996 DMB<br>Fuel acc. Marpol 73/78 AnnexVI (Reg. 14/18) |

Bunker sampling:
1) The charterers shall supply bunkers of a quality suitable for burning in the vessel's engines and auxiliaries and which are conform to the
specification(s) mutually agreed under this charter.

2) At the time of delivery of the vessel the owners shall place at the disposal of the charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

3) In order to make sure that always a representative sample is available drawn from the barge or the vessels' manifold by continuous drip sampler when the fuel is  passing the pipeline between suppliers barge and seagoing vessel, the whole bunkering procedure to be controlled by an independent surveyor from either DNV, SGS, ITS or Maritech mutually agreed upon before bunkering. Costs to be shared.
Sample have to be sealed and labelled and shall be legally binding for all parties involved (no paper seal). In case of need the aforementioned samples will be used for analyses by an independent surveying company mutually agreed between owners and charterers. In case the surveyor finds the barge is not properly equipped with a continuous drip sampler, then binding sample to be drawn from vessels manifold.

4) The owners reserve their right to make a claim against the charterers
for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Time for claiming: within 4 weeks after bunkering.

| | |
|---|---|
| Main engine: | HYUNDAI MAN / B&W 12 K 98 MC-C   68,520 kW 104 RPM (100 % MCR) |
| Auxiliary engine | HHI/Holeby  2 x 2,565 kW, 2 x 1,995 KW  electric capacity |
| Port / emergency genset | 1 x  STX/Cummins 500 kW elect. capacity |

| | | |
|---|---|---|
| Holds/Hatches | 8 holds / 17 hatches | |
| | hatch # 1 F | 12,640 mm x 17,900 mm 2 panels |
| | hatch # 1 A | 12,640 mm x 27,940 mm 3 panels |
| | hatch # 2 F | 12,640 mm x 33,480 mm 3 panels |
| | hatch # 2A, 3F, 3A, 4F, 4A, 5F, 5A, 6F, 6A, 7F, 7A, 8F, 8M, 8A | 12,640 mm x 38,340 mm 3 panels |

Covers                Steel pontoon, non-sequential type, max. weight per panel 41.0 mtons excl. lash gear.

Cranes               nil

| Tank capacities | HFO | 10,408 m3 |
|---|---|---|
| | MDO | 512 m3 |
| | Ballast water | 24,140 m3 |
| | Potable water | 594 m3 |

Dangerous cargo:      According    to vessel's dangerous cargo certificate

| Vessel's dimensions: | | |
|---|---|---|
| | L.O.A. | 300.076 m |
| | L.P.P. | 287.580 m |
| | Breadth | 42.80 m |
| | Draft design | 13.00 m |
| | Draft scant. | 14.50 m |
| | Air draft | 61.35 m  without hinged mast |
| | Air draft | 58.00 m  with hinged mast |

Bow thruster:             1 x 2,500 kW

Navigational / Communication aids:    Vessel is fitted with all modern nautical aids / satellite navigation / weather chart recorder / INMARSAT system / GMDSS / SAT C / SAT F / SAT M
above is all about

All other terms, conditions and exceptions of the Charter Party dated 25th April, 2003 and Addenda thereto to remain unaltered and in full force.

**CHARTERERS**
=============

Signatory:

HANJIN SHIPPING CO., LTD.

**OWNERS**
========

CONTI 31. Container Schiffahrts-GmbH & Co. KG
MS "CONTI BOSTON"
Weather-von-Braun-Str. 10 - 8364 [illegible] una
Tel. 0 367-45 65 50-0 • Fax 0 89 [illegible] 65-30 55

Signatory:

*A(L* **Original**

Hamburg, 02.05.2007

## ADDENDUM NO. 6
### TO CHARTER PARTY MV HANJIN BOSTON
### DATED 25th April 2003

#### BETWEEN

Messrs. CONTI 31. Container Schiffahrts-GmbH & Co. KG
MS "CONTI BOSTON", Munich / Germany

- as Owners -

AND

Messrs. Hanjin Shipping Co., Ltd. Seoul / Korea

- as Charterers -

It has been agreed today that the above mentioned Charter Party has been amended
under the following conditions:

Owners' domicile has been changed from "Putzbrunn / Germany" to "Munich / Germany" as
from 1st May 2007.

All the other terms and conditions of the Charter Party dated 25th April 2003 and the
subsequent addenda are deemed to remain valid and in full force.

