UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)

CAPEHART & SCATCHARD, PA.
SERGIO I. SCUTERI, ESQ. (019901995)
8000 Midlantic Dr., Suite 300 S
Mt. Laurel, NJ 08054
856-234-6800
sscuteri@capehart.com

Attorneys for Ashley Furniture Industries, Inc.

In Re:

HANJIN SHIPPING CO. LTD.

Debtor in a Foreign Proceeding

Case No.: 16-27041

Chapter: 15

Judge: JKS

**VERIFIED EMERGENCY MOTION OF ASHLEY FURNITURE INDUSTRIES, INC. SEEKING AN ORDER (I) AUTHORIZING ASHLEY'S ADMINISTRATIVE FREEZE ON AMOUNTS DUE TO HANJIN ON PRIOR SHIPMENTS AND (II) MODIFYING THE PROTOCOL TO PERMIT IT TO CREATE AN ESCROW RESERVE ACCOUNT TO PROTECT ITS RIGHTS OF SETOFF ON FUTURE DELIVERIES**

Ashley Furniture Industries, Inc. ("Ashley"), by and through its undersigned counsel, hereby moves (the "Motion"), on an emergency basis, for an order (i) approving Ashley's administrative freeze on amounts due to Hanjin Shipping Co. Ltd. (the "Debtor" or "Hanjin") on previous shipments and (ii) modifying the protocol attached as Exhibit A to the *Order Granting Provisional Relief Pursuant to Sections 362, 365(e), 1519, 1520, and 105(a) of the Bankruptcy Code Pending Hearing on Petition for Recognition as a Foreign Main Proceeding* [D.I. 102] to allow Ashley to create an escrow reserve account to preserve its setoff rights in connection with amounts owed to Hanjin under Ashley's service contract with the Debtor (the "Service Contract"), which Hanjin has breached through its unilateral modification of the delivery and

1

payments terms, and respectfully states as follows:

### Preliminary Statement

1. As set forth more fully below, to date Ashley has suffered significant damages from the Debtor's breach of the Service Contract. Moreover, each new container that arrives into the United States results in a fresh breach by Hanjin, because Hanjin has unilaterally changed the terms of the Service Contract by refusing to transport the containers beyond the port of arrival as required by the Service Contract. Thus, each new delivery brings with it the certainty of further cover damages. However, Hanjin's insistence on payment of a unilaterally imposed freight fee up front has deprived Ashley of any opportunity to recover even a slight portion of its cover damages.

2. By this Motion, Ashley seeks to have the Court recognize that Ashley has a valid right to place an administrative freeze on monies owed to Hanjin on account of prior deliveries and that Ashley may maintain that freeze until the Court determines Ashley's setoff rights at the appropriate time and (ii) to withhold, on future deliveries to Ashley, $986.41 per container from Hanjin's unilaterally determined fee to create a reserve to which Ashley may look to offset damages that will be suffered on those deliveries.

### Background

3. Ashley contracted with Hanjin for two types of moves. First, Hanjin provided Ashley with a "Port to Door" shipping service, which entailed (x) providing an empty container at a foreign port that would be loaded with Ashley cargo and shipped to a North American port; (y) transporting the container from the destination port to an Ashley distribution center by a combination of rail and truck transport depending on the distribution center's distance from the

2

port of arrival and the availability of rail service near the ultimate destination; and (z) retrieving the empty container and chassis from the Ashley distribution center (collectively, "Port to Door Service"). As part of this arrangement, Ashley was permitted to possess a container for twenty (20) days before being charged detention fees. The Service Contract provided definite pricing for Port to Door Service to various locations with the price determined by port of origin, port of destination and the location of the distribution center.

4. Second, Hanjin also provided Ashley with Port to Door service, shipping directly to Ashley's customers ("Port to Customer Service"). The only difference between Port to Door Service and Port to Customer Service was that Hanjin would deliver a container directly to an Ashley customer rather than to an Ashley distribution center. The Service Contract provided fixed pricing for the cost of shipping to the port of destination using the same costs as Port to Door Service. The cost of transporting the container from the port of destination to the customer location is set forth in the Service Agreement.

5. Ashley rarely contracted for "Port to Port" moves (i.e. moves from a foreign port to a North American port). Although Hanjin, following the commencement of its bankruptcy, has proposed amendments to the Service Contract to add new prices for Port to Port moves, Ashley has not agreed, and does not intend to agree, to those modifications.

