**EXHIBIT B**

*PSA*

**Execution Version**

# PURCHASE AND SALE AGREEMENT

### DECEMBER 20, 2016

**By and Among**

**HANJIN SHIPPING CO., LTD.,**

**as Seller**

**and**

**TERMINAL INVESTMENT LIMITED S.À R.L.,**
**(for itself and on behalf of Hyundai Merchant Marine Co., Ltd.)**

**as Purchaser**

**Relating to**

**TOTAL TERMINALS INTERNATIONAL, LLC**

**and**

**HANJIN SHIPPING TEC, INC.**

US 4806757v.17



# CONTENTS

| Section | | Page |
|---|---|---|
| 1. | Definitions | 2 |
| 2. | Purchase and Sale Transactions | 6 |
| 3. | Condition of the Interests | 7 |
| 4. | Representations and Warranties | 8 |
| 5. | Covenants | 11 |
| 6. | Closing Conditions | 14 |
| 7. | Closing | 17 |
| 8. | Transaction Costs | 18 |
| 9. | Remedies | 18 |
| 10. | Miscellaneous Provisions | 18 |

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this **Agreement**) is made and entered into as of December 20, 2016 (the **Effective Date**),

**BY AND AMONG:**

(1)      **Hanjin Shipping Co., Ltd.**, a company organized under the laws of the Republic of Korea (**Hanjin Receiver** or **Seller**); and

(2)      **Terminal Investment Limited S.à r.l.**, a private limited liability company (*société à responsabilité limitée*) incorporated in Luxembourg with registered number B 174.117 whose principal place of business is at 28, Boulevard d'Avranches, L-1160 Luxembourg, Grand Duchy of Luxembourg (**TIL** or **Purchaser**).

Seller and Purchaser are sometimes referred to herein individually as a **Party**, and collectively as the **Parties**.

**WHEREAS:**

(A)      Total Terminals International, LLC (**TTI**) operates certain waterfront container terminals located in Long Beach, California and Seattle, Washington (the **TTI Facilities**). Hanjin Shipping TEC, Inc. (**HTEC**) provides certain equipment used in the operations of the TTI Facilities.

(B)      Seller is a member of TTI and (i) owns beneficially and of record fifty four per cent (54%) of the outstanding membership interests of TTI (the **TTI Interests**) and, (ii) pursuant to one or more shareholder loan agreements, has made shareholder loans to TTI having an outstanding principal amount (including accrued and unpaid interest) as of November 30, 2016 of $82,699,641.50 in respect of senior shareholder loans and $114,725,314.13 in respect of junior shareholder loans (the **TTI Shareholder Loans**).

(C)      Seller as of the date hereof (i) owns beneficially and of record 100% of the outstanding equity interests of HTEC (the **HTEC Interests** and, together with the TTI Interests, the **Interests**) and, (ii) pursuant to one or more shareholder loan agreements, has made shareholder loans to HTEC having an outstanding principal amount as of October 31, 2016 of $5,500,000 excluding unpaid interest (the **HTEC Shareholder Loans** and together with the TTI Shareholder Loans, the **Shareholder Loans**).

(D)      TIL as of the date hereof owns beneficially and of record forty six per cent (46%) of the outstanding membership interests of TTI.

(E)      TIL has separately entered into a legally binding agreement with Hyundai Merchant Marine Co., Ltd. (**Hyundai**) pursuant to which, *inter alia*, (i) TIL is acting as representative of Hyundai with respect to this Agreement with respect to the Interests and Shareholder Loans being acquired by Hyundai, and (ii) TIL (for itself and on behalf of Hyundai) will acquire the Interests and Shareholder Loans at the Closing (as defined below) in accordance with the terms and conditions of this Agreement on substantially the same economic terms and conditions as those set forth in the joint bid letter, dated November 28, 2016 (the **Joint Bid Letter**), from TIL and Hyundai to the Financial Advisor (as defined below).

(F)     Seller desires to sell, convey, assign and transfer, and Purchaser desires to purchase, all of Seller's collective right, title and interest in the Interests and the Shareholder Loans, on the terms set forth in this Agreement.

(G)     Seller has provided evidence in writing to Purchaser that the Korean Rehabilitation Court (as defined below) has approved this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.     **DEFINITIONS**

In addition to the terms defined above in the introduction and recitals to this Agreement, the following terms when used in this Agreement shall have the meanings set forth in this Article 1.

**Accounts Receivable Balance** has the meaning set forth in Section 2.1(d).

**Affiliate** means, with respect to the Person in question, any other Person that, directly or indirectly, (a) owns or controls fifty percent (50%) or more of the outstanding voting and/or equity interests of such Person, or (b) controls, is controlled by or is under common control with, the Person in question. For the purposes of this definition, the term **control** and its derivations means having the power, directly or indirectly, to direct the management, policies or general conduct of business of the Person in question, whether by the ownership of voting securities, contract or otherwise.

**Antitrust Law** means any federal, state and international statutes, rules, regulations, orders, decrees, administrative and judicial doctrines and other laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, anti-competitive conduct or restraint of trade.

**Applicable Law** means (a) all statutes, laws, common law, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, stock exchange and similar quasi-governmental authority, and (b) any judgment, injunction, order or other similar requirement of any court or other adjudicatory authority, in effect at the time in question and in each case to the extent the Person or property in question is subject to the same.

**Business Day** means any day other than a Saturday, a Sunday, a federal legal holiday or any day observed as a holiday in New York City or Seoul, Korea.

**Closing** has the meaning set forth in Section 7.1.

**Closing Date** has the meaning set forth in Section 7.1.

**Code** means the Internal Revenue Code of 1986, as amended from time to time, and any regulations, rulings or guidance issued by the Internal Revenue Service.

**Confidential Information** has the meaning set forth in Section 5.1(a).

**Confidentiality Agreement** means the confidentiality undertaking set forth in Section 15.4 of the TTI LLC Agreement.

US 4806757v.17

**Credit Agreement** means the U.S. $320,000,000 Credit Agreement dated as of December 29, 2014 among TTI as borrower, Wells Fargo Bank, N.A. as administrative agent and collateral agent, and the lender and other parties named therein.

**Environmental Laws** means any Applicable Laws which regulate the manufacture, generation, formulation, processing, use, treatment, handling, storage, disposal, distribution or transportation, or an actual or potential spill, leak, emission, discharge or release of, Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media.