**CHARTERERS**
============

**HANJIN SHIPPING CO., LTD.**
Signatory:

**OWNERS**
=======

CONTI 31. Container Schiffahrts-GmbH & Co. KG
MS "CONTI BOSTON"
Paul-Wassermann-Str. 5 · 81829 München
Tel. 0 89 / 45 65 50-0 · Fax 0 89 / 45 65 50 55

Signatory:

 Munich, 30/08/2010

## A D D E N D U M  NO. 7
### TO CHARTER PARTY MV HANJIN BOSTON
### DATED 25th APRIL 2003

BETWEEN

Messrs. CONTI 31. Container Schiffahrts-GmbH & Co. KG MS "CONTI BOSTON",
Munich / Germany

- as Owners -

AND

Messrs. Hanjin Shipping Co., Ltd., Seoul / Korea

- as Charterers -

<u>Preamble</u>

Charterers have declared to exercise the two extension options of each 12 months in direct
continuation to the firm charter period ending 7th July 2015, 24:00 hrs UTC originally agreed
on with subject Charter Party.

Furthermore both parties agreed on a reduction of the charter hire for period of 18 months
and which to be compensated by an extension of the charter period by additional 24
months.

Considering the above it has been mutually agreed that subject Charter Party has been
amended under the following conditions:

1) Charterers have declared to exercise the extension options originally agreed on with
subject Charter Party for the period from 8th July 2015, 00:01 hrs UTC until 7th July
2016, 24:00 hrs UTC respectively the period from 8th July 2016, 00:01 hrs UTC until
7th July 2017, 24:00 hrs UTC. The charter hire for aforesaid periods to remain as per
governing C/P at            net pd pr inclot.

2) The charter hire of governing C/P and subsequent addenda to be reduced from USD
30.000 net pd pr inclot to            net pd pr inclot for the period as from 1st July
2010, 00:01 hrs UTC until 31st December 2011; 24:00 hrs UTC.
Hire for remaining period of governing C/P as from 1st January 2012, 00:01 hrs UTC
until 7th July 2015, 24:00 hrs UTC to remain unchanged as per governing C/P.

3) The period of governing C/P and subsequent addenda to be extended by another
period of 24 months as from 8th July 2017, 00:01 hrs UTC (+/- 90 days in Charterers'
Option) at a minimum hire of            net pd pr inclot. However, if the market
rate for a 24 months time charter of respective vessel at the beginning of the same is
higher than            net pd, the positive difference between actual market rate
and            net pd to be fully in owners favour and the charter hire for
extension period to be increased by the aforementioned positive difference
accordingly. In order to determine the actual market rate for the extension period

each party shall nominate an independent, internationally well-reputed container chartering broker. Each broker to ascertain 25 working days prior to the beginning of the extension period the market rate for the 24 months extension. In case the ascertained market rates of the two brokers do not differ by more than 10 percent the arithmetical mean of the two market rates shall be deemed to be and shall constitute the relevant market rate for the extension period.

In case the market rates ascertained by the two brokers differ by more than 10 percent, both parties shall latest 20 working days prior the beginning of the extension period agree on a third independent, internationally well-reputed container chartering broker to act as an Umpire, who shall ascertain the market rate between the valuations of the two aforementioned independent container chartering brokers, nominates by the parties. The opinion of such Umpire shall be binding upon both parties, the Owners and Charterers.

If the parties cannot agree on an Umpire within the aforementioned period, the President of BIMCO, Copenhagen, Denmark or its successor shall on instruction of both either party nominate an Umpire and such nomination shall be valid and binding for both parties and the nominated brokers. However, the third broker's evaluation on the market rate should be within the two brokers' rate evaluations on the market.

For the purpose of "market rate" evaluation hereinabove, broker(s)' market rate evaluation shall primarily include but not limited to fixtures of similar-sized vessels for over 2 years' time charter contract and vessel´s age also should be taken into consideration in the final evaluation of rate.

All the other terms and conditions of the Charter Party dated 25th April 2003 and the subsequent addenda are deemed to remain valid and in full force.

**CHARTERERS**
============

Signatory:
HANJIN SHIPPING CO., LTD.

**OWNERS**
=======

CONTI 31 Container Schiffahrts-GmbH & Co. KG
MS "CONTI BOSTON"
Paul-Wassermann-Str. 5 · 81829 München
Tel. 0 89 / 45-65 59-0 · Fax 0 89 / 45 65-60 55

Signatory: *Sedlmeyr, Huber*

2

Λο

CONTINENTAL CHARTERING
GmbH & Co. KG

# A D D E N D U M   NO. 8
TO CHARTER PARTY MV HANJIN BOSTON
DATED 25th April 2003

### BETWEEN

Messrs. CONTI 31. Container Schiffahrts-GmbH & Co. KG MS "CONTI BOSTON",
Munich / Germany

- as Owners -

### AND

Messrs. Hanjin Shipping Co., Ltd., Seoul / Korea

- as Charterers –

It has been agreed today that the above mentioned Charter Party has been amended
under the following conditions:

1. Bunker Specification

(a) The fuel oil supplied shall correspond with the specification given below:

ISO 8217-2005(e) RMK 700 (with maximum viscosity 500 cSt) and any subsequent
amendments thereto.