6. Notwithstanding Ashley's unwillingness to agree to Hanjin's proposed modifications, Hanjin unilaterally changed all waybills with Ashley to Port to Port. In addition, Hanjin refuses to honor its credit terms with Ashley and now insists on payment in full in readily available funds prior to releasing a container to Ashley. Hanjin cannot even comply with the Port to Port terms, as those terms require Hanjin to accept returns of empty containers, which Hanjin refuses to do at this time.

7. Thus, for every delivery since Hanjin filed its petition, and for every container that remains to be delivered, Hanjin has or will breach the originally contracted for delivery terms. In addition, Hanjin has and will continue to breach the Port to Port delivery terms that it purports to unilaterally impose upon Ashley.

8. Generally, Ashley's current and anticipated damages fall into three broad categories: (a) damages related to cargo in containers at foreign ports (i.e. stranded containers); (b) cover costs for Port to Door and Port to Customer contract breaches; and (c) damages related to ongoing container and chassis storage costs.

9. The stranded containers fall into three categories: those from finished good vendors, those from Wanek Furniture Co. Ltd. ("Wanek"), a Vietnamese subsidiary and those from Wanvog Furniture (Kunshan) Co. Ltd. ("Wanvog"), a Chinese subsidiary. Wanek and Wanvog supply Ashley with both parts for assembly in Ashley's United States facilities as well as finished goods sold by Ashley. Ashley's damages arising from the finished good vendors are comprised of (a) customs fees, (b) port fees, (c) excess transportation fees and (d) other miscellaneous fees ("Finished Good Damages"). The Finished Good Damages arise from scenarios where Ashley required its foreign suppliers to halt deliveries that were set to ship out on Hanjin ships (and in Hanjin containers) due to Hanjin's inability to comply with its obligations following the bankruptcy filing. These deliveries were in route to foreign ports when Hanjin filed its bankruptcy proceeding, and Ashley has paid, or will be required to reimburse its finished good suppliers, for additional costs related to the rerouting and transloading of these goods. To date, Ashley has incurred average damages per container of $792.50 with the various fee categories, when applicable, averaging $246.47 for customs fees; $430.73 for port fees;

$297.97 for transportation fees and $51.82 of miscellaneous fees.[1] With 142 finished good containers at issue, Ashley's estimates its total Finished Good Damages to be $112,535.00.

10. In addition to the Finished Good Damages, Ashley has also incurred, or will incur, damages with respect to the Wanek and Wanvog goods. For the Wanvog goods, Ashley has incurred additional logistics costs in the following categories: (a) transportation fees, (b) container UP and Down charges, (c) container release charges, (d) seal fees, (e) customer clearance fees, (f) labor costs for transferring goods to non-Hanjin containers, and (g) container detention fees. Altogether, the total cost for these assorted fees is $12,087, with an average cost per container (7 affected containers) of $1,726. In addition, Ashley has paid Hanjin a deposit of $26,515 as security to secure the return of the containers. Ashley returned the containers to Hanjin Shanghai on September 16, 2016, but Hanjin has not yet refunded the deposit. This amount would need to be added to the total damages if the deposit is not returned.

11. At this time, the calculation of damages for the Wanek goods is less clear. Nevertheless, Ashley believes that the damages per container used to calculate the Finished Good Damages can serve as a very conservative estimate of the damages related to the Wanek Goods. 119 containers holding Wanek goods have been adversely affected by Hanjin's breaches of the Service Agreement. Using the $792.50 per container estimate that was derived from the finished vendor goods, Ashley estimates its damages related to the Wanek goods to be $94,307.50. Critically, this estimate does not include costs related to (a) labor for loading and unloading specific containers, (b) administrative expenses or (c) expenses related to delays in product availability that could range anywhere from 2 to 6 weeks.

---

[1] Note that if each of these categories of fees applied to a particular container, the average fee for that container would be $1,026.99.

12. Altogether, Ashley's conservative estimate of its damages related to the stranded goods is $218,929.50 ($94,307.50 for the Wanek goods + $12,087.00 for the Wanvog goods + $112,535 for Finished Good Damages). With 268 total containers affected, the average estimated damages per container is $816.90.

13. In addition to the damages arising from the stranded goods that never made it to the foreign port, Ashley also has an additional 16 containers stranded in Singapore, which were pulled off of a Hanjin vessel that was headed to the U.S. Ashley is working with a freight forwarder to pull these containers from the Singapore port, transload the product into another carrier's container and then ship the containers to Ashley's Redlands, CA facility. An estimate received from the freight forwarder indicates that Ashely will need to pay $90,400—or $5,650 per container—to rescue these stranded goods.