**Financial Advisor** means Jefferies International Ltd.

**Financing Documents** means the Credit Agreement, the Subordination Agreement and the Pledge Agreement.

**GAAP** means United States generally accepted accounting principles.

**Governmental Authority** means any federal, state or local government or other political subdivision thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question.

**Hanjin Receiver** has the meaning set forth in the preamble.

**Hanjin Rehabilitation Proceeding** has the meaning set forth in Section 3.3(a).

**Hazardous Substances** means any hazardous or toxic substances, materials or waste, whether in solid, semisolid, liquid or gaseous form, including, without limitation, asbestos, petroleum or petroleum by-products and polychlorinated biphenyls.

**HSR Act** means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

**HTEC** has the meaning set forth in the recitals.

**HTEC Interests** has the meaning set forth in the recitals.

**HTEC Shareholder Loans** has the meaning set forth in the recitals.

**Hyundai** has the meaning set forth in the recitals.

**Indebtedness** means, with regard to any Person, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (c) all obligations of such Person as an account party in respect of letters of credit and bankers' acceptances or similar credit transactions, solely to the extent drawn as of the Closing; (d) all payment obligations of such Person pursuant to any hedging, swap or similar arrangements; and (e) all liabilities and guarantee obligations of such Person in respect of the type described in the foregoing clauses (a) through (d).

**Indemnitees** means, with respect to a Party, such Party and its Affiliates, and each of their respective shareholders, members, partners, trustees, beneficiaries, directors, professionals, officers and employees, and the successors, assigns, legal representatives, heirs and devisees of each of the foregoing.

US 4806757v.17

**Interests** has the meaning set forth in the recitals.

**Joint Bid Letter** has the meaning set forth in the recitals.

**Korean Rehabilitation Court** has the meaning set forth in Section 3.3(a).

**Liability** means any liability, obligation, damage, loss, diminution in value, cost or expense of any kind or nature whatsoever, whether accrued or unaccrued, actual or contingent, known or unknown, foreseen or unforeseen.

**Lien** means any mortgage, pledge, security interest, encumbrance, lien, charge, adverse interest or the like.

**Losses** means any and all actual liabilities, obligations, losses, damages, deficiencies, claims, awards, causes of action, assessments, fines, judgments, settlements, penalties, Specified Taxes, costs and expenses (including reasonable fees and expenses of counsel, accountants, court or arbitration fees, and other reasonable costs and expenses paid in investigation, defense or settlement of any of the foregoing).

**Mutual Closing Conditions** has the meaning set forth in Section 6.1(a).

**Notice** has the meaning set forth in Section 10.1(a).

**Ordinary Course of Business** means, with respect to the TTI Facilities, the ordinary course of business consistent with TTI's past custom and practice (as applicable), taking into account the facts and circumstances in existence from time to time.

**Outside Date** has the meaning set forth in Section 7.1.

**Permitted Liens** means Liens securing the obligations of TTI under the Financing Documents.

**Person** means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

**Pledge Agreement** means the Pledge Agreement dated as of December 29, 2014 among Seller and TIL as pledgers and Wells Fargo Bank, N.A. as collateral agent for the secured parties under the Credit Agreement.

**Port Leases** means (a) the Terminal 46 Lease and Agreement, dated as of March 26, 1991, between the Port of Seattle and Hanjin Receiver, as amended, as assigned to TTI pursuant to the Assignment and Assumption of Lease and Consent of Port of Seattle, dated as of December 30, 2003, between Hanjin Receiver and TTI and consented to by the Port of Seattle, and (b) the Preferential Assignment Agreement, dated as of February 28, 2000, between the City of Long Beach and Hanjin Receiver, as amended, as assigned to TTI pursuant to the Consent to Assignment effective January 1, 2004 by the City of Long Beach.

**Port Approvals** has the meaning set forth in Section 6.1(a)(vi).

**Purchase Price** has the meaning set forth in Section 2.2.

**Purchaser** has the meaning set forth in the preamble.

US 4806757v.17

**Purchaser Closing Conditions** has the meaning set forth in Section 6.2(a).

**Purchaser Documents** has the meaning set forth in Section 4.2(b).

**Releasors** means, with respect to a Party, such Party and its Affiliates, and each of their respective shareholders, members, partners, trustees, beneficiaries, directors, professionals, officers and employees, and the successors, permitted assigns, legal representatives, heirs and devisees of each of the foregoing.

**Seller** has the meaning set forth in the preamble.

**Seller Closing Conditions** has the meaning set forth in Section 6.3(a).

**Seller Documents** has the meaning set forth in Section 4.1(b).

**Shareholder Loans** has the meaning set forth in the recitals.

**Specified Taxes** means any U.S. federal, state, local or non-U.S. personal property, sales, use, room, occupancy, ad valorem or similar taxes, assessments, levies, charges or fees imposed by any Governmental Authority on Seller with respect to the Interests or the TTI Facilities, including, without limitation, any interest, penalty or fine with respect thereto, but expressly excluding any (a) U.S. federal, state, local or non-U.S. income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift or generation skipping tax, or (b) transfer, documentary stamp, recording or similar tax, levy, charge or fee incurred with respect to the transaction described in this Agreement.

**Subordination Agreement** means the Subordination Agreement dated as of December 29, 2014 among Seller as subordinated creditor, TTI as borrower and Wells Fargo Bank, N.A. as collateral agent for the secured parties under the Credit Agreement.

**Taxes** means any U.S. federal, state, local or non-U.S. income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift or generation skipping, personal property, sales, use, room, occupancy, ad valorem, transfer, documentary stamp, recording or other taxes, assessments, levies, charges or fees imposed by any Governmental Authority including, without limitation, any interest, penalty or fine with respect thereto or with respect to any Tax Return.

**Tax Proceedings** has the meaning set forth in Section 5.6(a).

**Tax Return** means any and all returns, information returns, statements, forms, filings and reports (including elections, declarations, disclosures, amendments, schedules, estimates, or attachments thereto) required to be filed with a Governmental Authority with respect to Taxes.

**TIL** has the meaning set forth in the preamble.

**TTI** has the meaning set forth in the recitals.

**TTI Facilities** has the meaning set forth in the recitals.

**TTI Interests** has the meaning set forth in the recitals.

**TTI LLC Agreement** means the Second Amended and Restated Limited Liability Company Agreement of TTI dated as of December 14, 2011, as amended, supplemented or otherwise modified from time to time.