In the event that fuels meeting ISO 8217-2010(e) are available in a particular port, Charterers shall
supply fuels meeting the ISO 8217-2010(e) RMK 500 requirements.

Furthermore the fuel oil shall meet the following criteria:

- The fuel oil shall be of homogeneous and stable nature and in all respect suitable.

- The fuel oil shall not contain any added substances or chemical waste that

    a) Jeopardizes the safety of the ship or adversely affects the performance of the machinery; or

    b) is harmful to personnel; or

    c) contributes overall to additional air pollution.

(b) The higher density and viscosity of the fuel oil may lead to higher sludge and higher consumption.
Charterer therefore will not claim higher fuel consumption within reasonable range in connection
with change over from 380 cSt fuel to 500 cSt fuel.

# CONTINENTAL CHARTERING
## GmbH & Co. KG

### 2. Emission Control Clause

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the requirements of any emission control zone when the vessel is ordered to trade within that zone.

In turn, Owners acknowledge that in order to meet the requirements of this Sub-clause, Charterers will likely maintain fuels of varying sulfur specifications on board. While Charterers will ensure that there is always sufficient fuel available to meet the sulfur limits of any emission control zone that the vessel trades within, it shall remain the sole duty of Owners and the Vessel's crew to ensure there is available tankage to keep it segregated from high sulphur fuel and to select and use the proper sulfur level fuel from those available in the vessel's bunker tanks to meet that zone's requirements.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterer to supply such fuels shall comply with Regulation 14 and 18 of MARPOL Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes.

Except where Owners fail to meet their responsibility as outlined in Sub-clause (a),
the Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising of resulting from Charterers' failure to comply with this sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-clause (a), the owners warrant that:

   (i) the vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
   (ii) the vessel shall be able to consume fuels of the required sulphur content in any emission control zone or when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

### 3. Bunker Quantity Control

(a) The quantity of fuel supplied shall be determined by the Supplier's and the Owners' representatives by comparing the barge soundings/truck figures with the ship's own figures.

If the difference between the Supplier's figure and the ship's received figure is abnormally large, a letter of protest shall be issued to the Supplier and the Charterers shall be informed about the problem immediately. A difference within 0,5% or 10MT can be accepted as measurement error.

(b) Charterers shall appoint a bunker surveyor to check the Supplier's and the ship's measurements and to witness sampling as per Chapter 4. Surveyor's findings regarding quantities shall be binding for all parties involved.

(c) Charterers always will order each grade of fuel with one supplier without splitting orders to several suppliers. If the quantity of each fuel grade is delivered by more than one Supplier for whatever reasons, then the Charterers shall present written evidence of the fuels' compatibility prior to bunkering. In case such evidence can not be presented, the Owners shall not mix the fuel but shall always bunker into separate, empty tanks. If there should not be sufficient storage capacity available onboard the vessel in such situation, the Owners shall have the right to reject the surplus bunker free of charge in order to avoid mixing of possible incompatible fuels.

## CONTINENTAL CHARTERING
GmbH & Co. KG

### 4. Bunker Sampling

(a) The Charterers shall supply bunkers of a quality suitable for burning in the vessel's engines and auxiliaries and which are conform to the specification(s) mutually agreed under this charter.

(b) At the time of delivery of the vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

(c) In order to make sure that always a representative sample is available drawn from the barge or the vessel's manifold by continuous drip sampler when the fuel is passing the pipeline between supplier's barge and seagoing vessel, the whole bunkering procedure to be controlled by an independent surveyor from either DNV, SGS, ITS or Maritech mutually agreed upon before bunkering. Costs to be shared.

Samples have to be sealed and labelled and shall be legally binding for all parties involved (no paper seal). In case of need the aforementioned samples will be used for analysis by an independent surveying company mutually agreed between Owners and Charterers. In case the surveyor finds the barge is not properly equipped with a continuous drip sampler, then binding sample to be drawn from vessel's manifold.

(d) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Time for claiming: As per clause 5.

### 5. Bunker Claims

(a) If fuel oils supplied do not correspond with the mutually agreed specifications charterers shall be held liable for all losses and costs as a result there from. Owners shall not be responsible for any reduction in the vessel's speed performance and / or increased fuel consumption nor for any time lost and any other consequences arising out of off-spec fuel oil.

(b) If fuel oils supplied do not correspond with the mutually agreed specifications Owners can request Charteres, at their cost and in their time, to remove and replace defective fuels, and any fuels with which they have been commingled, with fuel oil conforming with the requirements of this Charter Party.