14. Ashley has also incurred substantial costs in an effort to cover for Hanjin's breaches of its Port to Door and Port to Customer obligations. Those damages fall into a number of categories, including (a) terminal fees, (b) the payment of possessory lienholders, (c) transportation costs to move the goods from the port to their original destination, (d) transportation costs to return the containers to an appropriate location; and (e) fees for container and chassis storage during what should have been the twenty day "free" period. These damages per container vary by delivery location, as set forth in the table below.

| Location | # Containers | Extra Costs to Ashley | Rate Reduction | Net Cost / Container | Total Damages |
|---|---|---|---|---|---|
| Advance, NC | 76 | $1,754 | $800 | $954 | $72,504 |
| Leesport, PA | 6 | $1,275 | $580 | $695 | $4,170 |

6

| | | | | | |
|---|---|---|---|---|---|
| Ecru, MS | 16 | $3,443 | $2,050 | $1,393 | $22,288 |
| Romeoville, IL | 17 | $2,818 | $2,300 | $518 | $8,798 |
| Local Colton, CA | 118 | $1,287 | $550 | $737 | $86,907 |
| Redlands/Colton, CA | 465 | $1,424 | $550 | $874 | $406,410 |

In total, Ashley's damages for these goods is $601,077.00, with an overall average cost per container of $861.14 in excess of the price reduction offered by Hanjin when it unilaterally diverted the delivery location.

15. In addition to the foregoing hard costs, Ashley has also suffered damages as a result of Hanjin's breaches of its Port to Customer obligations, including damages to its goodwill and reputation due to the delays arising from Hanjin's failure to perform in accordance with the Service Agreement. Moreover, the foregoing damages do not include all additional fees that Ashley has incurred to cover for Hanjin's breaches. For example, these damages do not include (a) demurrage costs incurred at port, (b) demurrage or storage fees at last rail ramp, (c) pier pass fees for day deliveries and (d) bobtail fees or prepull charges from truckers for Port to Door and Port to Customer deliveries.

16. Finally, Ashley's third broad category of damages relates to container storage costs and chassis late fees due to Hanjin's complete refusal to accept returns and the container lessors' sporadic ability to accept returns. For example, due to the additional complications and time it takes to return a Hanjin container, Ashley's trucker in the Redlands/Colton, CA location has begun charging Ashley $125 for each Hanjin empty container that is returned. If all 552 containers in this area are returned empty, Ashley will be required to pay an additional $69,000. Even worse, many of the Hanjin containers are sitting in Ashley's yard, taking up valuable space

and jeopardizing the fluid operation of Ashley's distribution centers. Currently, 282 empty Hanjin containers are located on Ashley's property, and that number may grow to 603 containers by early November if return locations are not found. Given this growing problem, Ashley has arranged to lease property to hold up to 250 containers on their chassis for $26,000 per month. The dray cost of moving these containers to this new storage location is $100 per container, resulting in an additional $25,000 in damages. Aside from these storage fees, Ashley also continues to incur a daily chassis fee of approximately $27.50 per chassis. 282 containers sitting on 282 chassis will generate an additional $7,750 per day in damages—which will only increase as more containers arrive—if Ashley is forced to pay these charges.

17. In total, Ashley has incurred damages of approximately $961,397.50[2] to date because of Hanjin's breaches of the Service Agreement. That amount does not include additional miscellaneous fees and charges, nor does it include the potential $69,000 in additional trucker charges or the $7,750 (and increasing) daily charge for chassis late fees. These amounts far exceed the amounts that Ashley has placed on administrative freeze, and barring Ashley from continuing that freeze will only serve to further minimize Ashley's ability to recover its damage via its rights of setoff. Moreover, Ashley is expecting approximately 200 additional containers to arrive on Hanjin ships in October. Based on its average historical cover damages, Ashley projects further damages of at least $197,228.00 with respect to these new containers.[3]

---

[2] This amount consists of $218,920.50 in stranded goods costs, $90,400 in Singapore "rescue" costs, $601,077 in cover damages related to Hanjin's breach of its Port to Door and Port to Customer Obligations, $26,000 for one month of leased storage space, and $25,000 in dray charges to move 250 containers to the storage space.

[3] This amount consists of the historical $861.14 per container average cover cost plus an additional $125 per container trucker fee (as all of these containers are expected to come into Ashley's Redlands/Colton CA distribution center) multiplied by 200 additional containers.

## Relief Requested

18. In light of the foregoing damages, Ashley requests that the Court (a) recognize the validity of Ashley's administrative freeze on amounts owed to Hanjin on account of goods already delivered, pending a determination on the validity of Ashley's right of setoff at an appropriate future date and (b) permit Ashley to deduct $986.14 per container from amounts owed to Hanjin for future deliveries into an escrow account, pending a final reconciliation of damages incurred by Ashley as a result of Hanjin's breaches in connection with those deliveries.