US 4806757v.17

**TTI Shareholder Loans** has the meaning set forth in the recitals.

## 2.   PURCHASE AND SALE TRANSACTIONS

### 2.1   Purchase and Sale of the Interests; Assignment and Assumption of Shareholder Loans

Subject to the terms and conditions set forth in this Agreement, at the Closing:

(a)   Seller shall sell, convey, transfer and assign to Purchaser, and Purchaser shall purchase and accept from Seller, all right, title and interest of Seller in and to the Interests. The Interests shall be sold, conveyed, transferred and assigned to Purchaser free and clear of all Liens (other than Permitted Liens), claims and interests;

(b)   Hanjin Receiver shall cease to be a member of TTI and shall have no rights or obligations under the TTI LLC Agreement following the Closing (and, for the avoidance of doubt, Purchaser shall not assume any liabilities or obligations of Hanjin Receiver); the TTI LLC Agreement shall be amended and restated to reflect, *inter alia*, that Hanjin Receiver ceases to be a member of TTI as of Closing;

(c)   Seller shall transfer and assign to Purchaser, and Purchaser shall accept and assume from Seller, all right, title, interest, and obligations under the Shareholder Loans free and clear of all Liens (other than Permitted Liens), claims and interests; and

(d)   Subject to any required approvals under the Financing Documents, the Parties shall treat as paid in full any outstanding accounts receivable owed by Hanjin Receiver to TTI in the aggregate of $54,611,879.84 (the **Accounts Receivable Balance**) against the reduction of the outstanding balance of the junior TTI Shareholder Loans by an amount equal to the Accounts Receivable Balance.

### 2.2   Purchase Price

The total consideration for the Interests and the assignment of the Shareholder Loans shall consist of seventy eight million and 00/100 U.S. Dollars ($78,000,000) (the **Purchase Price**), allocated as: (i) $72,500,000, less $1, in respect of the TTI Shareholder Loans, (ii) $1 in respect of the TTI Interests, (iii) $2,750,000 in respect of the HTEC Shareholder Loans, and (iv) $2,750,000 in respect of the HTEC Interests. For the avoidance of doubt, the Purchase Price shall be payable without any set-off or deduction whatsoever, including with respect to the transaction set forth in Section 2.1(d).

### 2.3   Payment of Purchase Price

(a)   **Payment at Closing**

At Closing, Purchaser shall wire to the closing escrow account (an account notified by Seller to Purchaser in writing at least (3) Business Days prior to the Closing Date) established under the closing escrow agreement set forth in Section 7.2 an amount in cash equal to the Purchase Price in immediately available funds.

(b)   **Method of Payment**

US 4806757v.17



All amounts to be paid by Purchaser pursuant to this Agreement shall be paid by wire transfer of immediately available U.S. federal funds.

(c)      **Withholding**

Purchaser shall be entitled to deduct and withhold, or cause to be deducted and withheld, from amounts otherwise payable to Seller pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to such payments under any provision of Applicable Law. Any amounts so deducted and withheld will be treated for all purposes of this Agreement as having been paid to Seller. To the extent Seller is legally able to do so, Seller shall deliver to Purchaser a certificate meeting the requirements of U.S. Treasury Regulations Section 1.1445-11T(d)(2)(i), certifying that the sale of the relevant Interests and Shareholder Loans is not subject to withholding under U.S. Treasury Regulations Section 1.1445-11T(d)(1).

## 3.      CONDITION OF THE INTERESTS

**3.1      Interests Sold "As Is"**

Purchaser acknowledges and agrees that (a) the purchase of the Interests shall be on an "as is", "where is", "with all faults" basis, and the assets of TTI and HTEC shall be subject to wear and tear from the Effective Date until Closing, and (b) Seller shall not have any obligation to repair any damage to or defect in the TTI Facilities or otherwise remedy any matter affecting the condition of the TTI Facilities.

**3.2      Mutual Release for Violations of Applicable Law**

Each of the Parties (for itself and all its Releasors) does hereby forever release and discharge the other Party's Indemnitees from any and all liabilities of every nature and extent whatsoever on account of or in any way, directly or indirectly, relating to, concerning, arising out of or founded upon, whether now known or unknown to any of the other Party's Releasors, the violations of Applicable Law and all environmental claims and environmental liabilities. Each of the Parties (for itself and all of its Releasors) covenants and agrees not to sue the other Party, or any of its Indemnitees, and releases the other Party, and its Indemnitees, of and from and waives any claim or cause of action, including, without limitation, any strict liability claim or cause of action or contractual and/or statutory actions for contribution or indemnity, that the other Party, or any of its Releasors, may have against the other Party, or any of its Indemnitees, under any Environmental Laws, now existing or hereafter enacted or promulgated, relating to environmental claims, environmental liabilities, environmental matters or environmental conditions, in, on, under, about or migrating from or onto the TTI Facilities, including, without limitation, the Environmental Laws, or by virtue of any common law right, now existing or hereafter created, related to environmental claims, environmental liabilities, environmental matters or environmental conditions in, on, under, about or migrating from or onto the TTI Facilities.

**3.3      Acknowledgement of Hanjin Rehabilitation Proceeding and Mutual Release Related Thereto**

(a)      Purchaser acknowledges and agrees that Hanjin Receiver initiated a rehabilitation proceeding (the **Hanjin Rehabilitation Proceeding**) under Korean law in the Seoul Central District Court (the **Korean Rehabilitation Court**) as of August 31, 2016, pursuant to which Hanjin Receiver's affairs shall be wound up and dissolved, and Hanjin Receiver's actions and decisions including its actions and decisions with respect to any matters related to this Agreement are expected to remain subject to the jurisdiction of such court.

7

(b)     Each Party (for itself and all its Releasors) does hereby forever release and discharge the other Party's Indemnitees from any and all liabilities of every nature and extent whatsoever on account of or in any way, directly or indirectly, relating to, concerning, arising out of or founded upon, the existence of the Hanjin Rehabilitation Proceeding, including any and all consequences arising therefrom under the TTI LLC Agreement.  Each Party (for itself and all its Releasors) covenants and agrees not to sue the other Party, or any of its Indemnitees, and releases the other Party, and its Indemnitees, of and from and waives any claim or cause of action that the other Party, or any of its Releasors, may have against the other Party, or any of its Indemnitees, with respect thereto.