(c) The Owner shall submit any quality or quantity claim to the Charterer in writing within thirty (30) days after the date of delivery of the Products.

Otherwise all other terms, conditions etc to be as per present c/p dated 25.04.2003 and subsequent addenda thereto.

Hamburg, 19th December 2011

CHARTERERS
= = = = = = = = = = = =

Signatory:
HANJIN SHIPPING CO., LTD.

OWNERS
= = = = = = =

CONTI 35. Container Schiffahrts-GmbH & Co. KG
Paul-Was
Tel. 0 69 /

Signatory:

Original $\chi(\alpha$

# A D D E N D U M   NO. 9
TO CHARTER PARTY MV HANJIN BOSTON
DATED 25th April 2003

## BETWEEN

Messrs. CONTI 31. Container Schiffahrts-GmbH & Co. KG MS "CONTI BOSTON",
Munich / Germany

- as Owners -

## AND

Messrs. Hanjin Shipping Co., Ltd., Seoul / Korea (HJS)

- as Charterers –

It has been agreed today that the above mentioned Charter Party has been amended
under the following conditions:

This addendum is to overrule the respective Addenda for SSS Operations.

It is agreed in between HJS and the Owners that Super Slow Steaming engine operation may
necessitate more frequent cleaning of turbo chargers. Therefore regular ME load up to be carried out
according to the engine licensor and operation experience to clean turbocharger and the vessels
exhaust system as well as the economizer. Super Slow Steaming operation will result in more wear
and tear of auxiliary blowers and all components related to exhaust gas.

But it is also agreed that Super Slow Steaming engine operation is the mainstream operation of ship's
engine that are carried out on a universal basis in the shipping industry.

Therefore Owners always give their best effort/cooperation with HJS request to implement Super Slow
Steaming of the vessels.

The low load operation of owner is defined in a low load praxis company rule, standing order binding
for the crew and is under permanent evaluation. After first commissioning of TC Cut Out System this
procedure will be set up with the actual values and mutually agreed in between Hanjin and Owner.

It is furthermore agreed that an extra piece of auxiliary blower incl. impeller, gasket and electronic
motor is kept onboard and paid by HJS. Damaged blowers and blower motors will be repaired or
replaced and paid by HJS. HJS shall reimburse the Owners directly proven and documented
additional costs for the purchase and delivery of an extra auxiliary blower incl. impeller, gasket electric
motor (S1-Type, capable for permanent run). But for auxiliary blower, the repair and/or maintenance
costs will be shared by 50:50 between owner and HJS. HJS will care about transportation to repair
workshop and return the Motor in due time to the vessel. The repair and transport cost shall not
exceeded over 50% of the value of a new motor.

To optimize the Super Slow Steaming operation in regard of the combustion process a turbo charger
cut out system shall be installed to shift the operation point from at partial load to better fuel air ratio.

Original

**Agreement to Super Slow Steaming with one Turbocharger Cut Out Operation:**
The Slow Steaming Turbo Charger Cut Out Retrofit (Swing Gate) shall be applied to this engine. The Swing Gate shall be closed and one Turbo Charger will be cut off. To close the Swing Gate the vessel must be stopped. At a sea trail after commissioning the operational limits will be set. A safety margin to max. exhaust Gas Temperature, max. Cylinder Pressure and max. Turbo Charger Revolution of the remaining Turbo Chargers will be the limiting factors.

**Hanjin Boston Class, 12 K 98 MC-C 4 Turbo Chargers, Slide Gate closed approx 60% MCR**

From 10-30 % MCR the auxiliary blowers are permanently running from 30-50/60% MCR the blowers are off and TC no. 2 will be cut off. Above 50/60% MCR the Turbo Charger Cut Out Operation shall not be used due to operational limits. The Slide Gate need to be disabled, therefore the ME shall be stopped and started again with all TC running (see Slow Steaming Operation above). Regular every 72 hours loading up the ME for one hour up to 75% MCR with parallel nut shell TC and EGB cleaning shall prevent the fouling processes.

It is agreed that the vessels Turbocharger system will be modified by installing a flexible cut out system for TC no.2,. This installment will be carried out by the owners in cooperation with the engine licensor. For the time of installation in the preferred port Busan the vessel shall not be put off-hire.

The approximate modification cost of ▉▉▉▉▉▉▉▉ equivalent to approx. ▉▉▉▉▉▉▉. Conti will pay 60 % of the cost and HJS will pay 40 % of the cost. The cost will be finalized after HJS reviewing of detail items and scheme of T/C cut-out system.

HJS will pay the cost as a down payment to place the order.

If the TC CUT OUT system cannot be installed due to any problems, not caused by Hanjin, the down payment will be returned to Hanjin.

The Slide Gate installation is covered by MAN warranty the Turbocharger sealing air system is covered by a installation warranty of ABB.