19. While Ashley's damages arising from the Debtor's breach of the Service Agreement may be unavoidable, the Debtor's efforts to modify the Service Contract should not be countenanced by this Court. In particular, requiring Ashley to immediately pay the full shipping cost, in cash, will cause Ashley undue harm because it eliminates Ashley's rights of setoff. In the face of direct statements that the Debtor does not intend to deliver Ashley's merchandise in accordance with the terms of the Service Contract, Ashley should not be required to pay the Debtor in full until Ashley is in possession of its goods and the full extent of its damages are known.

20. Because the Debtor is unwilling or unable to fully perform on the Service Contract going forward, the Court must fashion relief to protect Ashley's rights. With respect to goods already received by Ashley, the Court should authorize Ashley's administrative freeze on amounts owed to Hanjin pending a ruling on the validity of Ashley's rights of setoff. As to goods still in transit, Ashley requests that the Court permit it to deduct $986.41 per container from amounts paid to Hanjin and to deposit those amounts into an interest-bearing escrow account, pending a reconciliation of Ashley's total damages on future deliveries. Once those damages are known, Ashley should then be able to directly withdraw those amounts from the

escrow account, with the remaining funds being paid over to the Debtor. If Ashley's damages ultimately exceed the amounts owed to Hanjin, Ashley should be entitled to the full amount held in the escrow account and will be required to file a claim for the remaining damages.

21. Debtor's counsel expressly agreed that payments could be netted against amounts owed to the Debtor at the hearing on September 9, 2016 in response to argument from Ashley's counsel. Because a damages claim against the Debtor is likely worthless, this is the only way to preserve Ashley's rights of setoff and to ensure that Ashley does not have to pay twice for the services the Debtor was obligated, but failed, to provide.

## Notice

22. Ashley has served this response on (a) the Office of the United States Trustee; (b) counsel to the Foreign Representative; and (c) those parties that have requested notice in this case.

## Conclusion

23. Ashley respectfully requests that the Court (a) grant the Motion, (b) authorize Ashley to continue its administrative freeze on amounts owed to Hanjin pending a ruling on Ashley's setoff rights, (c) authorize Ashley to deposit amounts owed to Hanjin on shipments in transit into an interest-bearing escrow account pending a final accounting of Ashley's damages in connection with those shipments and (d) grant such other and further relief as may be just and proper.

Dated: September 30, 2016

/s/ Sergio I.Scuteri
SERGIO I. SCUTERI, ESQ. (019901995)
CAPEHART & SCATCHARD, PA.
Attorneys for Ashley Furniture Industries Inc.
8000 Midlantic Dr., Suite 300 S
Mt. Laurel, NJ 08054
856-234-6800
sscuteri@capehart.com

10

## VERIFICATION

STATE OF WISCONSIN

COUNTY OF TREMPEALEAU

I, Brian Adams, Senior Director of International Sourcing & Corporate Quality Systems of Ashley Furniture Industries Inc., hereby declare under penalty of perjury under the laws of the United States that the information contained in paragraphs 5 through 12 of the foregoing motion is true. ~~and correct the foregoing motion is true and correct.~~

_____
BRIAN ADAMS

STATE OF WISCONSIN

COUNTY OF TREMPEALEAU

Sworn and subscribed before me, this 30th day of September, 2016, by Brian Adams, in his capacity as Senior Director of International Sourcing & Corporate Quality Systems of Ashley Furniture Industries Inc. He is personally known to me.

_____
Print Name _Danil T _____
Notary Public, ~~State at Large~~ Wisconsin
My commission is pending

1234865\2

## VERIFICATION

STATE OF WISCONSIN

COUNTY OF TREMPEALEAU

I, Christi Wozney, Vice President of International Logics and Customer Support, of Ashley Furniture Industries Inc., hereby declare under penalty of perjury under the laws of the United States that the information contained in paragraphs 1-7 and 13-17 of the foregoing motion is true and correct.

*Christine Wozney*
CHRISTINE WOZNEY

STATE OF WISCONSIN

COUNTY OF TREMPEALEAU

Sworn and subscribed before me, this 30th day of September, 2016, by Christine Wozney, in her capacity as, Vice President of International Logics and Customer Support, of Ashley Furniture Industries Inc. She is personally known to me.

Print Name: Daniel J. Aiman
Notary Public, State of Wisconsin
My Commission is permanent.