## 3.4     Reliance on Due Diligence

Purchaser acknowledges and agrees that:

(a)     Purchaser has had the opportunity to conduct due diligence inspections of the TTI Facilities, TTI and the Interests as of the Effective Date, including obtaining all information which it deems necessary to make an informed decision as to whether it should proceed with the purchase of the Interests;

(b)     In purchasing the Interests, Purchaser is relying only on its due diligence inspections of the TTI Facilities, TTI and the Interests and the representations and warranties expressly made by Seller in this Agreement (which Purchaser acknowledges and agrees shall not survive Closing); and

(c)     Purchaser is not relying on any statement made or information provided to Purchaser by or on behalf of Seller (except for the representations and warranties expressly made by Seller in this Agreement) or any of its Affiliates, or any of their respective shareholders, members, partners, trustees, beneficiaries, directors, managers, officers, employees, attorneys, accountants, contractors, consultants, agents or representatives, or any Person purporting to represent any of the foregoing.

## 3.5     Survival

This Article 3 shall survive the Closing.

## 4.     REPRESENTATIONS AND WARRANTIES

## 4.1     Seller's Representations and Warranties

To induce Purchaser to enter into this Agreement and to consummate the transaction described in this Agreement, Seller hereby makes the representations and warranties in this Section 4.1 as of the Effective Date and the Closing Date, in each case, subject to the acknowledgment set forth in Section 3.3(a).

(a)     **Organization and Power of Seller**

Seller is duly formed, validly existing, in good standing in the jurisdiction of its formation and has all requisite power and authority to own the Interests as currently owned.

(b)     **Authority and Binding Obligation**

US 4806757v.17

Subject to obtaining the approvals set forth in Sections 6.1(a)(iv), 6.1(a)(v), 6.1(a)(vi) and 6.1(a)(vii), (i) Seller has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by it pursuant to this Agreement (collectively, the **Seller Documents**), and to perform its obligations under each of the Seller Documents, (ii) the execution and delivery by the signer on Seller's behalf of each of the Seller Documents, and the performance by Seller of its obligations under each of the Seller Documents, has been duly and validly authorized by all necessary action, and (iii) each of the Seller Documents, when executed and delivered, will constitute Seller's legal, valid and binding obligations enforceable against Seller in accordance with its terms.

(c)    **Consents and Approvals; No Conflicts**

Subject to obtaining the approvals set forth in Sections 6.1(a)(iv), 6.1(a)(v), 6.1(a)(vi) and 6.1(a)(vii), (i) no filing with or notice to and no permit, authorization, consent or approval of, any Governmental Authority is necessary for the execution or delivery by Seller of any of the Seller Documents, or its performance of any of its obligations under any of the Seller Documents or its consummation of the transaction described in this Agreement, except for (A) such filings, notices, permits, authorizations, consents or approvals that may be required under the HSR Act or other applicable antitrust or competition law or (B) such filings, notices, permits, authorizations, consents or approvals the failure of which to be obtained or made would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Interests, the TTI Facilities or Seller's ability to consummate the transaction described in this Agreement, and (ii) neither Seller's execution and delivery of any of the Seller Documents, nor its performance of any of its obligations under any of the Seller Documents, nor its consummation of the transaction described in this Agreement, will: (A) violate any provision of its organizational or governing documents; (B) violate any Applicable Law to which it is subject in any material respect; or (C) result in the creation or imposition of any Lien (other than Permitted Liens), claim or interest on the Interests or any portion thereof.

(d)    **HTEC Due Organization**

HTEC is duly formed, validly existing, in good standing in the jurisdiction of its formation.

(e)    **HTEC Capitalization**

HTEC is a duly incorporated and validly existing corporation and is in good standing in the jurisdiction of its formation, and all of the outstanding equity interests in HTEC and the HTEC Shareholder Loans are owned and held by Seller. All of the outstanding equity interests in HTEC have been duly authorized, validly issued and are fully paid and non-assessable. HTEC has no right or obligation to purchase, redeem, or otherwise acquire, or make any payment in respect of, any equity interest in HTEC and there are no existing rights granted by HTEC with respect to registration under the Securities Act of 1933, as amended, of any equity interests in HTEC.

(f)    **Ownership of the Interests**

Seller owns beneficially and of record, and has good and valid title to, the Interests, and such ownership and title is free and clear of all Liens (other than Permitted Liens), claims and interests. Upon transfer of the Interests to Seller at the Closing, Purchaser shall own beneficially and of record, and have good and valid title to, the Interests, and such ownership and title shall be free and clear of all Liens (other than Permitted Liens), claims and interests.

(g)    **Finders and Investment Brokers**

9

Except for the Financial Advisor (whose fees shall not be the responsibility of Purchaser whatsoever), Seller has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Seller in connection with the transaction described by this Agreement in a manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement.

**4.2    Purchaser's Representations and Warranties**

To induce Seller to enter into this Agreement and to consummate the transaction described in this Agreement, Purchaser hereby makes the representations and warranties in this Section 4.2 as of the Effective Date and the Closing Date.

**(a)    Organization and Power**

Purchaser is duly formed, validly existing and in good standing in the jurisdiction of its formation, and has all requisite power and authority to own, lease and operate its properties and to carry on its business as currently being conducted.

**(b)    Authority and Binding Obligation**

Subject to obtaining the approvals set forth in Sections 6.1(a)(iv), 6.1(a)(v), 6.1(a)(vi) and 6.1(a)(vii), Purchaser has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Purchaser pursuant to this Agreement (the **Purchaser Documents**), and to perform all obligations of Purchaser arising under each of the Purchaser Documents, the execution and delivery by the signer on behalf of Purchaser of each of the Purchaser Documents, and the performance by Purchaser of its obligations under each of the Purchaser Documents, has been duly and validly authorized by all necessary action by Purchaser, and each of the Purchaser Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms, except to the extent Seller itself is in default thereunder.

**(c)    Consents and Approvals; No Conflicts**

Subject to obtaining the approvals set forth in Sections 6.1(a)(iv), 6.1(a)(v), 6.1(a)(vi) and 6.1(a)(vii), no filing with or notice to and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution or delivery by Purchaser of any of the Purchaser Documents, the performance by Purchaser of any of its obligations under any of the Purchaser Documents, or the consummation by Purchaser of the transaction described in this Agreement, and neither the execution and delivery by Purchaser of any of the Purchaser Documents, nor the performance by Purchaser of any of its obligations under any of the Purchaser Documents, nor the consummation by Purchaser of the transaction described in this Agreement, will: (A) violate any provision of the organizational or governing documents of Purchaser; (B) violate any Applicable Law to which Purchaser is subject; or (C) result in a violation or breach of or constitute a default under any contract, agreement or other instrument or obligation to which Purchaser is a party or by which any of Purchaser's properties are subject.