Of course, owners always give their best effort and cooperation with HJS request to implement super slow steaming with turbo charger cut out procedure. Always based on owners Turbo Charger Cut Out procedure adopting experience which will be made in the future.

If main engine operation is disturbed super slow steaming cannot be guaranteed until repairs are completed.

Owner is doing the utmost to avoid any damage, the design has been improved, preventive action has been carried out. As well for Super Slow Steaming with Turbo Charger Cut Out Operation at least one auxiliary blower and spare fan wheel with sets of gaskets need to be present on board as spare set to allow Super Slow Steaming and Super Slow Steaming with Turbo Charger Cut Out operation.

Directly related and documented extra cost and time incurred due to additional maintenance and/or excessive wear and tear resulting from Super Slow Steaming operation to be borne by HJS - but Owners are responsible to verify and provide to HJS that such cost is to be related to Super Slow Steaming implementation, provided that the recommendations and procedures of the engine manufacturers have been followed at all times. HJS has the right to send a representative for joint investigation.

Original

**Agreement to Super Slow Steaming without the use of Turbocharger Cut Out Operation:**
In case of Turbo Charger Cut Out System is defective the Swing Gate will be set in open position and
Super Slow Steaming can be performed as before.

**General:**
To protect the engine for cold corrosion at very low load barred speed range 1: 0-10% MCR will be
implemented, which may differ from engine type, individual installation, weather and ship's condition.

Off hire cost shall not be claimed to OWNER by HJS for cases related to Super Slow Steaming. For
vessels with T/C cut out speed- and consumption claims shall also not be claimed to OWNER by HJS.

Otherwise all other terms, conditions etc. to be as per present c/p dated 25.04.2003 and subsequent
addenda thereto.

Munich/Busan, 22nd February  2013

CHARTERERS
= = = = = = = = = = = =

HANJIN SHIPPING CO., LTD.
79-23 GA CHUNGANG-DONG, CHUNG-KU,
BUSAN, KOREA
Signatory:

OWNERS
= = = = = = =

CONTI 31 Container Schiffahrts-GmbH & Co. KG
MS "CONTI BOSTON"
Paul-Wassermann-Str. 5 PPA
Tel. 0 89 / 63 65 50-0  •  Fax 0 89 / 63 65 50 55

Signatory:
Michael Huber        Johannes Schwemmer

Original

# A D D E N D U M   NO. 10
## TO CHARTER PARTY MV HANJIN BOSTON
### DATED 25th April 2003

#### BETWEEN

Messrs. CONTI 31. Container Schiffahrts-GmbH & Co. KG MS "CONTI BOSTON",
Munich / Germany

- as Owners -

#### AND

Messrs. Hanjin Shipping Co., Ltd., Seoul / Korea (HJS)

- as Charterers –

It has been agreed today that the above mentioned Charter Party has been amended
under the following conditions:

Retroactively from 01.01.2013 Victualing shall be accounted at ▮▮▮▮ per meal.

Otherwise all other terms, conditions etc.  to be as per present c/p dated 25.04.2003
and subsequent addenda thereto.

Munich/Seoul, 13th February 2015

C H A R T E R E R S
= = = = = = = = = = = =

Signatory:  *CM KIM*
HANJIN SHIPPING CO.. LTD.

O W N E R S
= = = = = = =

CONTI 31. Container Schiffahrts-GmbH & Co. KG
MS "CONTI BOSTON"
Paul Wassermann- Str. 5 - 81829 München
Tel. 089 / 45 65 50-0 · Fax 0 89 / 45 65 50 55
Signatory

Michael Huber     Birger Meyer

Dated  24th June 2016

CONTI 31. Container Schiffahrts-GmbH & Co. KG MS "CONTI BOSTON"
as Transferor

and
Lanyard LLC
as Transferee

and
Hanjin Shipping Co., Ltd.
as Charterer

NOVATION AGREEMENT
relating to a charter party of m.v. "CONTI BOSTON"

This Novation Agreement is made on 24th June 2016

BETWEEN

(1)   CONTI 31. Container Schiffahrts-GmbH & Co. KG MS "CONTI BOSTON", a
      company incorporated in Germany, whose registered office is at Paul-Wassermann-
      Straße 5, 81829 Munich, Germany (the "Transferor"); and

(2)   Lanyard LLC, a company incorporated in the Marshall Islands, whose registered
      office is at Three Landmark Square, 5th Fl. Stamford, CT 06901, USA (the
      "Transferee"); and

(3)   Hanjin Shipping Co., Ltd., a company incorporated in Korea, whose registered
      office is at 25-11 Yoido Dong, Youngdeungpo-Ku, Seoul 150-878, Korea (the
      "Charterer").