**(d)    Hyundai Transaction**

The agreement with Hyundai referred to in Recital (E) of this Agreement provides that Hyundai shall acquire a portion of the Interests and Shareholder Loans on substantially the same economic terms as those set forth in the Joint Bid Letter.

US 4806757v.17



(e)     **Finders and Investment Brokers**

Purchaser has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Purchaser in connection with the transaction described by this Agreement in any manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement.

## 5.     COVENANTS

### 5.1     Confidentiality

(a)     **Disclosure of Confidential Information**

Seller and Purchaser shall keep confidential and not make any public announcement or disclose to any Person the existence or any terms of this Agreement or any other documents, materials, data or other information with respect to Seller, the TTI Facilities or the Interests which is not generally known to the public (the **Confidential Information**), in each case in accordance with the Confidentiality Agreement. Notwithstanding the foregoing, Seller and Purchaser shall be permitted to disclose Confidential Information to the relevant port authorities in connection with informing them of the transactions contemplated by this Agreement and obtaining the Port Approvals, to any lenders or their agents or representatives under the Financing Documents in relation to obtaining the required approvals under the Financing Documents, or to the relevant courts to the extent reasonably necessary in connection with satisfying the conditions set forth in Section 6.1(a)(iv) and (v).

(b)     **Public Announcements**

Notwithstanding Section 5.1(a), each of Seller and Purchaser shall have the right upon Closing to make a public announcement regarding the transaction described in this Agreement, **provided** that Seller and Purchaser shall approve the form and substance of any such public announcement, which approval shall not be unreasonably withheld, conditioned or delayed, except if a Party is required to make a public announcement under Applicable Law, in which case no such approval by the other Party shall be required but such Party (i) shall provide the other Party with written notice prior to the Closing that such public announcement is required under Applicable Law, and (ii) shall consult with the other Party regarding the form and substance of such public announcement.

### 5.2     Conduct of the Business

(a)     Prior to the Closing or earlier termination of this Agreement, except as otherwise provided in this Agreement, the Parties shall use their respective commercially reasonable efforts to cause the TTI Facilities and HTEC to be operated in the Ordinary Course of Business.

(b)     Prior to the Closing or earlier termination of this Agreement, except in the ordinary course of business, to the extent Purchaser consents (in its sole discretion) otherwise or as required by Applicable Law, Seller shall not, and shall not permit TTI and HTEC, to (A) change TTI or HTEC's fiscal year or any method of Tax accounting, (B) make, change or revoke any material Tax election of TTI or HTEC, (C) settle or compromise any material liability for Taxes of TTI or HTEC, (D) file any material amended Tax Return of TTI or HTEC, or (E) take any other material action (or permit TTI or HTEC to take any material actions) with respect to Tax matters.

(c)     Notwithstanding the foregoing, prior to the Closing or the earlier termination of this Agreement, Purchaser shall have the sole authority, in its sole discretion and without the approval of Seller, and at its own cost and risk, to negotiate, to agree to and to implement, for itself and on behalf of TTI, (i) the servicing of new volumes, (ii) debt and equity funding to TTI, including the incurrence of additional debt financing, (iii) any restructurings, refinancings, waivers, amendments, retirements or other variations, changes or alterations of the Financing Documents, or any other debt instruments, arrangements or understandings to which TTI is a party, in each case, in accordance with the terms and conditions of such instrument, arrangement or understanding, and (iv) any assignments, amendments, cancellations or other variations, changes or alterations of any contracts or lease agreements to which TTI or HTEC is a party, in each case, in accordance with the terms and conditions of such lease agreement. To the extent the provisions of this Section 5.2 are inconsistent with any provisions in the TTI LLC Agreement, Seller hereby waives any approval or other rights it or its director designees may have under the TTI LLC Agreement and the TTI LLC Agreement shall be deemed amended to the extent necessary to give effect to the provisions of this Section 5.2.

(d)     Notwithstanding the foregoing, promptly following the Effective Date, the Parties shall cause Mr. Kyu Kyoung Kim to resign as chief executive officer of TTI and Mr. Graham Scott to be appointed the acting chief executive officer of TTI, in each case, such action to be at no cost to Purchaser or TTI.

**5.3     Notices and Filings**

Seller and Purchaser shall use commercially reasonable efforts to cooperate with each other (at no cost or expense to the Party whose cooperation is requested, other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to provide written notice to any Person, and to effect any registrations or filings with any Governmental Authority or other Person, as may be reasonably necessary or desirable in connection with the transactions described in this Agreement.

**5.4     Port Leases**

Purchaser shall obtain a mutual release of Seller under the guarantees in connection with the Port Lease relating to the City of Long Beach at Closing.

**5.5     TTI Financing Documents**

Purchaser shall obtain a release as against Seller of all Liens, claims and interests on the TTI Interests and the TTI Shareholder Loans pursuant to the Financing Documents at Closing.

**5.6     Tax Matters**

(a)     From and after the Closing, Purchaser shall be entitled to control all matters relating to Taxes of or with respect to TTI and HTEC, including but not limited to filing any Tax Returns of TTI and HTEC and conducting any audit, litigation or other proceeding with respect to Taxes imposed on or with respect to the assets, operations or activities of TTI and/or HTEC (each a **Tax Proceeding**). Seller shall cooperate fully as and to the extent reasonably requested by Purchaser in connection with the filing of Tax Returns and the conduct of any Tax Proceeding.

US 4806757v.17



(b)   Seller shall cooperate with Purchaser to minimize, to the extent permissible under Applicable Law, the amount of any Taxes imposed on Purchaser resulting from the transactions contemplated by this Agreement and to otherwise structure such transactions in a Tax-efficient manner for Purchaser, including, to the extent requested by Purchaser, using its commercially reasonable efforts to revise the structure in order to effect such transactions in a Tax-efficient manner for Purchaser.

(c)   After the Closing, if applicable, Purchaser shall prepare and deliver to Seller an allocation of the Purchase Price and any other amounts properly treated as consideration for U.S. federal income tax purposes among the assets of each of TTI and HTEC consistent with the principles of Sections 755 and 1060 of the Code. The Parties shall, and shall cause their Affiliates to, report consistently with such allocation in all Tax Returns, unless required to do so by Applicable Law.

(d)   This Section 5.6 shall survive the Closing.