BACKGROUND

(A)   By a time charter dated 25th April 2003, as amended by an Addendum No. 1 dated
      17th June 2003, Addendum No. 2 dated 02nd September 2003, Addendum No. 3 dated
      04th May 2004, Addendum No. 4 dated 22nd June 2005, Addendum No. 5 dated 20th
      July 2006, Addendum No. 6 dated 02nd May 2007, Addendum No. 7 dated 30th
      August 2010, Addendum No. 8 dated 19th December 2011, Addendum No. 9 dated
      22nd February 2013 and Addendum No. 10 dated 13th February 2015 entered into
      between the Transferor and the Charterer (the "Charter"), the Transferor has
      chartered to the Charterer the m.v. "CONTI BOSTON", IMO no. 9290464 (the
      "Vessel") on the terms and conditions stated therein. It is agreed that the Charter does
      not include (and the Transferee is not bound by) any standstill or similar agreement
      entered into or to be entered into by and between the Transferor and the Charterer in
      respect of the Charter.

(B)   By a memorandum of agreement dated 24. June 2016 made between the Transferor
      and the Transferee (the "MOA"), the Transferor has agreed to sell the Vessel to the
      Transferee.

(C)   The parties hereto have agreed that the Charter shall be transferred from the
      Transferor to the Transferee.

(D)   This Agreement effects the novation necessary for the aforesaid transfer.

IT IS AGREED as follows:

1.    DEFINITIONS AND INTERPRETATION

1.1   Definitions



In this Agreement, except to the extent that the context requires otherwise, the following terms shall have the following respective meanings:

"**Charter Proceeds**" means any charter payments or proceeds payable by or due from the Charterer under or in respect of the Charter (including, without limitation, the hire thereunder).

"**Notice of Transfer**" means the written notice, which the Transferor will serve on the Charterer to formally confirm the Transfer Date, and accordingly the transfer of the Charter from the Transferor to the Transferee with effect on and from the Transfer Date, substantially in the form set out in Schedule 1.

"**Transfer Date**" means the transfer date and time as set out in the Notice of Transfer which shall be the time and date of delivery by the Transferor to the Transferee, and acceptance of the Vessel by the Transferee, under the MOA.

1.2     **Interpretation**

In this Agreement, a reference to:

(a)     a person includes a reference to that person's legal successors and assigns (unless the context otherwise requires);

(b)     clause headings are included for ease of reference only and shall not affect the construction of this Agreement; and

(c)     this Agreement or any other agreement or document shall be construed as a reference to this Agreement or such other agreement or document as the same may have been, or may at the time be, amended, varied, novated or supplemented.

## 2.     NOVATION OF CHARTER

2.1     With the consent of each of the parties to this Agreement and in consideration of the mutual covenants and agreements contained herein, with effect on and from the Transfer Date:

(a)     the Transferor assigns and transfers to the Transferee the benefit and burden of all of the Transferor's rights, obligations and interests in, to and under the Charter; the Transferor and Charterer acknowledge that a true and complete copy of the Charter as modified, amended or supplemented through the date hereof is attached hereto as Exhibit A and further represent and warrant that there are no outstanding defaults thereunder, except that at the date hereof the Transferor has certain claims under the Charter against the Charterer in respect of outstanding charter hire, which are the subject of arbitration between, inter alia, the Transferor and the Charterer;

(b)     the Transferee shall observe and perform the Transferor's obligations under and in respect of the Charter and will be bound by the Charter as if the Transferee had originally been a party to it and named therein as "Owners" in the place of the Transferor;



(c)     the Charterer releases and discharges the Transferor from further performance of its obligations under or in respect of the Charter and from all claims and liabilities in respect thereof and accepts the liability of the Transferee in the Transferor's place and is bound by all liabilities, the terms of, and undertakes to perform its obligations under, the Charter as if the Transferee had originally been a party to it and named in it in place of the Transferor; and

(d)     the Transferee undertakes to indemnify the Transferor against all consequences of claims made against the Transferor out of and/or in connection with bill(s) of lading signed on the Transferors' behalf in accordance with the Charter, after the Transfer Date.

2.2     The Transferor shall remain solely liable to the Charterer in respect of the performance of all of its obligations and all claims, liabilities, costs, expenses, taxes, duties, losses and/or damages (if any) or matters arising out of or in connection with its performance under the Charter prior to the Transfer Date.