**5.7   Further Assurances**

(a)   From the Effective Date until the Closing or earlier termination of this Agreement, Seller and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions described in this Agreement, including, without limitation, (i) obtaining all necessary consents, approvals and authorizations required to be obtained from any Governmental Authority or other Person under this Agreement or Applicable Law, and (ii) effecting all registrations and filings required under this Agreement or Applicable Law. Seller and Purchaser shall consult and cooperate to determine if Notification and Report Forms must be submitted to the Department of Justice and Federal Trade Commission under the HSR Act.

(b)   The Parties will cooperate to determine if an HSR Act filing is necessary. If Purchaser determines such filing is necessary, they shall cooperate to submit any required filing and to obtain the expiration of the HSR Act waiting period as soon as practicable. The decision whether or not to make an HSR Act filing will be in the sole discretion of Purchaser. In furtherance and not in limitation of the foregoing sentence and subclause (a), each of Seller and Purchaser shall, and shall cause its respective Affiliates and its and their respective shareholders, members, partners, trustees, beneficiaries, directors, officers and employees to, take any and all commercially reasonable actions necessary, proper or advisable to avoid each and every impediment under any Antitrust Law, including obtaining the termination of any applicable waiting period under the HSR Act, or other Applicable Law or order that may be asserted by any Governmental Authority or other Person with respect to this Agreement so as to cause the conditions set forth in Article 6 to be satisfied and to enable the Closing to occur as promptly as practicable and in any event prior to the Outside Date, **provided** that in no event shall Purchaser be obliged to (i) propose or agree to sell, divest, hold separate, license or otherwise dispose of any assets, operations, divisions or businesses of Purchaser or any of its Affiliates or to effect the same, (B) take or commit to take such other actions that may limit Purchaser's and its Affiliates' freedom of action with respect to, or their ability to retain, any assets, operations, divisions or businesses of Purchaser or any of its Affiliates, or of TTI or HTEC or (C) enter into and comply with any orders, settlements, undertakings, consent decrees, stipulations or other agreements to effectuate any of the foregoing.

(c)   Seller shall take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to facilitate the tax and finance due diligence investigation by

13

Purchaser with respect to the acquisition of the HTEC Interests and the HTEC Shareholders Loans.

**5.8    Director Resignations**

Except as set forth in Section 5.2(c), on or prior to the Closing Date, Hanjin Receiver shall take all necessary actions under the TTI LLC Agreement and otherwise to remove or cause the resignation of the Hanjin Directors (as defined in the TTI LLC Agreement) and the directors of HTEC.

**5.9    D&O Matters**

Purchaser shall use reasonable endeavours to arrange for directors' and officers' liability insurance to persons appointed by Hanjin Receiver pursuant to the TTI LLC Agreement serving as a director and/or officer of TTI or HTEC immediately prior to the Closing.

**6.    CLOSING CONDITIONS**

**6.1    Mutual Closing Conditions**

**(a)    Satisfaction of Mutual Closing Conditions**

The respective obligations of Seller and Purchaser to close the transaction contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the **Mutual Closing Conditions**):

**(i)    Adverse Proceedings**

No litigation or other court action shall have been commenced seeking to obtain an injunction or other relief from such court to enjoin the consummation of the transactions described in this Agreement, and no preliminary or permanent injunction or other order, decree or ruling shall have been issued by a court of competent jurisdiction or by any Governmental Authority, that would make illegal or invalid or otherwise prevent the consummation of the transactions described in this Agreement.

**(ii)    Adverse Law**

No Applicable Law shall have been enacted that would make illegal or invalid or otherwise prevent the consummation of the transactions described in this Agreement.

**(iii)    HSR Act**

All waiting periods under the HSR Act applicable to the transactions under this Agreement (if any) shall have expired or been terminated.

**(iv)    Korean Court Approvals**

This Agreement and the transactions contemplated hereby shall have been approved prior to execution by Seller by the Korean Rehabilitation Court as required by the Debtor Rehabilitation Act and other relevant statutes in Korea, pursuant to such forms of authorization reasonably acceptable to Purchaser, and such approval shall be effective, in full force and effect, and not

US 4806757v.17



stayed.  Seller shall have provided Purchaser with evidence of such approval upon execution of this Agreement.

### (v)    United States Bankruptcy Court Approvals

Pursuant to an order in form and substance reasonably acceptable to Purchaser (including provisions deeming Purchaser a "good faith" purchaser and providing for the transfer of the Interests and the Shareholder Loans free and clear of all Liens, claims and interests (other than Permitted Liens)), the United States Bankruptcy Court for the District of New Jersey overseeing the Chapter 15 proceedings of Seller shall have approved this Agreement and the transactions contemplated hereto and given recognition and full force and effect to the approval of the Korean Rehabilitation Court, and such order shall be effective, in full force and effect, and not stayed.  Such order shall provide that in the event Closing does not occur, any and all rights, remedies, privileges, arguments and the like of the Parties are preserved and reserved, and in the absence of Closing nothing in this Agreement shall be deemed an admission against either Party in such proceeding.

### (vi)    Port Leases

To the extent required under the Port Leases, the relevant port agencies under the Port Leases shall have approved the change in control in respect of TTI and the related transactions contemplated by this Agreement in accordance with the Port Leases (the foregoing approvals being referred to herein collectively as the **Port Approvals**).

### (vii)    TTI Financing Documents

The releases contemplated by Section 5.5 of this Agreement shall have been obtained in form and substance reasonably satisfactory to Seller and Purchaser.

### (b)    Failure of Mutual Closing Condition

Except as expressly provided in Section 6.4 and Article 9, if any of the Mutual Closing Conditions is not satisfied at Closing, then each Party shall have the right to terminate this Agreement by providing written notice to the other Party in which case the Parties shall have no further rights or obligations under this Agreement, except for those which expressly survive such termination.

## 6.2    Purchaser Closing Conditions

### (a)    Satisfaction of Purchaser Closing Conditions

In addition to the Mutual Closing Conditions, Purchaser's obligations to close the transactions described in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the **Purchaser Closing Conditions**):

### (i)    Interests and Assigned Shareholder Loans

Seller shall have delivered to Purchaser (x) the Interests, including in each case any certificates representing ownership thereof (if any), accompanied by all proper instruments evidencing the valid transfer of such Interests to Purchaser and (y) an assignment of the Shareholder Loans in form and substance reasonably satisfactory to Purchaser, and following such deliveries, the

15



Interests and the Shareholder Loans shall be held by Purchaser free and clear of all Liens (other than Permitted Liens), claims and interests.