2.3     The Transferor will serve the Notice of Transfer on the Charterer on the Transfer Date.

3.      **CHARTER PROCEEDS**

3.1     Subject always to the provisions in the Assignment of Earnings and Notice of Assignment dated 24th June 2016 for the assignment to the Transferee of earnings for June 2016, the Transferee and the Transferor agree that all Charter Proceeds accruing up to (but not including) the Transfer Date shall accrue for the sole benefit of the Transferor whilst all Charter Proceeds accruing on and after the Transfer Date shall accrue for the sole benefit of the Transferee.  Transferor and Transferee agree that any Charter Proceeds paid to the Transferor prior to the Transfer Date in respect of any period including and following the Transfer Date are owed to the Transferee and will be offset against the purchase price under the MOA.  For avoidance of doubt, any claim of the Transferor against the Charterer in respect of Charter Proceeds arising from a cause of action accruing before the Transfer Date shall be deemed to be Charter Proceeds accruing up to (but not including) the Transfer Date, notwithstanding that the claim may only be made by the Transferor, or the amount of the claim or the Charterer's liability for the same, may only be determined on or after the Transfer Date.

3.2     At the Transfer Date the Transferor shall pay to the Transferee any advance Charter Proceeds or other sum paid before the Transfer Date to the Transferor by the Charterer in respect of any period on and after the Transfer Date and the Charterer shall not under any circumstances have any liability to the Transferee or to Transferor in respect of such Charter Proceeds and any other monies paid by it under and pursuant to the Charter which had already been paid in advance.  Such liability of the Transferor to the Transferee shall be discharged by way of offset against the purchase price under the MOA as described in Clause 3.1.

3.3     Subject to Clause 3.1 and Clause 3.4, the Transferee is entitled to all Charter Proceeds accruing on and after the Transfer Date.  If the Transferor shall receive any such Charter Proceeds owed by the Charterer to the Transferee on or after the Transfer Date, the Transferor shall promptly notify the Transferee thereof and shall forthwith following receipt thereof pay,

transfer or deliver such Charter Proceeds to the Transferee, in the form received within seven (7) days. Pending the payment, transfer or delivery of such Charter Proceeds, the Transferor shall hold the same on trust for the Transferee. Nothing in this Clause 3 is intended to or shall create a charge or other security interest.

3.4     On and after the Transfer Date all payments shall be made by the Charterer to the account specified in Clause 5(b), except any payments in respect of a claim of the Transferor as described in the final sentence of Clause 3.1, which shall be made by Charterers to the account of the Transferor.

3.5     In making any payment of, or relating to, Charter Proceeds, to another party to this Agreement, each of the parties shall notify such other party whether that payment, or any part of it, is of or relates to:

    (a)     Charter Proceeds accruing up to (but not including) the Transfer Date; or

    (b)     Charter Proceeds accruing on and after the Transfer Date.

## 4.     REPRESENTATION AND WARRANTIES

4.1     Each of the parties represents and warrants to and for the benefit of the others that in respect of itself:

    (a)     it has the power to enter into, exercise its rights and perform and comply with its obligations under this Agreement;

    (b)     all action, conditions and things required to be taken, fulfilled and done (including the obtaining of any necessary consents) in order (a) to enable it to enter into, exercise its rights and perform and comply with its obligations under this Agreement, (b) to ensure that those obligations are legally binding and enforceable and (c) to make this Agreement admissible in evidence in the courts of its jurisdiction of incorporation, have been taken, fulfilled and done; and

    (c)     its obligations under this Agreement are valid, binding and enforceable in accordance with the terms hereof.

## 5.     CHANGE OF NAME AND FLAG

The Charterer hereby agrees that with effect on and from the Transfer Date:

    (a)     fly the flag of the Marshall Islands; and

    (b)     hire payments to be made to:
        Lanyard LLC





6.    FURTHER ASSURANCE

      Each of the Transferor and the Charterer agrees, with effect on and from the Transfer
      Date, to do everything reasonably necessary to give effect to this Agreement and the
      transactions contemplated by it and/or to perfect the assignments and transfers
      contemplated hereunder (including, without limitation, in respect of the Transferor,
      the execution and delivery of notices, instruments or other documents and the
      procuring of consents and acknowledgements) and to use all reasonable endeavours to
      cause relevant third parties to do likewise.

7.    COMMUNICATIONS

7.1   All notices, demands or communications required to be given or made under this Agreement
      shall be in writing and may be sent to the intended recipient by fax, delivered personally or
      sent by post to its fax number or address stated below (or to the fax number or address last
      notified in writing to the other parties):

      (a)   the Transferor:      CONTI 31. Container Schiffahrts-GmbH & Co. KG
                                  MS "CONTI BOSTON"
                                  Attn: Mr. Birger Meyer-Glöckner,
                                  Paul-Wassermann-Straße 5, 81829 Munich, Germany
                                  Fax: +49 89 456 55 055

            the Transferee:

                                  Lanyard LLC
                                  c/o MC Seamax Management Limited
                                  Att: Cao Deambrosio
                                  Three Landmark Square, 5th Fl.
                                  Stamford, CT 06901
                                  USA
                                  Phone: +1 (203) 487 6758
                                  Fax: +1 (203) 939 1560
                                  E-Mail: chartering@mcseamax.com

      (b)   the Charterer        Hanjin Shipping Co., Ltd.
                                  Attn: Mr. CH Kim, Fleet Management Team (SELCTF)
                                  25-11 Yoido Dong, Youngdeungpo-Ku, Seoul 150-878,
                                  Korea
                                  Fax: +82 222 87 3422

7.2   Any such notices, demands or other communications to each party under this Agreement shall
      be deemed to have been received (if sent by fax) on the day of despatch (if delivered
      personally) when left at the address required by Clause 7.1 above or (if sent by air mail) seven
      days after the same is posted.