(ii)     **U.S. Tax Certifications**

Seller shall have delivered to Purchaser (x) a U.S. Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, with respect to Seller, and (y) any other withholding forms or documentation reasonably requested by Purchaser.

(iii)     **Representations and Warranties**

The representations or warranties of Seller in this Agreement (as qualified by any schedules to this Agreement and any amendments or supplements to such schedules) shall be true and correct as of the Closing Date (or as of such other date to which such representation or warranty expressly is made), except to the extent any breach of such representations or warranties would not prevent Seller from consummating the transactions described in this Agreement.

(iv)     **Covenants and Obligations**

The covenants and obligations of Seller in this Agreement, to the extent required to have been performed prior to Closing, shall have been performed in all material respects.

(v)     **No Bankruptcy Proceedings**

Neither TTI nor any of its subsidiaries shall be subject to any case or proceeding under title 11 of the United States Code.

(vi)     **HTEC Matters**

With respect to the acquisition of the HTEC Interests and the HTEC Shareholders Loans (and the payment of the portion of the Purchase Price related thereto), Purchaser shall be satisfied with the results of its tax and finance due diligence investigation in its sole reasonable discretion.

(b)     **Failure of Purchaser Closing Condition**

Except as expressly provided in Section 6.4 in the case of a Seller default, if any of the Purchaser Closing Conditions is not satisfied at Closing, then Purchaser shall have the right (i) to terminate this Agreement by providing written notice to Seller, in which case the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (ii) to waive any of the Purchaser Closing Conditions at or prior to Closing.

**6.3     Seller Closing Conditions**

(a)     **Satisfaction of Seller Closing Conditions**

In addition to the Mutual Closing Conditions, Seller's obligations to close the transactions contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the **Seller Closing Conditions**):

(i)     **Receipt of the Purchase Price**

US 4806757v.17



Purchaser shall have paid to Seller the Purchase Price by wire transfer of immediately available funds in accordance with Section 2.3.

(ii)    **Accession Agreement**

Purchaser shall have delivered an accession agreement or equivalent instrument reasonably satisfactory to Seller whereby Purchaser agrees to be bound by all of the terms and provisions of the TTI LLC Agreement attributable to the TTI Interests.

(iii)    **Reserved**

(iv)    **Representations and Warranties**

The representations or warranties of Purchaser in this Agreement (as qualified by any schedules to this Agreement and any amendments or supplements to such schedules) shall be true and correct as of the Closing Date (or as of such other date to which such representation or warranty expressly is made), except to the extent any breach of such representations or warranties would not prevent Purchaser from consummating the transactions described in this Agreement.

(v)    **Covenants and Obligations**

The covenants and obligations of Purchaser in this Agreement, to the extent required to have been performed prior to Closing, shall have been performed in all material respects.

(b)    **Failure of Seller Closing Condition**

Except as expressly provided in Section 6.4 and Article 9 in the case of a Purchaser default, if any of the Seller Closing Conditions is not satisfied at Closing, then Seller shall have the right to (i) terminate this Agreement by providing written notice to Purchaser, in which case the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (ii) waive any of the Seller Closing Conditions at or prior to Closing.

**6.4**    **Frustration of Closing Conditions**

Seller and Purchaser may not rely on the failure of the Mutual Closing Conditions, Seller Closing Conditions or Purchaser Closing Conditions, respectively, if such failure was caused by such Party's failure to act in good faith or to use its commercially reasonable efforts to cause the Closing to occur.

**7.**    **CLOSING**

**7.1**    **Closing Date**

The closing of the transactions described in this Agreement (the **Closing**) shall take place at the offices of Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020 at 10:00 a.m. (Eastern Standard Time) on the date that is five (5) Business Days following satisfaction or waiver of the conditions set forth in Article 6 (other than with respect to conditions related to closing deliverables, which shall be satisfied on the Closing Date), or on such other date, time or place as is agreed to in writing by the Parties; **provided, however,** that in no event shall the Closing occur later than one hundred and eighty (180) days after the Effective Date (such date being the **Outside Date**). If the Closing does not occur by the Outside Date other than as a result of a default hereunder by a Party

US 4806757v.17



(which shall be governed by Section 9), then this Agreement shall automatically terminate in which case the Parties shall have no further rights or obligations under this Agreement, except for those which expressly survive such termination. The date on which the Closing occurs is referred to herein as the **Closing Date.**

**7.2     Closing Escrow**

At or prior to the Closing, the Parties shall enter into a closing escrow agreement with a reputable escrow agent to be appointed by Seller in form and substance reasonably acceptable to Seller, Purchaser, the Financial Advisor and such escrow agent. Such agreement will provide for the Purchase Price or any amount payable pursuant to Article 9 to be paid by Purchaser into a closing escrow account established under such agreement, and for funds to be released as specified therein, in each case, such payment of funds by Purchaser into such escrow account to be in full and final satisfaction of any and all corresponding payment obligation of Purchaser under this Agreement.

**8.      TRANSACTION COSTS**

**8.1     Seller's Transaction Costs**

In addition to the other costs and expenses to be paid by Seller set forth elsewhere in this Agreement, Seller shall pay for the following items in connection with this transaction: (i) the commission or other fees due to the Financial Advisor; and (iii) the fees and expenses of its own attorneys, accountants and consultants.

**8.2     Purchaser's Transaction Costs**

In addition to the other costs and expenses to be paid by Purchaser as set forth elsewhere in this Agreement, Purchaser shall pay for the following items in connection with this transaction: (i) any sales or similar tax and recording charges payable under Delaware law in connection with the conveyance of the Interests; and (ii) the fees and expenses of its own attorneys, accountants and consultants.

**9.      REMEDIES**

In the event that, at Closing, all Mutual Closing Conditions and Purchaser Closing Conditions have been satisfied and Purchaser nevertheless elects not to effect the Closing and consummate the transactions contemplated hereby, Seller shall have as its sole and exclusive remedy the right to claim liquidated damages from Purchaser in an amount equal to 25% of the Purchase Price without any set-off, deduction or counterclaim whatsoever, which the Parties acknowledge and agree is a reasonable estimate of the anticipated harm caused by any such breach. For the avoidance of doubt, Seller's remedies pursuant to this Section 9 shall only be against Purchaser, and such remedies shall be the sole and exclusive remedy of Seller against Purchaser in connection with this Agreement.