## 8.    EXERCISE OF RIGHTS

8.1     A party may exercise a right, power or remedy at its discretion, and separately or concurrently with another right, power or remedy. A single or partial exercise of a right, power or remedy by a party does not prevent a further exercise of that or of any other right, power or remedy. Failure by a party to exercise or delay in exercising a right, power or remedy does not prevent its exercise of the same subsequently and shall not be deemed to be a waiver thereof.

8.2     The rights, powers and remedies provided in this Agreement are cumulative with, and not exclusive of, the rights, powers or remedies provided by law independently of this Agreement.

## 9.    MISCELLANEOUS

9.1     Clause 45 of the Charter is hereby further amended by the deletion of "or an Israeli port" in the first sentence and by the deletion of the second sentence of Clause 45 thereof.

9.2     A variation of this Agreement is valid only if it is in writing and signed by or on behalf of each party.

9.3     This Agreement may be executed in any number of counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

9.4     The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision of this Agreement.

9.5     A person who is not a party to this Agreement has no rights under the Contracts (Rights of Third Parties) Act, 1999 to enforce any term of this Agreement.

9.6     Should delivery and acceptance of the Vessel by the Transferor to the Transferee under the MOA not take place for any reason whatsoever, this Agreement shall be null and void and none of the parties hereto shall have any recourse to the other parties.

## 10.    GOVERNING LAW AND JURISDICTION

10.1     This Agreement and any dispute or claim arising out of or in connection with it or its subject matter, existence, negotiation, validity, termination or enforceability (including non-contractual disputes or claims) shall be governed by and construed in accordance with English law.

10.2     Each Party irrevocably agrees that High Court of Justice of England shall have exclusive jurisdiction in relation to any dispute or claim arising out of or in connection with this Agreement or its subject matter, existence, negotiation, validity, termination or enforceability (including non-contractual disputes or claims).

10.3     Each Party irrevocably waives any right that it may have to object to an action being brought in those courts, to claim that the action has been brought in an inconvenient forum, or to claim that those courts do not have jurisdiction.



**This Agreement** has been duly executed by or on behalf of the parties and has, on the date stated at the beginning of this Agreement, been delivered as a deed.



## SCHEDULE 1
### NOTICE OF TRANSFER

To:   Hanjin Shipping Co., Ltd.
      25-11 Yoido Dong, Youngdeungpo-Ku
      Seoul 150-878
      Korea

Date: _____ 2016

Dear Sirs

**Vessel m.v. "CONTI BOSTON" (IMO number: 9290464) (the "Vessel")**

We refer to the novation agreement (the **"Novation Agreement"**) dated _____
2016 made between yourselves as charterer, **Lanyard LLC** as transferee, and ourselves as
transferor.

We hereby give you notice that the Transfer Date (as defined in the Novation Agreement) is
_____ 2016 at _____ hours (Central European Time).

Please acknowledge receipt of this letter by signing and returning the enclosed duplicate copy
of this letter.

Yours faithfully


_____

by:
for and on behalf of
**CONTI 31. Container Schiffahrts-GmbH & Co. KG MS "CONTI BOSTON"**


We acknowledge receipt of this letter.


_____

by:
for and on behalf of
**Hanjin Shipping Co., Ltd.**

Date:

## EXECUTION PAGE

**In witness whereof** the parties hereto have entered into this Agreement.


**Transferor**
**Signed as deed for and behalf of**
CONTI 31. Container Schiffahrts-GmbH & Co. KG)
MS "CONTI BOSTON"
by its attorney-in-fact/authorized signatory:

Birger Meyer-Glockner        Michael Huber

in the presence of:                    )

_____
Witness

**Transferee**
**Signed as a deed for and behalf of**
Lanyard LLC                             )
by its attorney-in-fact/authorized signatory:  )
                                        )

in the presence of                     )

_____
Witness

**Charterer**
**Signed as deed for and behalf of**
Hanjin Shipping Co., Ltd.              )
by its attorney-in-fact/authorized signatory:  )
                                        )

in the presence of                     )

_____
Witness