**10.     MISCELLANEOUS PROVISIONS**

**10.1    Notices**

(a)      **Method of Delivery**

All notices, requests, demands and other communications required to be provided by any Party under this Agreement (each, a **Notice**) shall be in writing and delivered, at the sending Party's cost and

US 4806757v.17



expense, by (i) personal delivery, (ii) certified U.S. mail, with postage prepaid and return receipt requested, (iii) overnight courier service, or (iv) in PDF format by electronic mail transmission, with a verification copy sent on the same day by any of the methods set forth in clauses (i), (ii) or (iii), to the recipient Party at the following address or facsimile number:

(i)    **If to Seller:**

Hanjin Shipping Co., Ltd.
25 Gukjegeumyung-ro 2-gil,
Yeongdeungpo-gu,
Seoul 150-949
Republic of Korea
Attn:    Kuk-We Jeong
Email: kwjeong@hanjin.com

With a copy to:

Allen & Overy LLP
1221 Avenue of the Americas
New York, New York 10019
Attn:    Kent Rowey
Email: kent.rowey@allenovery.com

(ii)    **If to Purchaser:**

Terminal Investment Limited S.à r.l.
28, Boulevard d'Avranches
L-1160 Luxembourg
Grand Duchy of Luxembourg
Attn:    Alistair Baillie
Email: abaillie@tilgroup.com

With a copy to:

Vinson & Elkins LLP
666 Fifth Avenue
New York, New York 10103
Attn:    Steven M. Abramowitz
Email: sabramowitz@velaw.com

(b)    **Receipt of Notices**

All Notices sent by a Party (or its counsel pursuant to Section 10.1(d)) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the physical address or email address of the recipient Party, **provided** that such delivery is made prior to 5:00 pm (local time for the recipient Party) on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such physical address or email address, and such recipient Party failed to provide the sending Party with its current physical address or email address pursuant to Section 10.1(c).

US 4806757v.17

    (c)    **Change of Address**

The Parties and their respective counsel shall have the right to change their respective physical address and/or email address for the purposes of this Section 10.1 by providing a Notice of such change in physical address and/or email address as required under this Section 10.1.

    (d)    **Delivery by Party's Counsel**

The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Party hereto.

**10.2**    **Time is of the Essence**

Time is of the essence of this Agreement; **provided, however,** that notwithstanding anything to the contrary in this Agreement, if the time period for the performance of any covenant or obligation, satisfaction of any condition or delivery of any Notice or item required under this Agreement shall expire on a day other than a Business Day, such time period shall be extended automatically to the next Business Day.

**10.3**    **Assignment**

This Agreement and the rights hereunder are not assignable by either Party unless such assignment is consented to in writing in advance by the other Party. Notwithstanding anything to the contrary herein, Purchaser shall have the ability, without Seller's consent, to assign any of its rights, benefits and obligations under this Agreement to any Person so long as Purchaser remains liable for the performance by any such assignee of its obligations under this Agreement. Seller agrees to enter into such amendments to this Agreement as may be reasonably required to give effect to this Section 10.3 so long as such amendments do not adversely affect the rights of Seller hereunder.

**10.4**    **Successors and Assigns**

This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and (subject to Section 10.3) assigns.

**10.5**    **Third Party Beneficiaries**

This Agreement shall not confer any rights or remedies on any Person, other than (a) the Parties and their respective successors and (subject to Section 10.3) assigns, and (b) any Indemnitee to the extent such Indemnitee is expressly provided any right of defense or indemnification in this Agreement.

**10.6**    **GOVERNING LAW**

THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY PRINCIPLES REGARDING CONFLICT OF LAWS.

**10.7**    **Rules of Construction**

The following rules shall apply to the construction and interpretation of this Agreement:

US 4806757v.17



(a)     Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

(b)     All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement and all references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, in each case unless otherwise expressly stated or clearly apparent from the context of such reference.

(c)     The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

(d)     Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and therefore any rules of construction requiring that ambiguities are to be resolved against the Party which drafted the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

(e)     The terms **hereby, hereof, hereto, herein, hereunder** and any similar terms shall refer to this Agreement, and not solely to the provision in which such term is used.

(f)     The terms **include, including** and similar terms shall be construed as if followed by the phrase "without limitation."

(g)     The term **sole discretion** with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

## 10.8    Severability

If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected term or provision at any other time or in any other jurisdiction.

## 10.9    JURISDICTION AND VENUE

ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT SHALL BE CONDUCTED IN NEW YORK STATE COURT, OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK SITTING IN THE CITY AND COUNTY OF NEW YORK (AND ANY APPELLATE COURT FROM ANY THEREOF), AND EACH OF SELLER (FOR ITSELF AND ALL ITS INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL ITS INDEMNITEES) HEREBY SUBMITS TO JURISDICTION AND CONSENT TO VENUE IN SUCH COURTS, AND WAIVES ANY DEFENSE BASED ON *FORUM NON CONVENIENS*.

US 4806757v.17

**10.10    WAIVER OF TRIAL BY JURY**

EACH PARTY HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT.

**10.11    Prevailing Party**

If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any Party to enforce its rights under this Agreement against any other Party, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, incurred by the prevailing Party in such litigation, action, arbitration or proceeding shall be reimbursed by the losing Party; **provided,** that if a Party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis.

**10.12    Incorporation of Recitals, Exhibits and Schedules**

The recitals to this Agreement, and all exhibits and schedules referred to in this Agreement are incorporated herein by such reference and made a part of this Agreement.  Any matter disclosed in any schedule to this Agreement shall be deemed to be incorporated in all other schedules to this Agreement.

**10.13    Entire Agreement**

This Agreement sets forth the entire understanding and agreement of the Parties hereto, and shall supersede any agreements and understandings (written or oral) between the Parties on or prior to the Effective Date with respect to the transaction described in this Agreement.

**10.14    Amendments, Waivers and Termination of Agreement**

No amendment or modification to any terms or provisions of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

**10.15    Survival**

Except as otherwise expressly set forth in this Agreement, the representations, warranties, covenants, liabilities and obligations of the Parties shall not survive the Closing.

**10.16    Execution of Agreement**

A Party may deliver executed signature pages to this Agreement by facsimile transmission to any other Party, which facsimile copy shall be deemed to be an original executed signature page.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

[signature page follows]

US 4806757v.17

22



**IN WITNESS WHEREOF,** each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.

**Terminal Investment Limited S.à r.l.**

By: _____

Name: _____

Title: _____

**Hanjin Shipping Co., Ltd.**

By: _____

Name: Tai Soo SUK

Title: Custodian